UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARIADNA JACOB and INFLUENCES, INC.

        Plaintiffs,

 -against-

TAYLOR LORENZ, and THE NEW YORK TIMES COMPANY,

        Defendants.

No.: 1:21-cv-06807-ER

**AMENDED COMPLAINT**

---

ARIADNA JACOB ("*Jacob*") and INFLUENCES, INC. ("*Influences*" and, together with Jacob, the "*Plaintiffs*"), as and for their Amended Complaint against TAYLOR LORENZ ("*Lorenz*") and THE NEW YORK TIMES COMPANY ("*The Times*" and, together with Lorenz, the "*Defendants*"), allege as follows:

## NATURE OF THE ACTION

1. Plaintiffs brings this action against Defendants for a defamatory article published by Defendants on August 14, 2020 (the "*Article*").[1] The Article makes numerous false and disparaging statements of fact of and concerning Plaintiffs.

2. Plaintiffs bring claims for libel *per se* and libel *per quod* based on the Article, seeking actual damages for reputational injuries, compensatory damages, and special damages for lost contracts resulting from the defamatory Article.

---

[1] *See* https://www.nytimes.com/2020/08/14/style/influences-tiktok-management-brittany-broski.html (last visited November 19, 2021).

## THE PARTIES

3. Plaintiff Jacob is a natural person who is domiciled in the State of Nevada. She may be contacted through undersigned counsel.

4. Plaintiff Influences is a Delaware corporation with its principal place of business in Nevada. It may be contacted through undesigned counsel of record.

5. Defendant Lorenz is a natural person who is believed to be currently domiciled in the State of California but may be served at her place of employment at 620 EIGHTH AVENUE, NEW YORK, NY, 10018. She has previously appeared in this action through her counsel.

6. Defendant *The Times* is a New York Corporation with its principal place of business in New York and may be served with process through its Chief Executive Officer, MEREDITH KOPIT LEVIEN, at 620 EIGHTH AVENUE, NEW YORK, NY, 10018. It has previously appeared in this action through her counsel.

## JURISDICTION, VENUE, AND CHOICE OF LAW

7. This court has jurisdiction over this case pursuant to 28 U.S.C. § 1332. There is complete diversity between the parties and the amount in controversy exceeds $75,000.00.

8. Personal jurisdiction over Defendants is proper under New York CPLR § 301. This Court has general personal jurisdiction over Defendant *The Times*, who, is headquartered and incorporated in New York and regularly conducts business in New York. This Court has specific personal jurisdiction over Defendant Lorenz because she: (1) wrote, or at least began writing, the Article in New York; (2) acted in concert with *The Times,* a New York corporation, in writing the Article; and (3) used the *Times'* investigative and other resources that are located in New York to write the Article, which create sufficient minimum contacts with New York so as not to offend traditional notions of fair play and substantial justice.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)-(2) because at least one Defendant resides in this district.

10. California substantive law applies to the claims brought by Plaintiffs herein. First, both Plaintiffs were citizens of California at the time the Article was researched and published. Second, the Article focused entirely on California, Plaintiffs and other witnesses' activities in California, California labor laws, proceedings before the California Labor Commission, and using sources residing in California at the time the Article was written. In fact, although Plaintiff initially believed Defendants' two "experts" who were interviewed for the Article were based in New York, these witnesses are and were also based in California, making every single source Defendants disclosed as being interviewed for the Article residing in California at the time the Article was researched and written. Finally, Plaintiffs believe that for a least part of the researching and/or drafting of the Article, Defendant Lorenz resided in California.

## FACTS

### A. Plaintiffs' Backgrounds.

11. Plaintiff Jacob was born in Mexico City, Mexico. She immigrated to the United States as a small child, having lost her father at a young age.

12. In 2018 she became the founder and CEO of Influences (www.influences.com), which was a leading online creator management and influencer marketing company. Jacob was a pioneer in the now multi-billion-dollar influencer industry on the TikTok ("*TikTok*") social media application.

13. Ms. Jacob has managed, counseled, and guided dozens of TikTok influencers, including some of the most recognizable names and faces in the industry. Indeed, at different

points in time, Influences had a roster that boasted over 85 TikTok superstars, including five of the seven creators currently listed on the Forbes top earning TikTok creator's list.

