UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

-------------------------------------------------------------- x

ARIADNA JACOB and INFLUENCES, INC.,          :
                                                           :     Case No. 1:21-cv-06807

                    Plaintiffs,          :

                                    :

            - against -          :     ORAL ARGUMENT REQUESTED

                                      :

TAYLOR LORENZ and THE NEW YORK          :
TIMES COMPANY,          :

                                    :

                  Defendants.          :

-------------------------------------------------------------- x

 

 

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION BY DEFENDANTS THE NEW YORK TIMES COMPANY AND
<u>TAYLOR LORENZ TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT</u>**

Katherine M. Bolger
Nimra H. Azmi
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Phone:     (212) 489-8230
Fax:       (212) 489-8340
katebolger@dwt.com
nimraazmi@dwt.com

*Attorneys for Defendants The New York
Times Company and Taylor Lorenz*

# <u>TABLE OF CONTENTS</u>

**Page**

I.      PRELIMINARY STATEMENT ................................................................. 1

II.     FACTUAL & PROCEDURAL BACKGROUND ...................................... 2

        A.      The Parties .......................................................................... 2

        B.      Plaintiffs' Contentious Relationships with Their Influencer Clients .................... 2

        C.      The Article .......................................................................... 3

        D.      The Complaint & Amended Complaint ................................... 3

III.    ARGUMENT ........................................................................................ 4

        A.      This Defamation Action Should Be Resolved at the Pleading Stage. ................... 4

        B.      Most of the Contested Statements Are Substantially True. .................................... 5

        C.      Statements 4, 5, 13, and 7 Are Not Capable of Defamatory Meaning. ............... 10

        D.      Statement 6 Is Absolutely Protected as a Fair and Accurate Report of a
                Judicial Proceeding. ............................................................ 12

        E.      Statements 1, 3, 7, 8, 11, and 12 Are Non-Actionable Hyperbole and
                Opinion. ............................................................................. 13

        F.      Plaintiffs Failed to Plead Actual Malice. ............................. 15

                1.      The New York Anti-SLAPP Law Applies to This Case. .......................... 16

                2.      Because Plaintiffs Are Public Figures, Actual Malice Is Also Required
                        under California Law. .......................................... 18

                3.      Plaintiffs Have Failed to Adequately Plead Actual Malice. ..................... 19

        G.      Plaintiffs Cannot Rely On the Article's "Impression" or "Tone." ....................... 22

IV.     CONCLUSION.................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbitt v. Carrube*,
  159 A.D.3d 408 (1st Dep't 2018) ...........................................................................15

*Abiola v. ESA Mgmt., LLC*,
  No. 13-CV-03496-JCS, 2014 WL 2196192 (N.D. Cal. May 27, 2014) ...................6

*Adelson v. Harris*,
  774 F.3d 803 (2d Cir. 2014)....................................................................................13

*Aronson v. Wiersma*,
  65 N.Y.2d 592 (1985) ..............................................................................................10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................................4

*Balzaga v. Fox News Network, LLC*,
  173 Cal. App. 4th 1325 (Cal. Ct. App. 2009) .........................................................11

*Beilenson v. Superior Ct.*,
  44 Cal. App. 4th 944 (Cal. Ct. App. 1996) .............................................................15

*Biro v. Condé Nast*,
  807 F.3d 541 (2d Cir. 2015).....................................................................................19

*Biro v. Conde Nast*,
  883 F. Supp. 2d 441 (S.D.N.Y. 2012)......................................................................22

*Biro v. Conde Nast*,
  963 F. Supp. 2d 255 (S.D.N.Y. 2013)........................................................................4

*Biro v. Conde Nast*,
  No 11-CV-4442 (JPO), 2014 WL 4851901 (S.D.N.Y. Sept. 30, 2014) ...................6

*Bose Corp. v. Consumers Union of U.S.*,
  466 U.S. 485 (1984)..................................................................................................19

*Cabello-Rondón v. Dow Jones & Co.*,
  16-cv-3346(KBF), 2017 WL 3531551 (S.D.N.Y. Aug. 16, 2017) ...........................6

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002).......................................................................................4

*Cochran v. NYP Holdings, Inc.*,
   58 F. Supp. 2d 1113 (C.D. Cal. 1998) ................................................................. 14

*Coleman v. Grand*,
   523 F. Supp. 3d 244 (E.D.N.Y. 2021) ................................................................. 17

*Contemporary Mission, Inc. v. N.Y. Times*,
   665 F. Supp. 248 (S.D.N.Y. 1987) ..................................................................... 20

*Croce v. New York Times Co.*,
   930 F.3d 787 (6th Cir. 2019) ............................................................................. 23

*Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*,
   No. 20 CIV. 7670 (CM), 2021 WL 3173804 (S.D.N.Y. July 27, 2021) ................... 4

*Davis v. Costa-Gavras*,
   580 F. Supp. 1082 (S.D.N.Y. 1984) ................................................................... 16

*Edwards v. Nat'l Audubon Soc'y, Inc.*,
   556 F.2d 113 (2d Cir. 1977) ............................................................................. 20

*Ferlauto v. Hamsher*,
   74 Cal. App. 4th 1394 (Cal. Ct. App. 1999) ........................................................ 13

*Garrison v. Louisiana*,
   379 U.S. 64 (1964) ........................................................................................... 20

*Gertz v. Welch*,
   418 U.S. 323 (1974) ......................................................................................... 15

*Global Telemedia Int'l, Inc. v. Doe 1*,
   132 F. Supp. 2d 1261 (C.D. Cal. 2001) ............................................................. 14

*Gross v. N.Y. Times Co.*,
   82 N.Y.2d 146 (1993) ....................................................................................... 22

*Harte-Hanks Comms. v. Connaughton*,
   491 U.S. 657 (1989) .................................................................................... 20, 22

*Healthsmart Pacific v. Kabateck*,
   7 Cal. App. 5th 416 (Cal. Ct. App. 2016) ........................................................... 13

*Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*,
   49 N.Y.2d 63 (1979) ........................................................................................ 12

*Howard v. Oakland Tribune*,
   199 Cal. App. 3d 1124 (Cal. Ct. App. 1988) ...................................................... 13

*Huggins v. Moore*,
    94 N.Y.2d 296 (1999) .............................................................................................17

*Icahn v. Raynor*,
    32 Misc. 3d 1224(A), (Sup. Ct. N.Y. Cty. 2011) .....................................................12

*Immuno AG v. Moor-Jankowski*,
    77 N.Y.2d 235 (1991) .............................................................................................13

*Issa v. Applegate*,
    31 Cal. App. 5th 689 (Cal. Ct. App. 2019) ...............................................................6

*Jacobus v. Trump*,
    156 A.D.3d 452 (1st Dep't 2017) ...........................................................................10

*Kerik v. Tacopina*,
    64 F. Supp. 3d 542 (S.D.N.Y. 2014) .......................................................................21

*Kesner v. Dow Jones & Co., Inc.*,
    515 F. Supp. 3d 149 (S.D.N.Y. 2021) ......................................................................5

*Kinsey v. New York Times Co.*,
    991 F.3d 171 (2d Cir. 2021) ...................................................................................16

*Kramer v. Time Warner Inc.*,
    937 F.2d 767 (2d Cir. 1991) .....................................................................................5

*Lee v. Bankers Tr. Co.*,
    166 F.3d 540 (2d Cir. 1999) ...................................................................................16

*Live Face on Web, LLC v. Five Boro Mold Specialist Inc.*,
    No. 15 CV 4779-LTS-SN, 2016 WL 1717218 (S.D.N.Y. Apr. 28, 2016) ........13, 15