14. Jacob was perfectly positioned to understand the emerging medium of TikTok. Her understanding of computer coding, SEO, and social media gave her insight into the platform's more technical details, while her background in traditional marketing and branding, including her acclaimed work for household brand and advertising agency names such as L'Oréal, GoDaddy, Universal Music Group, the LA Chargers, MasterCard, Lids, and Vayner Media, provided her knowledge of (and relationships with) companies with substantial marketing budgets – budgets that increasingly reserved substantial funds for online social media spends.

15. Social media in general has never been bigger, more profitable, and more omnipresent and it continues to grow. Jacob was poised to be on the brink of making substantial profits until August 2020 when, as discussed below, her life's work was derailed by Defendants' defamation.

16. TikTok in particular became a cultural phenomenon over the last year, driven not only by its own features, marketing, and word-of-mouth, but by the quarantines that have kept both kids and adults tied to screens more than ever before. In short, Ms. Jacob was uniquely situated to do something that others could not: building a bridge between the traditional world of marketing and branding and the new, rapidly evolving world of TikTok, all while making millions for her roster of talented clients.

17. Given her success, innovation, and impeccable timing, it is not at all surprising that some might envy Ms. Jacob for her success and innovation.

18. Enter: Taylor Lorenz.

B. **Lorenz Targets Jacob to Write A "Hit Job".**

19. Lorenz is currently a technology columnist with *The Times*. She was raised in Greenwich, Connecticut and attended boarding school in Switzerland.[2]

20. On approximately August 10, 2020, Lorenz reached out to Jacob with a text message claiming that she wanted to have a call with Jacob to "chat".

21. Jacob was suspicious and had one of her associates reach out to Lorenz in response to her request. Realizing she had been "made", Lorenz then disclosed that she was, in fact, in the process of doing a "story" on multifarious allegations of impropriety on behalf of Jacob and Influences. Lorenz had planned to ambush Jacob with these questions on a phone interview disguised as a friendly "catch up" phone call.

22. Jacob, through her publicist, asked for a list of questions from Lorenz so that she could respond to the pertinent allegations. Lorenz then sent an email providing a list of 27 questions, demanding a response by a deadline of only 5 business hours (email sent at noon, response due at 9am) hours away.

23. Lorenz clearly had been plotting the hit job piece for some time and only went through the perfunctory exercise of getting Plaintiffs' "side of the story" so she could pretend to have done an "investigation" when in reality she wanted to put Plaintiffs through a last-minute fire drill believing they simply would not respond.

24. However, Jacob and her attorney provided documentation and offered to provide evidence on background to Lorenz so that none of Influences' prior agreements would be breached via publishing of private documents. Lorenz then sent back another list of 12 new questions which were promptly responded to by Jacob's attorney. Lorenz followed with an email that purported to

---

[2] https://en.wikipedia.org/wiki/Taylor_Lorenz (last visited November 19, 2021).

summarize the "facts" and managed to slip in an additional 12 questions with an equally unreasonable deadline for Plaintiffs to provide evidence. Nonetheless, they did so and provided documentation refuting numerous accusations of malfeasance by Plaintiffs.

25. In fact, Plaintiffs also offered to provide copious amounts of documentary evidence to Lorenz that would have even more thoroughly refuted the false allegations but, because of Plaintiffs' contractual confidentiality restrictions, were only able to do so as "on background" or "off the record". Lorenz had allowed and relied upon "on background" and "off the record evidence" for the many persons she had allegedly interviewed to create the mosaic of false allegations regarding Plaintiffs. However, Lorenz refused to grant Plaintiffs these same courtesies in refuting their accusers' false allegations. This is evidence of Defendants' aversion to the truth, commitment to a pre-conceived narrative, and utter reckless disregard for the truth. Defendants set up the rules of the game to allow "off the record" evidence to create a defamatory story but refused to allow "off the record" evidence to rebut it.

26. Lorenz's ambush was foiled. However, as Plaintiffs would soon learn, she and *The Times* chose to publish the defamatory Article anyway, believing their status and power with the mainstream media would armor them against any liability for lying.