*Loeb v. New Times Comms. Corp.*,
    497 F. Supp. 85 (S.D.N.Y. 1980) ...........................................................................21

*Makaeff v. Trump University, LLC*,
    715 F.3d 254 (9th Cir. 2013) ..................................................................................18

*Manzari v. Associated Newspapers Ltd.*,
    830 F.3d 881 (9th Cir. 2016) ..................................................................................18

*Marom v. Pierot*,
    No. 18CIV12094VBJCM, 2020 WL 6572509 (S.D.N.Y. Aug. 30, 2020),
    *report and recommendation adopted*, No. 18 CV 12094 (VB), 2020 WL
    6565199 (S.D.N.Y. Nov. 9, 2020) ..........................................................................14

*Mayer v. Riordan*,
    55 Misc. 3d 1203(A), (Sup. Ct. N.Y. Cty. 2017)....................................................15

*McDougal v. Fox News Network, LLC*,
    489 F. Supp. 3d 174 (S.D.N.Y. 2020)....................................................................19

*Messenger ex rel. Messenger v. Gruner + Jahr Printing & Pub.*,
    94 N.Y.2d 436 (2000) ............................................................................................17

*Miller v. Saul*,
    No. 19CV1579PGGBCM, 2020 WL 5899520 (S.D.N.Y. Jan. 10, 2020),
    *report and recommendation adopted*, No. 19CIV1579PGGBCM, 2020 WL
    4365284 (S.D.N.Y. July 30, 2020) ....................................................................5, 15

*Mulder v. Donaldson, Lufkin & Jenrette*,
    161 Misc. 2d 698 (Sup. Ct. N.Y. Cty. 1994) ........................................................13

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964).............................................................................................4, 16

*Open Source Sec., Inc. v. Perens*,
    803 F. App'x 73 (9th Cir. 2020) ............................................................................22

*Palin v. New York Times Co.*,
    510 F. Supp. 3d 21 (S.D.N.Y. 2020)......................................................................17

*Peterson v. Gannett Co., Inc.*,
    No. 21-15057, 2021 WL 5507338 (9th Cir. Nov. 24, 2021) ..................................19

*Pritchard v. Herald Co.*,
    120 A.D.2d 956 (4th Dep't 1986)..........................................................................10

*Rapoport v. Asia Elecs. Holding Co.*,
    88 F. Supp. 2d 179 (S.D.N.Y. 2000)........................................................................4

*Rappaport v. VV Publ'g Corp.*,
    163 Misc. 2d 1 (Sup. Ct. N.Y. Cty. 1994), *aff'd*, 637 N.Y.S.2d 109 (1st Dep't
    1996) .......................................................................................................................12

*Ringler Associates Inc. v. Maryland Casualty Co.*,
    80 Cal. App. 4th 1165 (Cal. Ct. App. 2000) ...........................................................5

*Roe v. Doe*,
    No. C 09-0682 PJH, 2009 WL 1883752 (N.D. Cal. June 30, 2009) ......................19

*Rudwall v. BlackRock, Inc.*,
    289 F. App'x 240 (9th Cir. 2008) ..........................................................................11

*Sackler v. Am. Broad. Companies, Inc.*,
    71 Misc. 3d 693 (Sup. Ct. N.Y. Cty. 2021) ...........................................17

*Seelig v. Infinity Broad.*,
    97 Cal. App. 4th 798 (Cal. Ct. App. 2002) ...............................................13

*Sipple v. Found. For Nat. Progress*,
    71 Cal. App. 4th 226 (Cal. Ct. App. 1999) ...............................................12

*Small Bus. Bodyguard Inc. v. House of Moxie, Inc.*,
    230 F. Supp. 3d 290 (S.D.N.Y. 2017)............................................15, 22

*St. Amant v. Thompson*,
    390 U.S. 727 (1968)........................................................................20

*Sweigert v. Goodman*,
    18-cv-08653, 2021 WL 1578097 (S.D.N.Y. Apr. 22, 2021) ............................16, 17

*Tacopina v. O'Keeffe*,
    No. 14 Civ. 8379 (PAC), 2015 WL 5178405 (S.D.N.Y. Sept. 4, 2015) .................12

*Tannerite Sports, LLC v. NBCUniversal New Gp.,*
    *a division of NBCUniversal Media, LLC*, 864 F.3d 236 (2d Cir. 2017)...............5, 6

*Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*,
    603 F. Supp. 2d 584 (S.D.N.Y. 2009)......................................................12

*Yong Ki Hong v. KBS Am., Inc.*,
    951 F. Supp. 2d 402 (E.D.N.Y. 2013) ......................................................14

*ZL Techs., Inc. v. Does 1-7*,
    13 Cal. App. 5th 603 (2017) ................................................................10

*Zysk v. Fid. Title Ins. Co. of New York*,
    14 A.D.3d 609 (2d Dep't 2005) ............................................................15

**Statutes**

Cal. Civil Code § 47(d)...........................................................................12

N.Y. Civil Rights Law
    § 74........................................................................................12, 13
    § 76........................................................................................17
    § 76-a.....................................................................................15, 17
    § 76-a(d).................................................................................17

New York Anti-SLAPP Law ........................................................16, 17, 18

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)...........................................................................................1, 4, 24

Rachel Deahl, *Lorenz Goes 'Online' at Simon & Schuster,* PUBLISHERS WEEKLY
    (May 29, 2020) https://www.publishersweekly.com/pw/by-topic/industry-
    news/book-deals/article/83461-book-deals-week-of-june-1-2020.html..................................22

Taylor Lorenz, *When a Sponsored Facebook Post Doesn't Pay Off*, THE
    ATLANTIC (Dec. 26, 2018),
    https://www.theatlantic.com/technology/archive/2018/12/massive-influencer-
    management-platform-has-been-stiffing-people-payments/578767/......................................21

U.S. Const. amend. I...............................................................................................4, 13

Defendants The New York Times Company ("The Times") and Taylor Lorenz (collectively, "Defendants") submit this memorandum of law in support of their motion pursuant to Fed. R. Civ. P. 12(b)(6) for an order dismissing the Amended Complaint ("FAC") of Plaintiffs Ariadna Jacob and Influences, Inc. ("Influences") (collectively, "Plaintiffs") with prejudice.

## I.     PRELIMINARY STATEMENT

This defamation action, brought by Jacob, a manager of online creators and influencers, and her company, Influences, arises out of an article titled *Trying to Make It Big Online? Getting Signed Isn't Everything* written by Lorenz and published in *The New York Times* on August 14, 2020 (the "Article"). *See* Declaration of Kate Bolger ("Bolger Decl.") Ex. 1. The Article reports on a dispute between Jacob and her former clients in the unique world of "collab houses," where young Internet influencers, many of them teenagers away from home for the first time, live together and post content on social media platforms like TikTok and Instagram in the hopes of gaining money and fame. The Article reports the influencers' deep unhappiness with Plaintiffs, but also cites extensively to information Plaintiffs provided before publication and quotes Jacob's lawyer several times. Plaintiffs' attempt to manufacture a libel complaint out of this report about a public controversy fails as a matter of law.

*First,* the FAC and the documents incorporated therein by reference, including Plaintiffs' prepublication responses to Defendants, establish the accuracy of the allegedly defamatory statements, both in their broad descriptions of the Internet influencer world and in their small factual details about Jacob and her relationships with her clients. Because true statements cannot give rise to a defamation claim, this alone dooms the FAC. *Second*, many of the statements alleged to be defamatory cannot be reasonably read to convey a defamatory meaning. *Third*, many of the statements, particularly those quoting Jacob's former clients, are non-actionable as opinion and hyperbole. *Fourth,* certain statements are protected by the fair report privilege. *Last*, Plaintiffs'

1

mix of allegations regarding Defendants' purported actual malice cannot, as a matter of law, establish actual malice as Plaintiffs must. Despite an opportunity to correct these clear deficiencies, Plaintiffs' FAC still falls far short of stating a plausible defamation claim.