C. **Defendants Publish The Article.**

27. On August 14, 2020—just four days after initially contacting Plaintiffs—Defendants published the Article. It was entitled "*Trying To Make It Big Online? Getting Signed Isn't Everything*". The sub headline read "*Young people come to Los Angeles in droves with dreams of fame and fortune. Once they're discovered, it's not always sunny.*"

28. Defendants then waste no time informing the reader of an example of the "rain" on these aspiring young people's otherwise sunny "parade" – Ariadna Jacob and Influences.

Immediately below the headlines is a picture of Jacob and some of the influencers she represented. The caption to the photo identifies both Jacob and Influences and says that they turned these influencers dream "into a living nightmare". This set the tone and provided the context for the defamatory statements and impressions of fact created by the Article.

29. Defendants then quote two of Plaintiffs' former clients who lived in the "Kids Next Door" ("*KND*") influencer house: Marcus Olin ("*Olin*") and Jesse Underhill ("*Underhill*"). Defendants quote Olin as claiming that he was misled by Plaintiffs into believing that Plaintiffs would provide a guaranteed quota of brand deals that would generate sufficient revenue for the KND influencers to cover their share of the rent (Plaintiffs were paying approximately half the rent). This was false and Plaintiffs refuted this claim to Defendants prior to publication of the Article.

30. Defendants then quote Underhill who falsely claimed that the KND influencers were without Wi-Fi for a month, which disenabled them from "going live" with their influencer content. This was false and Defendants never even asked Plaintiffs about this issue prior to publication of the Article.

31. Defendants then suggested that Underhill and Olin's financial struggles (and, by implication, all the KND influencers) were due to Plaintiffs' failure to provide Wi-Fi and brand deals. Of course, Defendants fail to disclose that Underhill's real reason for his struggle with brand deals (and thus financial struggles) was due to his TikTok account suspension for failure to follow user guidelines – a suspension that Plaintiffs worked diligently to help him alleviate on May 28, 2020, which Lorenz was also aware of.

32. Defendants then claim that at the end of July 2020 Plaintiffs informed the KND influencers that they would have to "cover a larger share of the rent". This was false and Plaintiffs

refuted this claim to Defendants prior to publication of the Article. Plaintiffs merely demanded that the KND influencers comply with their contractual obligations.

33. Defendants next falsely claim that the above-referenced actions by Plaintiffs resulted in the "living nightmare" for "all" of the KND of a "financial crunch" caused by Plaintiffs, which caused half of the KND to move out.

34. Defendants then include a section heading entitled "Have You Made Any Money?". This was referring to the alleged statements made by one of Plaintiffs' former clients, Brittany Tomlinson ("***Tomlinson***"), who claimed that Jacob had messaged her asking her "have you made any money" after one of Tomlinson's videos went viral. But this was false, and the messages show that Plaintiffs never used those words or anything synonymous with those words. Defendants did not even ask Plaintiffs for information on this issue prior to publication. And regardless of whether this is defamatory in and of itself, it sets the tone of the Article to portray Plaintiffs as unethical and unscrupulous and also demonstrates Defendants' reckless disregard for the truth.

35. Then, continuing Defendants' verbal montage describing Tomlinson's background with Jacob, Defendants quoted Tomlinson as saying that Jacob told her that she had been mentored by entrepreneur Gary Vaynerchuk ("***Vaynerchuk***"). Defendants then parenthetically claimed that "Mr. Vaynerchuk said he has no affiliation with Influences". Defendants' juxtaposition made it appear that Jacob had made a false claim to Tomlinson. But it was, in fact, true that Vaynerchuk had mentored Jacob, regardless of his "affiliation" status with her new company, Influences. Lorenz purposefully phrased the question to Plaintiffs to include "mentor" verbiage and phrased the question to Vaynerchuk with "affiliation" verbiage so as to manufacturer an apparent "inconsistency" to fit the preconceived narrative. In fact, Vaynerchuk offered Tomlinson a spot

8

on a super bowl commercial expressly because of Tomlinson's relationship with this friend and protégé, Jacob. Defendants were aware of these facts prior to publication of the Article.