## II.     FACTUAL & PROCEDURAL BACKGROUND

### A.     The Parties

Jacob is the founder of Influences, a "leading online creator management and influencer marketing company" created in 2018. FAC ¶ 12. Jacob refers to herself as a "pioneer" in the "multi-billion-dollar influencer industry," and claims to have "managed" "some of the most recognizable names and faces in the industry." *Id.* ¶¶ 12, 13. Lorenz is an experienced technology reporter who covers tech culture and online creators for *The New York Times*. *Id.* ¶ 19. The Times is a newspaper and media company headquartered in New York. *Id.* ¶ 8.

### B.     Plaintiffs' Contentious Relationships with Their Influencer Clients

Prior to the Article's publication, as part of their business, Plaintiffs invited young influencers and aspiring influencers to live together in so-called "collaboration houses," including the Girls in the Valley ("GIV") house, the Kids Next Door ("KND") house, and the Drip Crib. *See id.* ¶¶ 29, 40, 44, 50. While Plaintiffs allege they were "legally responsible" for these collaboration houses, *see id.* ¶ 42, the influencers who stayed in them agreed to "create and post a certain number of contractual social media posts and pay their share of the rent." *See* Bolger Decl. Ex. 3 at 3.

This arrangement did not go well. During the months before the Article was published, the relationship between Plaintiffs and their influencer clients was marked by conflict: influencers moved out of the KND house, disputes in the GIV house grew so heated that the police were called, Plaintiffs "publicly disassociated" themselves with the Drip Crib, and influencer Brittany Tomlinson filed a petition with the California Department of Industrial Relations in April 2020 alleging that Jacob owed her tens of thousands of dollars in fees and illegally operated as an

2

unlicensed talent agency ("Tomlinson Petition"). *See* FAC ¶¶ 36, 46, 47, 51; *see also* Bolger Decl. Exs. 1, 3 at 7-8, & 6.

### C.    The Article

On August 14, 2020, The Times published the Article, which explores the still-developing, under-regulated, and potentially highly profitable world of social media influencers on TikTok. *Id.* ¶ 27. The Article relies on numerous interviews with influencers and members of the industry, Plaintiffs' contracts with influencers, and state administrative proceeding filings. *See* Bolger Decl. Ex. 1; *see also* FAC ¶ 37 & n. 3. Within the context of a larger discussion about the industry, the Article quotes several influencers describing their relationships with Plaintiffs. *Id.* Importantly, the Article makes a point to balance the narrative by incorporating Jacob's side of the story and quoting her lawyer on several occasions. FAC ¶¶ 22, 24. As the FAC acknowledges, before publication Lorenz asked Plaintiffs more than 50 questions to permit them to give their version of events— which they did—and the Article heavily relies on those responses to present the dispute. *See id.*

### D.    The Complaint & Amended Complaint

Nonetheless, Plaintiffs filed their original Complaint on August 12, 2021, alleging one cause of action for defamation. On October 18, 2021, Defendants wrote a letter to the Court seeking permission to move to dismiss based on the fatal deficiencies in Plaintiffs' Complaint, including that many of the allegedly defamatory statements were substantially true. *See* Dkt. No. 8. In response, Plaintiffs argued that the truth of the statements was not relevant because the "heart" of their Complaint was their allegation that "the Article created the false impressions/gists Plaintiffs committed illegal behaviors and that they engaged in unethical business behaviors…" *See* Dkt. No. 9 (citing Compl. ¶ 57). Plaintiffs served an amended complaint on November 19, 2021. Plaintiffs' FAC brings one cause of action for libel *per se* and libel *per quod* based on 14 statements in the Article, which are set forth in the chart attached as Bolger Decl. Ex. 2.

## III.   ARGUMENT

The Article is a carefully balanced discussion of a matter of public interest that draws on truthful facts and the firsthand opinions of Plaintiffs and their clients. Plaintiffs' FAC must be dismissed because it fails to plausibly plead a defamation claim.

### A.   This Defamation Action Should Be Resolved at the Pleading Stage.

This Court should dismiss the FAC pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. A court considering such a motion must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "In order to avoid dismissal under Rule 12(b)(6) . . . a plaintiff must state the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *Biro v. Conde Nast,* 963 F. Supp. 2d 255, 265 (S.D.N.Y. 2013).[1] In addition to the allegations in a complaint, a court may consider any documents incorporated by reference or which are "integral to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002). If documents contradict Plaintiffs' allegations, "the documents control and this Court need not accept as true the [Plaintiffs'] allegations." *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000).

Here, the FAC relies heavily on the Article (FAC ¶¶ 27-55), the prepublication responses Plaintiffs submitted to Lorenz (FAC ¶¶ 22, 24, 29, 32, 42, 47, 51, 52, 62), prepublication emails

---

[1] Further, because this case unquestionably implicates Defendants' First Amendment right to report the news, the Court must "consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). For that reason, courts in the Southern District have recognized that "[b]ecause a defamation suit may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, courts should, where possible, resolve defamation actions at the pleading stage." *Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*, No. 20 CIV. 7670 (CM), 2021 WL 3173804, at *3 (S.D.N.Y. July 27, 2021) (quoting *Adelson v. Harris*, 973 F. Supp. 2d 467, 481 (S.D.N.Y. 2013)).

between Plaintiffs and Lorenz (FAC ¶¶ 21-22, 24), and Tomlinson's contract with Influences (FAC n.1). *See* Bolger Decl. Exs. 1, 3, 4, & 5.  Each of these documents is incorporated by reference into, and is integral to, the FAC. Additionally, this Court can take judicial notice of Tomlinson's submissions before the California Department of Industrial Relations.[2] *See id.* Ex. 6. Once the FAC and these documents are considered, it is clear that Plaintiffs have failed to allege facts sufficient to establish a claim that is plausible on its face. Under New York law, to state a defamation claim, a plaintiff must allege "(1) a written [or spoken] defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." *Kesner v. Dow Jones & Co., Inc.*, 515 F. Supp. 3d 149, 169–70 (S.D.N.Y. 2021). Here, Plaintiffs have failed to satisfy even these most basic elements of a defamation claim, thereby requiring dismissal.[3]

## B.   Most of the Contested Statements Are Substantially True.

First, Plaintiffs have not and cannot plausibly allege falsity, because the FAC and particularly, the documents it incorporates, establish that the statements at issue are substantially true. To plead a defamation claim, Plaintiffs must plead "facts that, if proven, would establish that the Defendants' statements were not substantially true." *Tannerite Sports, LLC v. NBCUniversal New Gp., a division of NBCUniversal Media, LLC*, 864 F.3d 236, 247 (2d Cir. 2017); *see also Cabello-Rondón v. Dow Jones & Co.*, 16-cv-3346(KBF), 2017 WL 3531551, at *5 (S.D.N.Y. Aug. 16, 2017); *accord Abiola v. ESA Mgmt., LLC*, No. 13-CV-03496-JCS, 2014 WL 2196192, at *6

---

[2] The court "may also consider matters of which judicial notice may be taken," *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991), including documents filed in agency or administrative proceedings. *Miller v. Saul,* No. 19CV1579PGGBCM, 2020 WL 5899520, at *3 n.3 (S.D.N.Y. Jan. 10, 2020), *report and recommendation adopted,* No. 19CIV1579PGGBCM, 2020 WL 4365284 (S.D.N.Y. July 30, 2020).