36. Defendants then deceptively purport to answer the rhetorical question in the section heading as to whether Tomlinson had "made any money" by falsely suggesting that Plaintiffs had been withholding or delaying payment to Tomlinson of "tens of thousands of dollars". They quote Tomlinson as stating that "[b]y January, I realized I hadn't been paid since Halloween." Defendants then claim that "Tomlinson reached out to the brands she'd worked with and discovered that she was owed tens of thousands of dollars".

37. First, Tomlinson was not signed to Influences on the business agreement the Article refers to, but Tomlinson rather was signed to another company in which Jacob was one-third owner called "Creator Edge" ("*Creator Edge*").[3] Defendants knew this but nonetheless falsely suggested that it was Influences that was responsible for owing, but failing to pay, any fees to Tomlinson. And regardless of whether this is defamatory in and of itself, it sets the tone of the Article to portray Plaintiffs as unethical and unscrupulous and also demonstrates Defendants' reckless disregard for the truth.

38. Second, and more importantly, regardless of who owed the fees, Tomlinson's fees were not withheld, but had not yet been received from the brands. Records showed that all of Tomlinson's fees were being paid within five days of receipt by the brands. Any delay was due to late payments by the brands themselves – not Jacob or any entity she was involved with. Defendants knew this prior to publication of the Article but chose to lie and create a false and

---

[3] Although Tomlinson's agreement does appear to reference Influences as a "dba" of Creator Edge, this was a misnomer and is incorrect. Creator Edge and Influences are separate and distinct legal entities, and one is not a fictitious name, assumed name, or trade name of other. They are simply affiliated companies because Jacob is a common owner/officer. Lorenz (assuming she even reviewed the Tomlinson agreement prior to authoring the Article) is a sophisticated, educated, and intelligent journalist and should have understood this distinction. The signatories to the agreement were Tomlinson and Creator Edge – not Influences.

misleading impression. In fact, Lorenz had authored an article in *The Atlantic* in November 2018 wherein she specifically lamented the delay that influencers suffer in submitting content and receiving payment from brands.[4]

39. Defendants then go on to quote "experts" whose opinions, when juxtaposed with the false statements of fact discussed above regarding Tomlinson and the KND influencers, make it appear that even entering into contracts with influencers and/or attempting to enforce them is "unethical" and "unheard of".

40. The next section heading is titled "*I Had to Make Tough Decisions*". Defendants then provide quotations from Tianna Singer ("**Singer**") who, contrary to Defendants' claims in the Article, was not even managed by Plaintiffs. Rather, Singer was allowed to stay in the influencer house known as "The Girls in the Valley" ("**GIV**") and produce content in exchange for agreeing to a release of liability and a non-disclosure agreement. Singer was never under contract to contribute toward rent as were, for example, the KND and the GIV. She was simply allowed to be a guest of the GIV given she followed the rules and complied with agreements she signed. Defendants never investigated or asked Plaintiffs about these issues.

41. These false statements, when juxtaposed with the false quotes from Singer—that Plaintiffs falsely had promised her brand deals and income—further reinforce Defendants' false narrative that Plaintiffs "lock up" influencers into contracts, only to exploit and financially cripple them.

42. Defendants then proceed to provide quotations from Singer—not even managed by Plaintiffs—lamenting that Jacob would "show up" and monitor barely-adults in a house that Plaintiffs were legally responsible for. The security camera in the kitchen Defendants referred to

---

[4] https://amp.theatlantic.com/amp/article/578767/ (last visited November 19, 2021).

allegedly being installed "without the consent" of the GIV house members was, in fact, contractually agreed to. Yet another fact disclosed to Defendants prior to publication that refuted the false claims and which Defendants ignored.

43. Defendants also misleadingly suggest that Plaintiff threatened to throw out all the GIV girls unless they posted content "at least eight times a day". This was false. The GIV girls were asked to leave because of their failure to honor their contractual obligations and due to ethical violations. Plaintiffs never made posting content "at least eight times a day" a condition of remaining in the house. Also, as discussed above, influencers such as Singer were only staying at the house on a "trial run".

44. Collectives such as GIV were developed to operate like creator incubators. The value of spending time in a collaboration house to collaborate through consistent content and creation. The same way a startup incubator provides guidance through experienced mentorship, Influences often coached the members, helped them brainstorm ideas and provided useful information. For example, various platforms' algorithms favor consistency in posting. With Lorenz's extensive knowledge in the influencer space, she should have known that making two Instagram stories, three TikToks, and two photo posts for creators who have a tiny following is the only way to grow and to suggest this was some type of "slave labor" demonstrates Lorenz's malice aforethought to create a false impression. Defendants never even questioned Plaintiffs regarding these issues, despite asking scores of other questions.