[3] The elements are identical under California law. *Ringler Associates Inc. v. Maryland Casualty Co.*, 80 Cal. App. 4th 1165, 1179 (Cal. Ct. App. 2000).

(N.D. Cal. May 27, 2014) (dismissing claim where plaintiff failed to allege "facts showing that any false statements were made"). "[A] statement is substantially true if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Tannerite Sports, LLC*, 864 F.3d at 242; *accord Issa v. Applegat*e, 31 Cal. App. 5th 689, 708 (Cal. Ct. App. 2019). General allegations of an article's falsity do not supersede "specific factual statements" in an article's sources. *Biro v. Conde Nast*, No 11-CV-4442 (JPO), 2014 WL 4851901, at *4 (S.D.N.Y. Sept. 30, 2014). When assessing falsity, "[t]he entire publication, as well as the circumstances of its issuance must be considered" to prevent the media from being "damaged by an overly technical or exacting conception of truth in publication." *Tannerite*, 864 F.3d at 243.

The rigorous *Tannerite* pleading standard is especially important in a case like this one. Plaintiffs have articulated that the "heart" of their claim is that the Article's "impressions/gists" cast Plaintiffs in a negative light. FAC ¶ 60. But even if the Article can be said to make Plaintiffs look bad, that does not confer a viable defamation claim against Defendants unless Plaintiffs can establish that Defendants published actually false statements of fact. And there are none here. On the contrary, the substantial truth of these allegedly defamatory statements is confirmed not only by the FAC, but also by the responses Jacob's attorney submitted to Lorenz prior to the Article's publication, as well as the administrative proceeding documents. Specifically, the following allegations are contradicted by documentary evidence showing that the statements in the Article are substantially true:

- Plaintiffs claim that **Statement 6** accuses Plaintiffs of unethical conduct towards Tomlinson in part because the Article reports that Tomlinson was signed by Influences, when, in fact, she was signed by another company called "Creator Edge." *See* FAC ¶ 37.

Plaintiffs' allegations are contradicted the very agreement that Tomlinson signed, which

6

states that Tomlinson was signed with "Creator Edge dba Influences" and is executed by Jacob herself. Bolger Decl. Ex. 5 at 1. Accordingly, it is not just substantially, but entirely true, that Tomlinson was signed with Influences.[4]

The other details of Plaintiffs' dispute with Tomlinson are also substantially true and were confirmed by Plaintiffs' prepublication. Plaintiffs confirmed that the Tomlinson Petition alleged that Jacob withheld $23,683.82 in fees; that Jacob demanded up to 20% commission, and that Jacob bought and will not sell the domain name brittanybroski.com. *See* Bolger Decl. Ex. 3 at 4.

- Plaintiffs superficially contend that **Statement 1**—a quotation in which Marcus Olin, Plaintiffs' former client, says that the influencers expected to obtain enough brand deals to pay their portion of the rent but did not do so—is false. *See* FAC ¶ 29.

Plaintiffs' prepublication responses confirm the truth of this statement, agreeing "that each individual would create and post a certain number of contractual social media posts and pay their share of the rent" and that Influences exclusively held the influencers' contracts and therefore was solely responsible for procuring deals for the influencers. *See* Bolger Decl. Ex. 3 at 3. And the FAC concurs that the KND influencers were, in fact, struggling financially to secure brand deals. FAC ¶ 31.

- Plaintiffs allege falsity for the quotation in **Statement 3** from Plaintiffs' former client Jesse Underhill, an influencer from the KND house, who stated that Jacob informed the influencers they would need to cover more of the rent than they previously had been paying. *See* FAC ¶¶ 30, 33.

Once again, Plaintiffs' prepublication response confirmed that during a July 2020

---

[4] Rather than omitting this clearly erroneous allegation after Defendants pointed it out, Plaintiffs amended the complaint to concede that "Tomlinson's agreement does appear to reference Influences" but claim Defendants should have known that Influences' inclusion in the contract "was a misnomer and is incorrect." FAC n.3. In other words, Plaintiffs argue that Ms. Lorenz should have somehow divined that Jacob misrepresented the corporate relationship between her own companies in Tomlinson's contract. *See infra* §3.F.iii. That is absurd, not only because Jacob apparently did not know this information herself—despite owning both companies. *See* FAC ¶¶ 12, 37; n. 3.

conversation, Jacob told the KND influencers that they would need to pay more rent than they had

been. *See* Bolger Decl. Ex. 3 at 3. After Defendants pointed this out in their pre-motion letter,

Plaintiffs changed their allegations to characterize this as a "demand[] that the KND influencers

comply with their contractual obligations"—as opposed to an increase in contribution. FAC ¶ 33;

*see also* FAC ¶¶ 40-41. This change is merely an explanation, not a correction. Regardless of why

Jacob did it, it remains true she demanded more rent from Underhill and the KND influencers.

- The FAC seems to aver that **Statement 8**, in which Tianna Singer claims that Jacob
  promised influencers in the GIV house "brand deals, money, and opportunities," is false
  because Singer is a "deadbeat influencer" who was not her client. *See* FAC ¶¶ 41, 45.

Plaintiffs' own prepublication statements affirm that they promised the influencers they

represented brand deals, money, and opportunities. *See* Bolger Decl. Ex. 3 at 3. And Singer's status

as a client of the Plaintiffs is not relevant; the Article makes clear that Singer is speaking generally

about the GIV influencers' experience, not just her own.

- Plaintiffs allege the falsity of **Statement 9**, in which Singer contends that Jacob would
  appear at the GIV house late at night, text the influencers late at night, bring guests
  without informing the influencers, and had cameras installed in the GIV house.

Plaintiffs' prepublication responses confirm that Jacob installed cameras to monitor the

GIV influencers, that "Ms. Jacob brought guests to her house," and—in response to whether Jacob

texted the influencers late at night—said "Ms. Jacob runs a business that requires her to work 24-

7. Often times there are exigencies that require an immediate answer. Without knowing what

messages you are referring to, it is impossible for us to answer yes or no." *See* Bolger Decl. Ex. 3

at 6 & Ex. 4 at 2. Far from denying these statements, Plaintiffs' prepublication responses

acknowledge their accuracy and offer explanations. That is insufficient to establish material falsity.

- Plaintiffs argue that **Statement 10,** which states that Jacob required eight social media
  posts per day to allow the influencers to continue living in the GIV house, is
  "misleading[]" and untrue. *See* FAC ¶ 43.

Plaintiffs' prepublication response confirmed Jacob's frustration that "individuals living at

the house were not making the agreed upon posts" and acknowledging that "Jacob had a conversation with the individuals, stating that they needed to perform their obligations; otherwise, if they refused, they would need to leave the content house." *See* Bolger Decl. Ex. 3 at 6 & 7. Likewise, Plaintiffs' description of the contract confirms that each influencer was obliged to "create and post a certain number of contractual social media posts." *Id.* Whether that required number was eight does not refute that the "gist" or "sting" of the Article's statement is accurate: remaining in the collaboration houses required a certain amount of daily engagement.

- Plaintiffs claim that **Statement 13**, which describes the disintegration of the relationship between Drip Crib and Influences and states that on Influences' Instagram account, Influences blamed the breakdown on a breach of contract and failure to pay rent by Drip Crib, is inaccurate.

While Plaintiffs now allege the termination was not precipitated over rent payments, *see* FAC ¶ 50, Plaintiffs do not deny that the Article accurately reports on the statements they made on their own Instagram account nor that Influences split with Drip Crib over a purported breach of contract. And Plaintiffs admit that Drip Crib had a rent problem at the time of their separation. *Id.*

- Plaintiffs contend that **Statement 11**, which describes the influencers' move out of the GIV house—including that it involved "an escalating verbal fight" with Jacob and "several calls to local authorities"—is false.