45. Singer was ultimately asked to leave due to breaking rules such as hosting parties during COVID quarantine, drinking underage, and essentially becoming a deadbeat influencer who took advantage of Plaintiffs' creator house without generating results.

46. Defendants then claim that the GIV and Jacob had an "escalating verbal fight" that "resulted in several calls to local authorities to intervene." This statement, when juxtaposed with Defendants' statements that the GIV girls were "intimidated" by "explosive" conversations with Jacob creates the clear impression that Jacob's aggression and intimidation caused the GIV girls to call authorities. This is a lie and Defendants knew it.

47. This is because prior to publication of the Article, Defendants were informed that it was, in fact, Jacob who had called authorities—twice—on the girls because of their aggressive and threatening behavior. Moreover, prior to publication, Defendants were also informed of the "farewell vandalism" the GIV girls did on "move out day", which also were the basis of Jacob's calls to the police:



48. The fact that Lorenz suggested that Jacob was somehow responsible for the authorities being called, while ignoring the clear evidence to the contrary presented to her is a sickening, but all too uncommon event in today's mainstream and blatantly dishonest media.

49. Defendants then falsely suggest that Jacob threatened to "manipulate" another former client, Devion Young ("*Young*"), using "nude photos" of him to "shame him" and had, in fact, leaked the photos to Young's friends and business connections. This is completely false as Young had admitted to Jacob in previous messages that his nude photos were leaked from a cloud account that had nothing to do with Jacob. Defendants lied nonetheless stating only that Jacob denied "publicly" leaking the photos, leaving open the possibility that she did, in fact, "leak" them to a smaller group.

50. Further, Plaintiffs' termination of their relationship with Young's group—the "Drip Crib"—had nothing to do with any dispute over rent payments. Defendants invented this to further buttress the false narrative of Plaintiffs using heavy-handed tactics with influencers regarding rent payments. Rent had nothing to do with the falling out of this relationship and Defendants' link to a hyperlink story claiming to show this does not, in fact, even make this claim. Rather, it claims the Drip Crib had a rent problem with a third party – not Plaintiffs.

51. The final section heading in Defendant's hit job was entitled "Parenting in the Influencer Age." Defendants talk about how Singer's mother described Jacob's behavior as "shameful" for "taking advantage" of her daughter's "access to a lot of money". But as Defendants were informed prior to publication, Singer was not even "under contract" as Singer's mother claimed and Singer was a deadbeat influencer who was unable to generate enough followers or revenue-producing content to justify her staying the GIV house past a trial run.

52. Defendants then claim that Plaintiffs attempted to sign 16-year-old Ellie Zeiler ("*Zeiler*") to a contract, but her mother refused after "discovering" that Plaintiffs had already added Zeiler to Influence's marketing deck. As Defendants were informed prior to publication, Plaintiffs never presented Zeiler with a management contract and even specified that any agreement did not

13

have to be in writing. In addition, Zeiler was not on any "marketing deck" for Influences, as no such deck existed. Rather, Zeiler was listed on the GIV informational deck, which Zeiler's mother knew of, approved of, and even gave advice on. Later, once Zeiler's mother asked for her to be removed, Plaintiffs immediately removed her without controversy. Further, contrary to Defendants' false accusations in the Article, Jacob never referred to herself as Zeiler's "manager". Defendants were expressly made aware of this, but still wrote the false and defamatory statements.

53. Moreover, Zeiler actually *did* sign a brand agreement with Jacob on July 31, 2020, which completely belies the suggestion that there was no contractual relationship between Jacob and Zeiler – all facts Defendants were made aware of but nevertheless lied about.

**D. The Devastating Aftermath Of Defendants' Lies.**

54. Within days after the Article was published, Loreal informed Plaintiffs that it was no longer proceeding with its branding agreement with Influences. Numerous influencers under contract with Influences breached their agreement, citing Defendants' false allegations of illegal and unethical conduct supposedly committed by Plaintiffs.