The FAC, however, admits that the altercation and the calls to the police occurred, but claims it was the influencers who were "aggressive and threatening" and Jacob who "called the authorities" twice. *See* FAC ¶ 47. But the Article does not say otherwise – it simply states the undisputed fact that the move out from the GIV house entailed a "verbal fight" between Jacob and the influencers that resulted in calls to the police. *See* Bolger Decl. Ex. 1.

- Plaintiffs claim that **Statement 2**, in which Underhill states that the KND house "didn't have working Wi-Fi for a month," impacting the influencers' ability to post content and causing financial struggles, is false. FAC ¶ 30.

Plaintiffs admit that Jacob was not paying the Wi-Fi bill for the houses—they merely

dispute who was responsible for doing so. *See* Bolger Decl. Ex. 3 at 7. And Plaintiffs admit that the KND influencers were struggling financially. *See* FAC ¶ 30.

- Plaintiffs argue that **Statement 12**, a quote from Devion Young which claims that Jacob "leaked" his nude photos, is false. *See* FAC ¶ 49.

Plaintiffs confirm that Jacob informed a third-party of Young's nudes. *See* FAC ¶ 49. Because both Young and Jacob concur that she disclosed information about the nudes to others, this statement is substantially true.

### C.   Statements 4, 5, 13, and 7 Are Not Capable of Defamatory Meaning.

Plaintiffs' defamation claim must also be dismissed to the extent it is based on **Statements 4, 5, 13, and 7**, because Plaintiffs do not plausibly allege that those statements are capable of defamatory meaning. Words are defamatory meaning when they "arouse in the mind of the average person in the community an evil or unsavory opinion []or expose plaintiff to public hatred, contempt, or aversion." *Pritchard v. Herald Co.*, 120 A.D.2d 956, 956 (4th Dep't 1986). A court is empowered to decide whether a publication is capable of the meaning ascribed to it, a determination that is routinely made at the pleading stage. *Jacobus v. Trump*, 156 A.D.3d 452, 453 (1st Dep't 2017) (affirming dismissal for lack of defamatory meaning); *accord ZL Techs., Inc. v. Does 1-7*, 13 Cal. App. 5th 603, 624 (2017) ("[W]hether a challenged statement is reasonably susceptible of a defamatory interpretation" is a question of law). On a motion to dismiss, a court must evaluate challenged statements "in the context of the entire statement or publication as a whole," and "if not reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained or artificial construction." *Aronson v. Wiersma*, 65 N.Y.2d 592, 594 (1985); *accord Balzaga v. Fox News Network, LLC*, 173 Cal. App. 4th 1325, 1337 (Cal. Ct. App. 2009). Here, Plaintiffs' allegations are insufficient to show that these statements have defamatory meaning.

- Plaintiffs complain about **Statement 4**, which says that Jacob direct-messaged Tomlinson to ask if Tomlinson had "made any money" after Tomlinson's video went viral. *See* FAC ¶ 34.

It is simply not defamatory to say that Plaintiffs, who are talent managers, asked a prospective client this question.[5] To the contrary, it is appropriate for a talent manager to ask a prospective client whether they had been able to capitalize off of a viral image.

- Plaintiffs allege that **Statement 5**'s parenthetical stating "(Mr. Vaynerchuk said he has no affiliation with Influences)" wrongly suggests that Jacob's claim that Vaynerchuk had mentored her was "false." *Id.* ¶ 35.

This parenthetical merely clarifies that regardless of the relationship between Vaynerchuk and Jacob, Vaynerchuk had no direct affiliation with Influences—which Plaintiffs do not dispute. Even if Plaintiffs' strained reading of the parenthetical could be accepted, indicating that a businessperson has puffed their connections or success is not defamatory. *See, e.g., Rudwall v. BlackRock, Inc.*, 289 F. App'x 240, 242 (9th Cir. 2008) (affirming dismissal of libel claim where statements at issue accused plaintiff of "exaggerating his role in various business matters.").

- Plaintiffs allege that **Statement 13**'s description of Influences' split with the Drip Crib over the Drip Crib's "breach of contract and failure to pay rent" defames Plaintiffs because it makes them appear "heavy-handed" regarding rent payments. *See* FAC ¶ 50.

Statement 13 does not say anything negative about Plaintiffs—instead, it claims that Drip Crib failed to pay rent and breached its contract. There is nothing that would expose Plaintiffs to "contempt or hatred" for refusing to work with clients who do not meet their financial obligations.

- Plaintiffs claim that **Statement 7**, which quotes experts describing ethical talent agreements, is libelous.

When read in context, **Statement 7** offers nothing more than a backdrop in which to consider both sides of the dispute as presented in the Article. *See Rappaport v. VV Publ'g Corp.*,

---

[5] Moreover, Plaintiffs confirm that Jacob did in fact reach out to Tomlinson to begin a business relationship, rendering this statement substantially true. *See* FAC ¶ 35.

163 Misc. 2d 1, 5 (Sup. Ct. N.Y. Cty. 1994) ("A defamatory implication must be present in the plain and natural meaning of the words used."). This statement says nothing at all about Plaintiffs, much less something defamatory.

### D. Statement 6 Is Absolutely Protected as a Fair and Accurate Report of a Judicial Proceeding.

Plaintiffs' defamation claim based on **Statement 6**, which covers Tomlinson's Department of Industrial Relations petition, must be dismissed because the Article offers a fair and true report of an administrative proceeding under New York Civil Rights Law § 74 ("Section 74").[6] Under Section 74, "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding . . . or other official proceeding." N.Y. Civ. Rights Law § 74. California law has a similar provision. *See* Cal. Civil Code §47(d). Both Section 74 and Section 47(d) provide an absolute privilege against a libel claim. *See Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 49 N.Y.2d 63, 67-68 (1979); *Sipple v. Found. For Nat. Progress*, 71 Cal. App. 4th 226, 240 (Cal. Ct. App. 1999).

The absolute privileges of Section 74 and Section 47(d) broadly apply to news reports of judicial proceedings, including reports on administrative proceedings. *See, e.g.*, *Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*, 603 F. Supp. 2d 584, 588 (S.D.N.Y. 2009) ("an administrative agency investigation into activities within its purview is an 'official proceeding'" and reporting on same qualifies for privilege); *Icahn v. Raynor*, 32 Misc. 3d 1224(A), at *6 (Sup. Ct. N.Y. Cty. 2011) ("[A]bsolute privilege applies even in quasi-judicial hearings and administrative hearings, and the privilege 'attaches not only to the hearing stage, but to every step of the proceeding.'"); *accord Howard v. Oakland Tribune*, 199 Cal. App. 3d 1124, 1128 (Cal. Ct.

---

[6] New York courts regularly grant motions to dismiss under Civil Rights Law § 74. *See, e.g.*, *Tacopina v. O'Keeffe*, No. 14 Civ. 8379 (PAC), 2015 WL 5178405, at *5 (S.D.N.Y. Sept. 4, 2015).

App. 1988).

Plaintiffs do not make any allegations to dispute that the Article accurately describes Tomlinson's assertions in her filings or quotes directly from the Tomlinson Petition. *Compare* Bolger Decl. Ex. 6 *with* Ex. 1. Because the Article accurately reported on the content of the Tomlinson Petition, the absolute fair report privilege unquestionably applies. *See Mulder v. Donaldson, Lufkin & Jenrette*, 161 Misc. 2d 698, 705, (Sup. Ct. N.Y. Cty. 1994) (Section 74 privilege applies so long as the report gives a "substantially accurate description of" a proceeding); *accord Healthsmart Pacific v. Kabateck*, 7 Cal. App. 5th 416, 434 (Cal. Ct. App. 2016).