55. Influencers, brands, and social media platforms now refuse to work with Plaintiffs based on the false allegations in the Article. Influences lost all its clients. Jacob had to seek mental health treatment and had suicidal ideations after seeing her life's work destroyed by a spoiled dilettante whose life of privilege enabled her to use the megaphone of *The Times* to send shockwaves through Plaintiffs' world and destroy her career.

56. As a result of the defamatory Article and ensuing destruction of Plaintiffs' business and finances, Plaintiffs—who lived in California at the time of the Article's publication—were forced to relocate to Las Vegas, Nevada to seek new careers and business ventures.

57. Several of the influencers who were formerly with Influences landed at one of the largest talent-representation firms in the world – United Talent Agency ("*UTA*"). UTA was a direct competitor with Plaintiffs.

58. Just prior to publishing the Article, Lorenz signed a "book deal" with a Simon and Shuster-affiliated company to write content regarding social media. Who represented Lorenz in procuring that deal? None other than UTA. Lorenz clearly had an economic motive to assist UTA—her agents—by wrecking one of its competitors with a "news story" riddled with defamatory allegations of illegal and unethical conduct that would give Plaintiffs' clients an excuse to breach their contracts and land at UTA.

## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION
(Both Plaintiffs:  Libel *per se* and *per quod*)

59. Plaintiffs repeat and re-allege all the foregoing allegations of the Complaint as if set forth fully herein.

60. As described above, Defendants published false statements of fact of and concerning Influences and of and concerning Jacob. In addition, and in the alternative, even if every statement in the Article were literally true and/or were statements of opinion, when juxtaposed and arranged as Defendants did in the Article, the Article created the false impressions/gists that Plaintiffs committed illegal behaviors and that they engaged in unethical business behaviors, as described above. This includes, but is not limited to, that: (1) Plaintiffs "leaked" nude photos of a client; (2) Plaintiffs had the police called on them by clients for threatening and intimidating behaviors: (3) Plaintiffs lied about the status of their business relationships with influencers and business partners; (4) Plaintiffs acted unethically by signing clients to unconscionable contracts that caused them financial ruin; (5) Plaintiffs failed to honor

15

their contractual obligations with their clients. The reasonable and ordinary reader of the Article would have drawn the conclusions, impressions, and gists from the innuendo and juxtaposition of statements of fact and opinion in the Article.

61. The statements, impressions, and gists were made on private business matters between Plaintiffs and their clients/business associates. There was no matter of public concern related to the statements, impressions, and gists. Defendants acted under no privilege in publishing the statements, impressions, and gists in the Article and, to the extent there was any privilege available, it was abused by Defendants.

62. This is because Defendants engaged in a sham "investigation" into the details of the Article, waiting until the eleventh hour to verify details of the story with Plaintiffs and then, after Plaintiffs provided evidence rebutting Defendants' pre-conceived narrative, Defendants either outright lied or created impressions/gists that they knew were false. Moreover, when Defendants did not get the answers to the questions they wanted (over 50 questions asked) they simply reported falsities on questions they never asked, so as to ensure they would not have to publish the truth. This is classic purposeful avoidance of the truth.

63. This is underscored further by the fact that Plaintiffs also offered to provide copious amounts of documentary evidence to Lorenz that would have even more thoroughly refuted the false allegations but, because of Plaintiffs' contractual confidentiality restrictions, were only able to do so as "on background" or "off the record". Lorenz had allowed and relied upon "on background" and "off the record evidence" for the many persons she had allegedly interviewed to create the mosaic of false allegations regarding Plaintiffs. However, Lorenz refused to grant Plaintiffs these same courtesies in refuting their accusers' false allegations. This is evidence of Defendants' aversion to the truth, commitment to a pre-conceived narrative, and utter reckless

16

disregard for the truth. Defendants set up the rules of the game to allow "off the record" evidence to create a defamatory story but refused to allow "off the record" evidence to rebut it. This is classic purposeful avoidance of the truth that creates Constitutional malice.

64. In addition, Lorenz had a pecuniary motive for defaming Plaintiffs, so as to cause Plaintiffs' clients to breach their agreements with Plaintiffs in order for UTA to obtain Plaintiffs' clients, which would give Lorenz—as a co-UTA client—better access for interviews, news, and write books on the influencer phenomenon.