### E.   Statements 1, 3, 7, 8, 11, and 12 Are Non-Actionable Hyperbole and Opinion.

Next, **Statements 1, 3, 7, 8, 11, and 12**—many of which are the views of the influencers affiliated with Plaintiffs—are protected as opinion or hyperbole. It is well-established that "rhetorical hyperbole and unfalsifiable opinion protected by the First Amendment." *Adelson v. Harris*, 774 F.3d 803, 807 (2d Cir. 2014). Indeed, the First Amendment's commitment to free expression requires that "rhetorical hyperbole, vigorous epithets, [] lusty and imaginative expression," and "loose figurative, hyperbolic language" will not give rise to liability for defamation as a matter of law. *Immuno AG v. Moor-Jankowski*, 77 N.Y.2d 235, 242, 244 (1991); *accord Ferlauto v. Hamsher*, 74 Cal. App. 4th 1394, 1401 (Cal. Ct. App. 1999). Moreover, expressions of opinion are protected by both New York and California law. *See Live Face on Web, LLC v. Five Boro Mold Specialist Inc.*, No. 15 CV 4779-LTS-SN, 2016 WL 1717218, at *2 (S.D.N.Y. Apr. 28, 2016) (statements of opinion "receive absolute protection under the New York Constitution"); *Seelig v. Infinity Broad.*, 97 Cal. App. 4th 798, 810 (Cal. Ct. App. 2002) (holding that there can be no liability for "statements of the speaker's subjective judgment"). Of particular relevance, the opinion doctrine protects "emotionally-charged opinions in response" to business disputes. *See, e.g.*, *Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 435 (E.D.N.Y. 2013)

(finding that statements that a business decision was "unfair" were not defamatory where they reflected defendants' opinion); *accord Global Telemedia Int'l, Inc. v. Doe 1*, 132 F. Supp. 2d 1261, 1270 (C.D. Cal. 2001) (a statement that the plaintiff lied used "exaggerated speech and broad generalities, all indicia of opinion" showing the poster was merely "expressing displeasure with the way the company is run").

Here, **Statement 3**, which, describes a "crunch" felt by the influencers in the KND house and one influencer's assessment of the situation as a "living nightmare," is obviously just such emotionally charged opinion. Courts have found that characterizing something as a "nightmare" is opinion and rhetorical hyperbole. *See, e.g.*, *Cochran v. NYP Holdings, Inc.*, 58 F. Supp. 2d 1113, 1124 (C.D. Cal. 1998) (describing reference to lawyers as "Nightmare Team" as "opinion[], colorfully expressed, which renders the statement at issue simply mere rhetorical hyperbole"); *Marom v. Pierot,* No. 18CIV12094VBJCM, 2020 WL 6572509, at *6 (S.D.N.Y. Aug. 30, 2020), *report and recommendation adopted*, 2020 WL 6565199 (S.D.N.Y. Nov. 9, 2020) (using "hyperbolic" terms such as "nightmare" to describe a house "diminish[ed] the likelihood that a reasonable listener would perceive the statements" as "objective fact.").

**Statements 1, 8, 11, and 12** are also statements of opinion. They include the wholly subjective perspectives, often hyperbolic, of Olin, Young, and Singer's mother, about the business relationship with Plaintiffs. They include words like, "shameful," "intimidated," "explosive," and "manipulative," which are classic hyperbolic opinion because the words "may mean different things to different people, and they are not capable of being proven true or false because of their subjective, relative meanings." *Live Face on Web, LLC*, 2016 WL 1717218, at *2; *see Zysk v. Fid. Title Ins. Co. of New York*, 14 A.D.3d 609, 610 (2d Dep't 2005) (saying someone should be "ashamed" of themselves would be "certainly" understood as "rhetorical hyperbole expressing

[an] opinion of the plaintiff's character"); *Abbitt v. Carrube*, 159 A.D.3d 408, 410 (1st Dep't 2018) (the use of the word "'intimidation' to characterize petitioner's conduct" was "an expression of [defendant's] opinion of [plaintiff's] performance and its effect on" certain relationships); *Small Bus. Bodyguard Inc. v. House of Moxie, Inc.*, 230 F. Supp. 3d 290, 312 (S.D.N.Y. 2017) (accusations of "manipulation" were of the "loose, figurative, or hyperbolic" sort that is not actionable for defamation).[7]

In **Statement 7**, two talent experts opine at a high level and without reference to Plaintiffs on what makes a functional and "ethical" talent management relationship. As discussed above (§ III.c *supra*), the Statement is not about Plaintiffs. But even if it were, whether an act is ethical is nonactionable opinion. *See Mayer v. Riordan*, 55 Misc. 3d 1203(A), at *2 (Sup. Ct. N.Y. Cty. 2017) (holding that statement that plaintiff was "violating ethical principals [sic]" was non-actionable opinion); *accord Beilenson v. Superior Ct.*, 44 Cal. App. 4th 944, 952 (Cal. Ct. App. 1996) (holding that charge of "breach of ethics" was non-actionable opinion).

## F.    Plaintiffs Failed to Plead Actual Malice.

Finally, Plaintiffs' claims should be dismissed because they have failed to plead actual malice, which is required both by New York's Anti-SLAPP Law, N.Y. Civil Rights Law § 76-a, and because Jacob is a public figure. *See Gertz v. Welch*, 418 U.S. 323 (1974). The "actual malice" standard requires sufficient allegations that a statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Sullivan,* 376 U.S. at 279-80. Plaintiffs have failed to meet this high burden.

---

[7] As for the criticisms by Tomlinson, Olin, Underhill and others, the Article includes Plaintiffs' rebuttal that "Ms. Jacob has conducted herself with the utmost professionalism and courage in the face of individuals who attack her both personally and professionally. These individuals attacking her don't want to play by the rules of decent individuals in society, but want to attack Ms. Jacob publicly from the shadows, talking to any individual who is willing to listen to them." *See* Bolger Decl. Ex. 1. Jacob's point of view is, therefore, represented in the Article.

### 1.    The New York Anti-SLAPP Law Applies to This Case.

Unlike the law above, in which California and New York law align, there is a conflict in determining whether actual malice applies to Plaintiffs' claims via the New York Anti-SLAPP Law or California's public figure analysis. Under New York's choice-of-law rules, New York applies the law of the state with the most significant interest in the litigation. *See Lee v. Bankers Tr. Co.*, 166 F.3d 540, 545 (2d Cir. 1999). In evaluating these interests, New York gives greater weight to rules that are "conduct-regulating rules," such as rules governing libel. *Kinsey v. New York Times Co.*, 991 F.3d 171, 176 (2d Cir. 2021). Thus, in *Kinsey,* the Second Circuit determined that a plaintiff's domicile state's interest in protecting its citizens was outweighed by New York's "strong policy interests in regulating the conduct of its citizens and its media." *Id.* at 178. Indeed, courts have long recognized this compelling interest because of New York's unique role:

> [A]s the national center of the publishing industry, [New York] has a significant interest in assuring that the risks and liabilities flowing from publishing…will be uniform. Publishers, authors, and film makers consciously attempt to mold their conduct to legal norms, with the expectation that the legal consequences of their conduct will be predictable. Their justified expectation that their conduct will be judged by the rules of jurisdictions in which they carry on their activities merits protection.

*Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1092 (S.D.N.Y. 1984).