65. Accordingly, Defendants published their statements with actual malice as they knew their statements, gists, and impressions were false or, at minimum, in fact entertained serious doubts about their trust, as evidenced by Lorenz's continual questioning of Plaintiffs, Plaintiffs' responses to those questions, as well as Plaintiffs provision of information (and, at minimum, at least information that would make it incumbent on Defendants to inquire further wherein they would have discovered the claims in the Article were false) coupled with Defendants' refusal to accept Plaintiffs further offer to provide "off the record" evidence, even though Defendants' defamatory Article was informed by "off the record evidence" from Plaintiffs' detractors, thus demonstrating a degree of malice/recklessness, in addition to ordinary negligence, in publishing the false statements, gists, and impressions in the Article.

66. The false statements, gists, and impressions in the Article were defamatory *per se*, presumptively causing reputational injury to each Plaintiff in an amount in excess of $75,000.00. In addition, Jacob was caused mental anguish resulting from the libelous Article, having felt shame and anxiety over facing friends and business colleagues over the false "reporting" by one of the world's most recognized newspapers. She seeks the maximum amount allowed under California law.

67. Alternatively, and in addition, the false statements, gists, and impressions in the Article caused special damages to Plaintiff Influences in the form of lost profits/broken contracts, as follows:

   a. A contract with Loreal that was withdrawn days after publication of the Article worth $100,000.00 because of the false statements, gists, and impressions in the Article;

   b. An existing contract with Universal Music Group that was breached after publication of the Article worth $60,000.00 because of the false statements, gists, and impressions in the Article;

   c. The loss of the following influencers who were under contract, but breached, because of the false statements, gists, and impressions in the Article (or used it as an excuse to breach their contracts), each of whom had a contract that was worth at least $200,000.00 in profits to Influences: (i) Marcus Olin; (ii) Jessie Underhill; (iii) Hailey Orona; (iv) Branden Westenberg; (v) Stephanie Margarucci; (vi) Alex French; (vii) Randy Gonzales; (viii) Jamil Neffati; (x) Jamel Neffati; (xi) Alicia Allen; and (xii) Colie Nuanez.

   d. The loss of the following influencers who had agreed to non-exclusive representation by Influences, and who were actively pursuing opportunities with Influences, but refused to continue working with Influences because of the false statements, gists, and impressions in the Article, each of whom had prospective business relations that would have been worth at least $500,000.00 in profits to Influences: (i) Jena Frumes; (ii) the three members of the Coffee Family; (iii) SpencerX; (iv) Lillian Hepler; and (v) Sarah Magusara.

e. The loss of the following influencer who was not yet under contract, but with which a contract was imminent, but refused to enter into a contract with Influences because of the false statements, gists, and impressions in the Article, who had a contract that would have been worth at least $500,000.00 in profits to Influences: (i) Giovanny Valencia.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for Judgment in their favor and against Defendants awarding to it the following relief:

a. An award of compensatory damages for reputational injury to both Jacob and Influences in an amount exceeding $75,000.00 each and mental anguish damages for Jacob to the maximum extent allowed by California law;

b. Special damages for lost profits in an amount exceeding $6,200,000.00;

d. An award of pre-judgment and post-judgment interest in the maximum amount allowed under the law;

e. Punitive and/or exemplary damages; and

f. An award of such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all of their claims so triable.

Dated: New York, New York
November 19, 2021

                                            **REISS SHEPPE LLP**

                                              **/s/ Matt Sheppe**
                                            By: Matthew Sheppe

                                            425 Madison Avenue, 19th Floor
                                            New York, New York 10017
                                            Tel: (212) 753-2424

Fax: (347) 348-0731
Email: msheppe@reisssheppe.com


Joseph Sibley, Esq. (admitted *pro hac vice*)
**CAMARA & SIBLEY LLP**
1108 Lavaca St., Ste 110263
Austin, Texas 78701
Tel: (713) 966-6789
Fax: (713) 583-1131
Email: sibley@camarasibley.com

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of November 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which I understand to have caused service on all counsel of record.


*/s/ Joe Sibley*

Joseph Sibley