Because Plaintiffs themselves alleged this case has strong connections to New York, FAC ¶ 8, and because of New York's paramount interest in enforcing its libel law to regulate the conduct of its journalists and media, New York's Anti-SLAPP Law must apply.

In 2020, the New York Legislature expanded the Anti-SLAPP Law to "broaden" its scope and "provide greater protections to defendants facing SLAPP suits." *Sweigert v. Goodman*, 18-cv-08653, 2021 WL 1578097, at *1 (S.D.N.Y. Apr. 22, 2021). It did so by "substantially broaden[ing] the reach of the actual malice rule," *see Palin v. New York Times Co*., 510 F. Supp. 3d 21, 25 (S.D.N.Y. 2020), and "broaden[ing] the definition of an action involving public petition and

participation," *Sackler v. Am. Broad. Companies, Inc.*, 71 Misc. 3d 693, 695 (Sup. Ct. N.Y. Cty. 2021). The law now applies, in both federal and state court, to any claim arising from "lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest." N.Y. Civil Rights Law § 76-a ("Section 76-a"). *See, e.g., Coleman v. Grand*, 523 F. Supp. 3d 244, 258 (E.D.N.Y. 2021) (holding that Section 76-a applies to federal courts); *Sweigert*, 2021 WL 1578097, at *2 (same).

The amended Anti-SLAPP Law was designed for claims just like these. The Article concerns matters of "public interest," a term Section 76 *mandates* "shall be construed broadly, and shall mean any subject other than a purely private matter." Section 76-a(d); *see generally Messenger ex rel. Messenger v. Gruner + Jahr Printing & Pub.*, 94 N.Y.2d 436, 441 (2000) (under New York law, the "public interest" must be "broadly construed"). It is the responsibility of publishers, not the courts, to determine what constitutes a matter of public concern: "Absent clear abuse, the courts will not second-guess editorial decisions as to what constitutes matters of genuine public concern." *Huggins v. Moore*, 94 N.Y.2d 296, 303 (1999).

Here, the Article easily meets the broad definition of "public interest." Although Plaintiffs offer conclusory allegations that the Article concerned "private business matters" and did not address a "matter of public concern," *see* FAC ¶ 61, that is plainly not the case. As the FAC alleges, the Article explores a burgeoning "multi-billion-dollar" segment of the entertainment industry, which "has never been bigger, more profitable, and more omnipresent and it continues to grow." FAC ¶¶ 12, 15. In fact, Plaintiffs boast in the FAC of their importance, dubbing themselves "pioneer[s]" of the TikTok industry, who "ha[ve] managed, counseled, and guided dozens of TikTok influencers, including some of the most recognizable names and faces in the industry." *Id.* ¶¶ 12-13. Coverage of the social media industry, which Plaintiffs allege they are a vital part of, is

17

a matter of public interest. New York's Anti-SLAPP Law applies and Plaintiffs must adequately allege that Defendants acted with actual malice.

> ### 2.     Because Plaintiffs Are Public Figures, Actual Malice Is Also Required under California Law.

Should this Court proceed under California law, Jacob is a limited purpose public figure who—as under the New York Anti-SLAPP Law—must prove Defendants acted with actual malice. *See Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881, 888 (9th Cir. 2016). "Whether an individual is a public figure is a question of law that must be assessed through a totality of the circumstances." *Id.* "In undertaking this inquiry, we consider whether (i) a public controversy existed when the statements were made, (ii) whether the alleged defamation is related to the plaintiff's participation in the controversy, and (iii) whether the plaintiff voluntarily injected [him]self into the controversy for the purpose of influencing the controversy's ultimate resolution." *Makaeff v. Trump University, LLC*, 715 F.3d 254, 266 (9th Cir. 2013).

Here, the FAC cements Jacob as a limited purpose public figure for the social media world, stating that she is the CEO of a "leading online creator management and influencer marketing company," a "pioneer" in the "multi-billion-dollar influencer industry," and has managed "some of the most recognizable names and faces in the industry." FAC ¶¶ 12-13. In addition, the Article states that "[b]y January of this year, Business Insider had named Influences and Ms. Jacob one of the top creator managers, and the company was working with some of the most notable influencers on TikTok, including Addison Easterling and Charli and Dixie D'Amelio." *See* Bolger Decl. Ex. 1. And Jacob is prominent enough that she easily received an invitation from Fox News to discuss this lawsuit.[8] California courts have held that sports and entertainment managers are limited

---

[8] After filing the Complaint, Plaintiff Jacob appeared on Tucker Carlson's show to promote the lawsuit and herself. *Talent agent exposes New York Times reporter Taylor Lorenz,* (Oct. 1, 2021),

purpose public figures because they have "entered the public arena," so long as "the challenged statements arose out of the performance of the public role [they] voluntarily undertook." *Roe v. Doe*, No. C 09-0682 PJH, 2009 WL 1883752, at *13 (N.D. Cal. June 30, 2009); *see also Peterson v. Gannett Co., Inc.*, No. 21-15057, 2021 WL 5507338, at *1 (9th Cir. Nov. 24, 2021) (plaintiff was limited purpose public figure related to his "business dealings" where the complaint alleged that plaintiff was a "well-known technology entrepreneur" with a popular website and political connections). There is no question that Jacob is a public figure for the purposes of this lawsuit.

### 3.    Plaintiffs Have Failed to Adequately Plead Actual Malice.

Plaintiffs have not pled actual malice as required by both New York and California law. The Second Circuit has affirmed that to allege actual malice, a plaintiff "must plead 'plausible grounds' to infer actual malice by alleging 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' actual malice." *Biro v. Condé Nast*, 807 F.3d 541, 546 (2d Cir. 2015). Actual malice requires clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement. *See Bose Corp. v. Consumers Union of U.S.*, 466 U.S. 485, 511, n. 30 (1984). Allegations of actual malice that are no more than "pure speculation" and are "supported not by facts but by only conclusory statements" are insufficient grounds to infer actual malice. *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 185 (S.D.N.Y. 2020) (dismissing defamation claim because the plaintiff's allegations of personal bias were insufficient to show actual malice).

Actual malice "is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term." *Harte-Hanks Comms. v. Connaughton*, 491 U.S. 657, 666 (1989). It "is not measured by whether a reasonably prudent man would have published, or would have

---

https://youtube/ggqrOCKopZc. She has also posted a donation campaign to create a "legal fund." https://givesendgo.com/influences.

investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Instead, "[t]here must be sufficient evidence to permit the conclusion that the defendant *in fact* entertained serious doubts as to the truth of his [statements]," *id.* (emphasis added), or had a "high degree of awareness of their probable falsity," *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). Plaintiffs' conclusory and contradicted allegations do not meet this high standard.

*First*, actual malice "cannot be predicated on mere denials, however vehement," since "such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." *Edwards v. Nat'l Audubon Soc'y, Inc.*, 556 F.2d 113, 121 (2d Cir. 1977); *see also Contemporary Mission, Inc. v. N.Y. Times*, 665 F. Supp. 248, 270 (S.D.N.Y. 1987) ("Publication in the face of a denial by plaintiffs of a statement's truth does not demonstrate actual malice."). Accordingly, it is not enough for Plaintiffs to allege, as they do repeatedly, that they disputed the accuracy of certain statements prior to publication. *See, e.g.*, FAC ¶¶ 29, 32, 52-53, 62. For the same reasons, Plaintiffs' allegations that Defendants waited "until the eleventh hour to verify details"[9] with Plaintiffs, or refused to accept off-the-record evidence from Plaintiffs, *see* FAC ¶ 62, are insufficient. That is particularly true here, where Plaintiffs' prepublication responses confirmed, rather than contradicted, the statements in the Article.

The weakness of Plaintiffs' claim of actual malice is underscored by the few concrete examples Plaintiffs allege. For example, Plaintiffs complain that because Lorenz is "a sophisticated, educated, and intelligent journalist," Lorenz should have divined that the express reference to "Influences as a 'dba' of Creator Edge" in Tomlinson's agreement was "incorrect."

---

[9] Nor is it accurate to say that Defendants "waited until the eleventh hour." In fact, Defendants gave Plaintiffs a day to reply and incorporated many of their prepublication statements in the Article. *See* FAC ¶ 22. *See generally* Bolger Decl. Exs. 1 & 3.

FAC n.3. They also allege that because Lorenz once wrote an article about delays in brand payments to *other* influencers, she should have known that Plaintiffs were not responsible for delaying Tomlinson's payments.[10] *Id.* ¶ 38. But these are not the kind of "obvious reasons" to doubt a story's accuracy because they are not about Defendants' actual conduct in writing the Article at all. *See Kerik v. Tacopina*, 64 F. Supp. 3d 542, 573 (S.D.N.Y. 2014) (quoting *Biro*, 963 F. Supp. 2d at 277). Here, there is only speculation that Defendants should have known more. Defendants' failure to read Plaintiffs' mind prepublication, or to simply recite her preferred viewpoint, is not evidence of actual malice.

**Second**, "failure to verify statements with the plaintiff" before publication "do[es] not amount to [actual malice]." *Loeb v. New Times Comms. Corp.*, 497 F. Supp. 85, 93 (S.D.N.Y. 1980). Thus, Plaintiffs' allegations that Defendants did not seek comment on Statements 2, 4, and 10 and that Lorenz refused to accept documents "on background" or "off the record" cannot establish that Defendants acted with "reckless disregard to the truth." FAC ¶¶ 30, 34, 40, 62.

**Third,** Plaintiffs offer conspiratorial allegations that Lorenz had an "economic motive" to assist United Talent Agency ("UTA") agents by defaming Plaintiffs, because Lorenz signed a book deal in which she was represented by a literary agent from UTA. *Id* ¶ 58. Setting aside that it is entirely unclear how Lorenz purportedly defaming Defendants would aid her in securing a book deal with Simon & Shuster (which she procured in June 2020, *two* months before the Article's

---

[10] Plaintiffs mischaracterize this article, which examines why influencers are not timely paid and describes a situation in which management, not the brand, was responsible for failing to promptly pay an influencer. *See* Taylor Lorenz, *When a Sponsored Facebook Post Doesn't Pay Off*, THE ATLANTIC (Dec. 26, 2018), https://www.theatlantic.com/technology/archive/2018/12/massive-influencer-management-platform-has-been-stiffing-people-payments/578767/.

publication),[11] allegations about improper personal biases do not establish actual malice without additional facts to suggest the speaker acted pursuant to that bias. *See Harte-Hanks Commc'ns*, 491 U.S. at 665 ("[A] newspaper's motive in publishing a story—whether to promote an opponent's candidacy or to increase its circulation—cannot provide a sufficient basis for finding actual malice."). In short, Plaintiffs are required to, but did not, plead actual malice.

### G.    Plaintiffs Cannot Rely On the Article's "Impression" or "Tone."

Finally, Plaintiffs attempt to buttress their defamation claims by arguing that the "heart" of their complaint is that even if the statements at issue are true or opinion, they created "false impressions/gists" regarding Plaintiffs' conduct. *See* FAC ¶ 60. But this argument, too, fails as a matter of law. Conclusions based on truthful, disclosed facts are protected as opinion in both New York and California. *Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 153-54 (1993) (where the facts supporting the opinion are fully set forth, the characterization accompanying those facts is a non-actionable opinion); *accord Open Source Sec., Inc. v. Perens*, 803 F. App'x 73, 76 (9th Cir. 2020) (protecting as non-actionable opinion defendant's blog posts that "'expressed [his] opinions and fully disclosed provably true facts on which the opinions were based'"). Accordingly, because the Article meticulously lays out the truthful facts underlying any alleged criticism of Plaintiff, any impression based on those facts is constitutionally protected opinion. *See Small Bus. Bodyguard Inc.*, 230 F. Supp. 3d at 315 (holding that calling someone "unethical, unscrupulous" is a "constitutionally protected statement of opinion").[12]

---

[11] Rachel Deahl, *Lorenz Goes 'Online' at Simon & Schuster,* PUBLISHERS WEEKLY (May 29, 2020) https://www.publishersweekly.com/pw/by-topic/industry-news/book-deals/article/83461-book-deals-week-of-june-1-2020.html.

[12] Plaintiffs attempt to shoehorn defamation-by-implication into their defamation *per se* and *per quod* claims. But these claims are not interchangeable and fatally, Plaintiffs have failed to allege that Defendants *intended* any alleged defamatory implication. *See Biro v. Conde Nast*, 883 F. Supp. 2d 441, 466 (S.D.N.Y. 2012) (holding that a plaintiff must show that the implication can "be reasonably read to impart the false innuendo" and "the author intends or endorses the inference").

Ultimately, Plaintiffs' allegations resemble the failed defamation allegations in *Croce v. New York Times Co.*, 930 F.3d 787 (6th Cir. 2019). There, the article at issue described complaints lodged against the article's subject and raised concerns about errors in the subject's academic papers. *Id.* at 794. Despite the critical nature of the reporting, the Sixth Circuit concluded that "stating that there are allegations against someone and raising these concerns does not necessarily imply guilt." *Id.* The court also observed that the article was not "entirely unfavorable," because, in part, it explained that the subject had never been found guilty of misconduct. *Id.* at 795. The Sixth Circuit concluded, "A reasonable reader would therefore interpret the article as presenting two sides of this controversy." *Id.*; *see also id.* at 790 ("The article is a standard piece of investigative journalism that presents newsworthy allegations made by others.").

Here, too, the Article recounts newsworthy allegations against Plaintiffs made by former clients regarding their professional relationships. The Article does not suggest that either party is in the right. Indeed, the Article intersperses Plaintiffs' refutations with the allegations by her former clients, structurally underscoring the he-said/she-said nature of the reporting. *See generally* Bolger Decl. Ex. 1. Moreover, the Article is not "entirely unfavorable" to Plaintiffs. The Article recognizes Plaintiffs' achievements, including listing big brand deals they have secured, notable influencers they had worked with, and accolades received by Plaintiffs as top creator managers. *See id.* The Article's reporting on negative perceptions held by others of Plaintiffs does not "imply guilt" nor does it convey "false impressions/gists" regarding Plaintiffs' conduct nor negative imputations regarding Plaintiffs' character. Instead, a reasonable reader would understand the Article as reporting on the various sides of a heated dispute—the heart of investigative journalism and of the utmost importance to protect. Thus, even the so-called "heart" of Plaintiffs' claim cannot salvage its fatally flawed complaint and Plaintiffs' defamation claim must fail.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the FAC should be dismissed with prejudice pursuant to Fed. R.

Civ. P. 12(b)(6).

Dated: December 23, 2021

<u>*/s/ Katherine M. Bolger*</u>
Katherine M. Bolger
Nimra H. Azmi
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Phone:        (212) 489-8230
Fax:            (212) 489-8340
katebolger@dwt.com
nimraazmi@dwt.com

*Attorneys for Defendants The New York*
*Times Company and Taylor Lorenz*

## <u>CERTIFICATE OF SERVICE</u>

I, Katherine M. Bolger, hereby certify that on December 23, 2021, a copy of the foregoing

document was filed electronically and served by e-mail to all parties of record via ECF.

<u>*/s/ Katherine M. Bolger*</u>
Katherine M. Bolger