UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARIADNA JACOB and INFLUENCES, INC.

                         Plaintiffs,

    -against-

TAYLOR LORENZ, and THE NEW YORK TIMES
COMPANY,

                         Defendants.

No.: 1:21-cv-06807-ER

## MEMORANDUM OF LAW IN OPPOSITION TO MOTION BY DEFENDANTS THE NEW YORK TIMES COMPANY AND TAYLOR LORENZ TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

**  /s/ Matt Sheppe**
By:    Matthew Sheppe
**REISS SHEPPE LLP**
425 Madison Avenue, 19th Floor
New York, New York 10017
Tel: (212) 753-2424
Fax: (347) 348-0731
Email: msheppe@reisssheppe.com


Joseph Sibley, Esq. (admitted *pro hac vice*)
**CAMARA & SIBLEY LLP**
1108 Lavaca St., Ste 110263
Austin, Texas 78701
Tel: (713) 966-6789
Fax: (713) 583-1131
Email: sibley@camarasibley.com


*Attorneys for Plaintiff*

## **TABLE OF CONTENTS**

Table of Contents ................................................................................................................. i

Index of Authorities ........................................................................................................ ii-iv

Preliminary Statement ........................................................................................................ 1

Summary of Argument ....................................................................................................... 2

Argument and Authorities .................................................................................................. 2

I.  California Law Applies To Plaintiffs' Libel Claims ..................................................... 2

II.  The MTD Glosses Over The Express Defamatory Factual Implications And Misreads The Defamatory Gist Of The Statements In The Article ........................................................ 5

A. The Article Commits Express And Implied Defamation ............................................. 6

B.  Defendants' Other Arguments On Defamation By Implication Fail ........................ 11

C.  The Court Cannot Grant The MTD If The Meaning Is Ambiguous ........................ 13

III.  The Extrinsic Information Does Not Establish Substantial Truth .......................... 13

IV.  The Fair Report/Rhetorical Hyperbole/Opinion Arguments Fail .......................... 17

V.  Plaintiffs Adequately Pleaded Actual Malice ......................................................... 19

Conclusion ...................................................................................................................... 23

## Index of Authorities

**Cases**

*Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373 (1995))....................................................5-6

*Brimelow v. N.Y. Times Co.*, No. 21-66-cv, 2021 U.S. App. LEXIS 31672 (2d Cir. Oct. 21, 2021) ................................................................................................................................22

*Biro v. Conde Nast*, 883 F. Supp. 2d 441 (S.D.N.Y. 2012)........................................................11

*Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163 (2d Cir. 2000)...............................................6, 13

*Cianci v. New Times Publishing Co.*, 639 F.2d 54 (2d Cir. 1980) ...............................................18

*Croce v NY Times Co.*, 930 F3d 787 (6th Cir. 2019)...................................................................12

*Davis v. Ross*, 754 F.2d 80 (2d Cir. 1985)..................................................................................13

*Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862 (W.D. Virg. 2016).......................................21

*Forsher v. Bugliosi*, 608 P.2d 716 (Cal. 1980) .............................................................................5

*Greenberg v. Spitzer*, 155 A.D.3d 27 (2d Dep't 2017)................................................................22

*Harte-Hanks Commc'ns., Inc. v. Connaughton*, 491 U.S. 657 (1989)....................................21-22

*Herbert v Lando*, 781 F2d 298 (2d Cir. 1986)...........................................................................12

*Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988)...............................................................18

*Kinsey v. New York Times Co.*, 991 F.3d 171 (2d Cir. 2021)......................................................2-4

*La Liberte v. Reid*, 966 F.3d 79 (2d Cir. 2020)...................................................................5, 11-12

*Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504 (S.D.N.Y. 2013) ........................................6

*Levin v. McPhee*, 119 F.3d 189 (2d Cir. 1997) .............................................................5

*Loeb v. New Times Comms. Corp.,* 497 F. Supp. 85 (S.D.N.Y. 1980) .........................22

*MacLeod v. Tribune Publishing Co.*, 52 Cal. 2d 536 (Cal. 1959) ................................13

*Martin v Hearst Corp.*, 777 F3d 546 (2d Cir 2015) .....................................................6

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) ..................................................18

*November v. Time Inc.*, 13 N.Y.2d 175 (1963) .............................................................6

*Palin v. N.Y. Times Co.*, 940 F.3d 804 (2d Cir. 2019) ............................................5, 21

*Peterson v. Gannett Co., Inc.*, No. 21-15057, 2021 WL 5507338 (9th Cir. Nov. 24, 2021) ..........20

*Project Veritas v. N.Y. Times Co.,* 2021 N.Y. Misc. LEXIS 2264, 2021 NY Slip Op 31908(U) (Sup. Ct.) (W.D. Virg. 2016) ................................................................20

*Roe v. Doe*, No. C 09-0682 PJH, 2009 WL 1883752 (N.D. Cal. June 30, 2009) ........................19

*Stepanov v Dow Jones & Co., Inc.,* 120 A.D.3d 28 (1st Dep't 2014) ...........................12

*Sweigert v Goodman,* No. 1:18-cv-08653, 2021 US Dist. LEXIS 77704 (S.D.N.Y. Apr. 22, 2021) ....................................................................5

*White v Fraternal Order of Police*, 909 F2d 512 (D.C. Cir. 1990) ..............................12

**Statutes and Rules**

Cal. Penal Code § 647(J)(4)................................................................8

CPLR § 3211(g)..............................................................................5

Fed. R. Civ. P. 12(b)(6)............................................................. passim

N.Y. Civil Rights Law 76-a ..............................................................5

**Secondary Authorities**

Rodney A. Smolla, 1 Law Of Defamation § 4:17 (2d ed. 2011)................................5

ARIADNA JACOB ("*Jacob*") and INFLUENCES, INC. ("*Influences*" and, together with Jacob, the "*Plaintiffs*"), file this Memorandum of Law in Opposition to the Motion (Doc. 16) by THE NEW YORK TIMES COMPANY ("*The Times*") and TAYLOR LORENZ ("*Lorenz*" and, together with *The Times*, the "*Defendants*") to Dismiss Plaintiffs' First Amended Complaint for libel under California law (Doc. 13, "*FAC*") and would respectfully show the Court as follows:

## PRELIMINARY STATEMENT

Defendants' motion to dismiss seeks dismissal of the FAC with prejudice pursuant to Fed. R. Civ. P. 12(b)(6) ("*Rule 12(b)(6)*") on grounds that New York—not California—law applies and that thereunder Plaintiffs fail to state a plausible claim for libel based on the article published by Defendants on August 14, 2020 (the "*Article*", Doc. 18-1) either because of failure to plausibly plead essential elements or because of affirmative defenses that appear from the face of the FAC. *See generally Defendants' Memorandum of Law in Support of Their Motion to Dismiss* (Doc. 17, the "*MTD"*).  The MTD also relies on documents outside of the pleadings, including certain of alleged communications and documentation provided by Plaintiffs to Defendants prior to publication of the Article.  *See* Docs. 18-3; 18-4.  These documents, however, are incomplete.  *See* January 24, 2022 Declaration of Ariadna Jacob ("*Jacob Decl.*") at ¶ 2 (Ex. 1).  Plaintiffs incorporate the entirety of the most pertinent pre-publication communications herewith.[1]  *See* Ex.

---

[1] Whether Rule12(b)(6) permits Defendants to even include the pre-publication communications between Plaintiffs and Defendants is dubious because no one communication was specifically identified in the FAC.  Rather, the FAC merely discusses "documents and information" that were provided to Defendants.  *See generally* FAC.  Plaintiffs do not object to the inclusion of these materials, however, provided that Plaintiffs may utilize the additional communications in this Response as Defendants have selectively chosen communications and documents they received pre-publication and these do not represent the complete set of pre-publication communications.  Jacob Decl. at ¶ 2.  The pertinent communications are included herewith as Ex. 1-A to the Jacob Decl.

1-A to Jacob Decl.  For the reasons discussed below—regardless of whether California or New York law applies—Plaintiffs plausibly state claims for libel and the MTD should be denied.

**SUMMARY OF ARGUMENT**

The MTD should be denied for a myriad of reasons.  <u>First</u>, the MTD incorrectly concludes that New York—not California—law applies to Plaintiffs' claims.  <u>Second</u>, the MTD improperly looks at each statement in isolation to tease out innocent meaning and also ignores the implied defamatory meanings of the statements and gists of the Article.  <u>Third</u>, the pre-publication information and documents do not prove the substantial truth of the complained-of statements/gists of the Article.  <u>Fourth</u>, the complained of statements/gists are not protected opinion or subject to the fair report privilege.  <u>Finally</u>, regardless of what law applies, Plaintiffs' plausibly and properly pleaded actual malice.

**ARGUMENT AND AUTHORITIES**

**I.      California Law Applies To Plaintiffs' Libel Claims.**

Defendants concede that New York and California law contain some substantive conflicts on the tort of libel.  Defendants argue that New York—not California—law applies to Plaintiffs' libel claims.  Defendants cite *Kinsey v. New York Times Co.*, 991 F.3d 171 (2d Cir. 2021) in support of this argument.  However, *Kinsey* actually recognizes that "[u]nder New York choice-of-law rules in defamation cases the state of the plaintiff's domicile will usually have the most significant relationship to the case, and its law will therefore govern." *Id.* at 176-77 (collecting cases).  *Kinsey* did hold that New York—and not D.C.—law applied to the alleged defamatory publication by *The Times* because, in that case, the only alleged connection D.C. had to the publication was that some of the events reported on happened in D.C. and plaintiff's employment was allegedly adversely

2

affected in D.C.  *Id.* at 178.  But the *Kinsey* plaintiff was domiciled in Maryland—not D.C.—at the time of the publication.  *Id.*

Here, both Plaintiffs were domiciled in and were citizens of California at the time the Article was researched and published.  FAC at ¶ 10.  Second, the Article focused entirely on California, Plaintiffs and other witnesses' activities in California, California labor laws, proceedings before the California Labor Commission, and used sources residing in California at the time the Article was written.  *Id.*; *see also generally* Article.  Defendants attach as an exhibit and request the Court take judicial notice of a complaint filed with the California Labor Commission for alleged violations of California law that Defendants contend provided source material for the Article.  *See* Doc. 18-6.  In fact, every single source Defendants disclosed as being interviewed for the Article resided in California at the time the Article was researched and written.  FAC at ¶ 10; *see also generally* Article.  Finally, Plaintiffs have also made the uncontroverted allegation that for a least part of the researching and/or drafting of the Article, Defendant Lorenz resided in California.  FAC at ¶ 10.  Thus, unlike in *Kinsey*, there is not a "multi-state" analysis of choice of law, but only a contest between California (place of residence of Plaintiffs and apparently Defendant Lorenz who appears to have relocated to California shortly before the Article was published[2]) and New York, the domicile of the media defendant publisher.

In weighing "all the factors that might impact on the interests of various states in the litigation . . . includ[ing,] where [the] plaintiff suffered the greatest injury; where the statements emanated and were broadcast; where the activities to which the allegedly defamatory statements refer took place; and the policy interests of the states whose law might apply" (*Kinsey*, 991 F3d at

---

[2] *See* FAC at ¶ 10; *see also* https://www.latimes.com/entertainment-arts/story/2020-07-17/twitter-taylor-lorenz-los-angeles-new-york-stereotypes (last visited Jan. 23, 2022).

177), this is an easy call for the Court. First, as discussed above, Plaintiffs' primary injuries (lost contracts) were felt almost exclusively in California, mitigating strongly in favor of California. Second, the Article emanated from sources in California, court filings in California, California laws, and from Lorenz who resided in California for at least part of the writing/research for the Article. Thus, the only connection that New York has to the controversy is the fact that *The Times* is domiciled in New York and that Lorenz may have written some of the Article in New York and utilized *Times* resources there. This factor arguably weighs in favor of California as well but, at minimum, this factor weighs evenly between the states and certainly does not weigh in favor of New York.[3]  FAC at § 8.

Finally, there is no significant policy interest that New York has in reporting on exclusively California activities, California judicial proceedings involving California citizens, California laws, and conduct occurring exclusively in California that would trump California's policy interests. Compared to the above-referenced factors detailing the laser-focused reporting of the Article on California residents, California laws, California lawsuits, California sources, a *Times* reporter (Lorenz) residing in California while writing the Article, and conduct occurring entirely in California, any conclusion other than California being the most significant situs of the tort and having the most significant contact to the libel claims is patently unreasonable. If California law does not apply here, then it is difficult to imagine any fact set where the Court could apply the law

---

[3] The fact that Plaintiffs pleaded that there are sufficient "minimum contacts" between Lorenz's writing of the Article and New York to allow this Court to exercise personal jurisdiction over her (FAC ¶ 8) does not mean, as Defendants have suggested, that New York has the "most significant contacts" with the controversy. Otherwise, the choice of law analysis would simply collapse into a single question of whether the defendant was subject to the jurisdiction of the forum state and then applying the forum state's law. The fact that Defendants utilize Plaintiffs' jurisdictional allegations as to California citizen Lorenz having sufficient minimum with New York in support of their choice of law argument underscores the weakness of their arguments.

of the plaintiff's forum over a New York media defendant.  Accordingly, the Court should reject Defendants' arguments for the application of New York law and instead apply California law.[4]

## II.   The MTD Glosses Over The Express Defamatory Factual Implications And Misreads The Defamatory Gist Of The Statements In The Article.

Regardless of what law applies, it is black letter defamation law that, in order to determine the meaning of a publication, the Court must read the entire publication to determine the overall meaning and gist, without engaging in a "hair-splitting analysis" of what is said in a statement to find an innocent meaning that would not be found by the common sense "person on the street" and not the careful or "literal" reader.  *See Forsher v. Bugliosi*, 608 P.2d 716, 722 (Cal. 1980); *see also* Rodney A. Smolla*, 1 LAW OF DEFAMATION § 4:17 (2d ed. 2011).  At the motion to dismiss stage, the court "must decide whether the statements, considered in the context of the entire publication, are reasonably susceptible of a defamatory connotation, such that the issue is worthy of submission to a jury." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (citations and quotations omitted).  This determination is "guided not only by the meaning of the words as they would be commonly understood . . . but by the words considered in the context of their publication." *Levin v. McPhee*, 119 F.3d 189, 195 (2d Cir. 1997) (citing *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 381 (1995)).  Allegedly defamatory statements must not "be read

---

[4] Even if the Court determines that New York provides the substantive rule of law for Plaintiffs' libel claims, Defendants ambiguously argue that the "New York Anti-SLAPP law" applies to this case.  To be clear, while N.Y. Civil Rights Law 76-a does indeed provide the substantive New York rule of law for libel, it does not carry with it the special motion to dismiss (Anti-SLAPP motion) provisions of CPLR § 3211(g).  *See Sweigert v Goodman,* No. 1:18-cv-08653, 2021 US Dist. LEXIS 77704, at *6 (S.D.N.Y. Apr. 22, 2021) (following *La Liberte v. Reid*, 966 F.3d 79 (2d Cir. 2020) and its holding that California's Anti-SLAPP law's allowance of a special motion to dismiss does not apply in federal court because it conflicted with Fed. R. Civ. P. 12 and 56 to draw the same conclusion as to CPLR § 3211(g) and rejecting a special motion to dismiss under New York's Anti-SLAPP law).  Thus, the MTD is a Rule 12(b)(6) motion, governed by plausibility pleading standards, and is not an "Anti-SLAPP" motion under New York law.

in isolation but must be perused as the average reader would against the 'whole apparent scope and intent' of the writing." *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) (quoting *November v. Time Inc.*, 13 N.Y.2d 175, 178 (1963)).  As such, a publication may commit "defamation by implication" where there are false suggestions, impressions and implications arising from otherwise truthful statements.  *Armstrong, Inc.*, 85 N.Y.2d 373, 381 (1995).  Indeed, defamation by implication can include statements whose falsity is based not on what was said, but rather "by omitting or strategically juxtaposing key facts".  *Martin v Hearst Corp.*, 777 F3d 546, 552 (2d Cir 2015).  Defendants, in the MTD, impermissibly ask the Court to "strain" to interpret statements in their most mild or defamatory sense and ignore their implications to the ordinary reader.  *See Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 518 (S.D.N.Y. 2013).

> A.     **The Article Commits Express And Implied Defamation.**

Here, apparently recognizing that their best argument is to cherry-pick individual statements from the Article and dissect them with a scalpel of innocuity, Defendants spend only two pages at the tail end of their MTD arguing that Plaintiffs may not sustain their defamation by implication action.  By way of reminder, Plaintiffs pleaded in the FAC that the Article created the false and defamatory impressions that:  (1) Plaintiffs "leaked" nude photos of a client; (2) Plaintiffs had the police called on them by clients for threatening and intimidating behaviors: (3) Plaintiffs lied about the status of their business relationships with influencers and business partners; (4) Plaintiffs acted unethically by signing clients to unconscionable contracts that caused them financial ruin; and (5) Plaintiffs failed to honor their contractual obligations with their clients.  FAC ¶ 60.

Defendants' unrealistic reading of the Article is demonstrated by their take on the portion of the Article that implies that Plaintiffs had the police called on them by their clients for threatening and intimidating behavior:

> "We were often very intimidated by Ari because the conversations became explosive," said Ms. Singer.  In mid-June, Ms. Singer and others left the house. They described a hectic move-out day that involved an escalating verbal fight with Ms. Jacob which resulted in several calls to local authorities to intervene.  The group documented the day's events on Instagram Stories; Ms. Jacob said she asked not to be filmed, but she recorded the events too. In an email from her lawyer, Ms. Jacob denied that a fight took place.

Article at pp. 4-5 [**Statement 11**].[5]  Any reasonable reader would conclude that Defendants are intentionally suggesting, by the language and context used, the Plaintiffs' "intimidating" and "explosive" and "escalating verbal fights" with the influencers prompted in "several calls to the local authorities to intervene".  The Article sees fit to refer to an email from Ms. Jacob's lawyer "denying" that a fight took place but fails to correct the false impression created by the Article by disclosing the truth – that it was *Jacob* who twice called the police because of the influencers threatening behavior and vandalism.  *See* FAC at ¶¶ 46-48; Doc. 18-4 at 3; Ex. 1-A to Jacob Decl. at 1.

Defendants devote only a few sentences to this portion of the Article to argue it is substantially true and opinion.  MTD at 9, 14-15.  Defendants first argue that the literal truth of the above-referenced statements make them invulnerable to defamation.  But while it is literally true that the police were called twice, an ordinary reader would conclude the police were called on Jacob by the influencers – not vice versa.  Moreover, reporting that the influencers had vandalized the property and painted "F*** Ari" on the walls would have cast a material different impression

---

[5] References to "**Statement     **" herein shall track Defendants' monikers in the MTD as defined by Doc. 18-2.

on the mind of the ordinary reader than that cast by Defendants.  While the Article gives the impression that Plaintiffs were intimidating and unhinged, striking fear in the influencers and prompting them to call the police on Plaintiffs, the reality is that the influencers engaged in violent criminal mischief and it was, in fact, Plaintiffs who called the police for their own protection.  And contrary to Defendant's argument that this was protected opinion, whether Jacob was the complaining party who called the police on the influencers due to objectively verifiable criminal behavior as opposed to being the party who had the police called on her is an objectively verifiable statement of fact.

And this problem pervades the MTD.  For example, perhaps the most egregious defamatory statement in the Article is the false allegation that

> "She manipulates you, it's a nightmare," Mr. Young said.  He said that she used nude photos of his to shame him.  "Right before we parted ways she leaked my nudes and sent them to business partners, people in my house and potential investors to slander my name, saying I was unprofessional," Mr. Young said.  "Ms. Jacob informed an internal consultant of the picture's existence," Ms. Jacob's lawyer wrote, and clarified that she did not "publicly" leak the photos.

Article at 5 [**Statement 12**].  This overtly—and impliedly—accuses Plaintiffs of a criminal offense.  In California, where this alleged conduct took place, it is a criminal offense to leak nude photos of another person without their consent, as Jacob was accused of doing here.  *See generally* CAL. PENAL CODE § 647(J)(4) (the "revenge porn" statute).  How do Defendants respond to this?  Shockingly Defendants argue that the accusations that Plaintiffs engaged in "leaking" of nude photos and circulating them to multiple third parties is substantially true because Plaintiffs admit that they informed a third-party[6] of the picture's existence.  MTD at 10.

---

[6] The "third party" was actually an employee of Plaintiff Influences who was under a non-disclosure agreement.  Doc. 18-4 at 23.

8

This is like saying that a partner in a law firm who is made aware of a website with compromising pictures of another law firm partner on the internet and then shares it with human resources (i.e., "Hey, are you aware of this?") stands in the same position as the person who originally "leaked" the compromising pictures. This is an absurd conclusion. Defendants could have easily clarified in the Article that Plaintiffs had nothing to do with publicly disclosing (i.e., "leaked") nude photos of Mr. Young.[7] Instead, they chose to leave the impression that Plaintiffs did, in fact, "leak" photos of Mr. Young and use them for improper purposes. This is an objectively verifiable fact—not opinion—and Defendants' argument that leaking nude photos of someone is the same thing as telling someone that nude photos were leaked is simply preposterous.

Finally, Defendants argue that **Statements 4, 5, 7**, and **13** are not capable of defamatory meaning. MTD at 10. Defendants' arguments on this point are either moot or suffer from the same infirmities as described above. For example, Plaintiffs do not contend that **Statements 4, 7**, and **13** (regarding the initial contact with Brittany Tomlinson ("***Tomlinson***"), the contract "experts", and the termination of the relationship with the "Drip Crib") are, in and of themselves, defamatory. However, coupled with the surrounding statements and in the entire context of the Article (as discussed above and below), these statements create the false gist that Plaintiffs acted unethically by targeting unsuspecting influencers (i.e., "Hey, want to make some money?") into signing unconscionable contracts causing them financial ruin and that Plaintiffs failed to honor their contractual obligations with their clients. However, the allegations of falsity also support Plaintiffs' allegations that Defendants acted with complete aversion to the truth because they either did not even question the factual accuracy of these statements prior to publication (FAC ¶ 34) or

---

[7] The common definition of "leak" includes being the *source* of public disclosure of information. *See* https://www.merriam-webster.com/dictionary/leak (last visited Jan 24, 2022).

knew they were false (FAC ¶¶ 34; 50 (even the hyperlink to the Drip Crib rent story does not support the accuracy of the statement)).

However, **Statement 5** creates the false and defamatory impression that Jacob lied about her relationship with Gary Vaynerchuk ("***Vaynerchuk***"). Defendants claim that the Article merely clarifies a business relationship that was "puffed" by Plaintiffs. But the record shows that the only question that Defendants asked in this regard was whether Vaynerchuk "mentored" Jacob, which Plaintiffs confirmed was true. Doc. 18-4 at 2. However, the Article's statement (and apparently the question asked to Vaynerchuk to "fact-check" this claim) was not "did you mentor Jacob?", but rather "are you affiliated with Influences?" These two things have nothing to do with one another. If one claims they were mentored by David Boies prior to forming their own law firm, the way to fact-check this claim would be "Mr. Boies, did you mentor John Doe?" and not "Mr. Boies do you have an affiliation with Doe & Doe LLP?' But this is exactly what Defendants did, creating a false and defamatory gist that Plaintiffs lie about their business relationships and, in fact, Defendants clearly intended for that false impression to occur because there is no other reason why Defendants would thusly juxtapose these facts (and without disclosing that it was *true* that Jacob was mentored by Vaynerchuk). **Statement 5** carries defamatory meaning by implication and demonstrates Defendants created the impression with knowledge of falsity and reckless disregard for the truth.

Defendants' juxtaposition made it appear that Jacob had made a false claim to Tomlinson to seduce her into an unconscionable contract. But it was, in fact, true that Vaynerchuk had mentored Jacob, regardless of his "affiliation" status with her new company, Influences. Lorenz purposefully phrased the question to Plaintiffs to include "mentor" verbiage and phrased the question to Vaynerchuk with "affiliation" verbiage so as to manufacturer an apparent

"inconsistency" to fit the preconceived narrative.  In fact, Vaynerchuk offered Tomlinson a spot on a super bowl commercial expressly because of Tomlinson's relationship with this friend and protégé, Jacob.  Defendants were aware of these facts prior to publication of the Article.

### B.   Defendants' Other Arguments On Defamation By Implication Fail.

As to the other defamatory implications/gists of the Article, Defendants tie their fate to Defendants' other arguments regarding substantial truth (refuted below) by arguing that because the "Article meticulously lays out the truthful facts underlying any alleged criticism of Plaintiff, any impression based on those facts is constitutionally protected opinion."  MTD at 22.  As just discussed, and as discussed further in this Response, Plaintiffs did not—much less "meticulously" do so—lay out "truthful" facts regarding Plaintiffs. The Court can, based on the entirety of the Article, find that the ordinary reasonable reader would draw the conclusions that Plaintiffs (1) lied about the status of their business relationships with influencers and business partners; (2) Plaintiffs acted unethically by signing clients to unconscionable contracts that caused them financial ruin; (3) Plaintiffs failed to honor their contractual obligations with their clients.  FAC at ¶ 60. Defendants do not get the protection of "opining" these impressions because Defendants did not truthfully present the factual underpinnings of those "opinions" when they falsely claimed that Plaintiffs had the police called on them for unruly behavior and "leaked" revenge porn breaking the law.[8]

---

[8] Defendants drop a footnote in the MTD (n. 12) claiming that Plaintiffs failed to plead that Defendants affirmatively intended the implications Plaintiffs allege the Article conveyed, which Defendants' claim is a requirement under New York law.  First, California should apply here. Second, Defendants never raised this issue in their conference letter on the motion.  *See* Doc. 7. Third, the case Defendants cite, *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 466 (S.D.N.Y. 2012) does not purport to impose a heightened pleading requirement under New York law, but rather holds that a plaintiff alleging defamation by implication under New York law must "show" the defendant's intended implications.  *See id.*  Plaintiffs object to the imposition of any heightened pleading requirement that would conflict with Fed. R. Civ. P 12 (*cf. generally La Liberte*, 966 F.3d

Thus, unlike the case Defendants rely on, *Croce v NY Times Co.*, 930 F3d 787 (6th Cir. 2019), the Article does suggest Plaintiffs are "guilty of any of these allegations and charges of scientific misconduct" and "suggest that these allegations are true" as discussed above and herein. *Id.* at 794-795  Moreover, unlike in *Croce*, the Article did not use language that qualified the statements made by others as mere "allegations" contradistinguishing this case from *Croce*, which specifically acknowledged that in a case such as this "the Defendants potentially could be liable for reporting third-party statements." *Id.*  Moreover, unlike the article in *Croce* that specifically disclosed the plaintiff had not been found guilty of any misconduct, the Article makes not such exculpatory qualification even though it is, in fact, true that Plaintiffs have never been found culpable—or even charged with—violating any laws (revenge porn, labor, or otherwise) in connection with the operation of their business.  *Cf. with id.* ("The article explains that Dr. Croce

───────────────────

79) and, further, to the extent that the Court finds that both New York law applies and this is a pleading requirement, Plaintiffs request leave to replead this element.  Finally, Plaintiffs can demonstrate that Defendants intended these impressions *objectively* from an examination of the Article and pre-publication materials in the record.  *See Stepanov v Dow Jones & Co., Inc.,* 120 A.D.3d 28, 37 (1st Dep't 2014) ("[I]t is not a subjective standard like the 'actual malice' test, but an objective one that asks whether the plain language of the communication itself suggests that an inference was intended or endorsed.").  In making this determination, the Court must examine whether "the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant intends or endorses the defamatory inference".  *White v Fraternal Order of Police*, 909 F2d 512, 520 (D.C. Cir. 1990).  Even if the proof indicates that the Defendants did not mean to endorse the negative innuendo, but the communication, read or viewed as a whole objectively, conveys that the publisher meant such meaning, the test is met.  *See Herbert v Lando*, 781 F2d 298, 307 n 4 (2d Cir. 1986).

Plaintiffs have made the showing Defendants endorsed inferences regarding the police being called on them, violating the "revenge porn" laws by leaking nude photos, and lying about client relationships above and herein.  Defendants also cited to purported "expert" opinions endorsing the inference that Plaintiffs acted unethically by signing clients to unconscionable contracts that caused them financial ruin and failed to honor their contractual obligations with their clients, thus justifying the Article's title "getting signed isn't everything"  As such, this element—assuming it applies—is shown objectively by the Article itself.

has never been found to have committed misconduct…").  Accordingly, Plaintiff has sufficiently stated claim for defamation by implication that (1) Plaintiffs "leaked" nude photos of a client; (2) Plaintiffs had the police called on them by clients for threatening and intimidating behaviors: (3) Plaintiffs lied about the status of their business relationships with influencers and business partners; (4) Plaintiffs acted unethically by signing clients to unconscionable contracts that caused them financial ruin; (5) Plaintiffs failed to honor their contractual obligations with their clients. FAC at ¶ 60.

### C.      The Court Cannot Grant The MTD If The Meaning Is Ambiguous.

Where the challenged statements are "susceptible of multiple meanings, some of which are not defamatory," the court may not conclude, as a matter of law, that the statements are or are not defamatory.  *Celle.*, 209 F.3d at 178 (citing *Davis v. Ross*, 754 F.2d 80, 83 (2d Cir. 1985)).  At minimum, the statements, implications, and gists described above are *susceptible* to a defamatory meaning and, therefore, even if they do not *necessarily* carry the defamatory meaning Plaintiffs suggest, the Court should deny the MTD as this is a matter for the factfinder.  *See, e.g., MacLeod v. Tribune Publishing Co.*, 52 Cal. 2d 536, 546 (Cal. 1959) (collecting cases on this principal of California law).

### III.     <u>The Extrinsic Information Does Not Establish Substantial Truth</u>.

Defendants claim that "most" of the Article is substantially true based on pre-publication information exchanged between Plaintiffs and Defendants as well as a contract with Tomlinson ("***Tomlinson Contract***", <u>Doc. 18-5</u>) and a labor complaint filed by her ("***Tomlinson Complaint***", <u>Doc. 18-6</u>).  *See* MTD at 5-10.  Each will be dealt with in turn.[9]

_____

[9] **<u>Statements 11</u>** and **<u>12</u>** are discussed in the preceding section *supra* as to the substantial truth issue.  Plaintiffs contend that **<u>Statements 10</u>** and **<u>13</u>** are false but will not contest the argument of substantial truth as to that Statement's independent and individual actionability.  However, the

First, Defendants argue that **Statement 6** is substantially true because Tomlinson's Complaint made these allegations.[10]  *See* Doc. 18-6.  But this is false.  First, Defendants' rendition of **Statement 6** does not include the most important sentence, which is where Tomlinson said, "By January, I realized I hadn't been paid since Halloween".  FAC at ¶ 36.  As Plaintiffs detailed to Defendants, these monies were not paid to Tomlinson because the *brands* had not yet sent checks. *See* FAC at ¶ 38; Doc. 18-4 at 18.   The Tomlinson Complaint complains of approximately $23,000.00 that Tomlinson claimed that Creator Edge was not entitled to retain as a commission (Doc. 18-5 at ¶ 14; Doc. 18-4 at 18).  But the "I hadn't been paid since Halloween" money was approximately $100,000 that had not yet been paid by the brands and therefore was not being "withheld" by Plaintiffs.  This was specifically disclosed to Defendants.  Doc. 18-4 at 18.  Lorenz knew this was the process, but now feigns ignorance.[11]

---

Statement is still relevant to the overall gist and implications of the Article demonizing Plaintiffs in various ways.

[10] Plaintiffs will not quibble over the Article's erroneous attribution of the Tomlinson contract to Jacob as opposed to Creator Edge.  However, the Tomlinson Complaint clearly states the contract was with Creator Edge (dba Influences) and that Tomlinson was supposedly duped into signing with Creator Edge based on false representations.  Doc. 18-6 at ¶ 6.  If Defendants were supposedly "fair reporting" on this Complaint, why not just say it was with Jacob and not with an entity she had ownership in?  Instead, in the MTD, Defendants argue "how were we supposed to know?"  Other than being expressly stated in the Complaint they were "fair reporting on", Creator Edge was also listed as the signatory on the Tomlinson Agreement that Defendants apparently had prior to publication, even though it was unauthorized. *See* Doc. 18-5 at sig. block and Schedule 1, ¶ 8 (making terms of Tomlinson Agreement confidential).  Finally, Plaintiffs informed Defendants that Tomlinson was signed to Creator Edge prior to publication.  Doc. 18-4 at 18.  This simply serves to demonstrate how Defendants were intent on covering Plaintiffs' names with negativity, justified or not.

[11] *See* Lorenz's 2018 article for *The Atlantic* at https://amp.theatlantic.com/amp/article/578767/ discussing the practice of brand to manager to influencer payments that she would later falsely impugn Plaintiffs for with respect to Tomlinson in the Article.

So, with respect to **<u>Statement 6</u>**, Plaintiffs do not complain of any quotations from the Tomlinson Complaint, disclosing it was filed, or discussing the allegations.[12]  Plaintiffs complain that Defendants falsely juxtapose the $100,000 worth of brand deals that *had not yet been paid* from Halloween 2019 to January 2020 (no fault of Plaintiffs) and the $23,000 disclosed in the Tomlinson Complaint seeking recovery of commissions that had been retained for brand deals *already paid*.[13]  The pre-publication materials and the Complaint make clear these are not the same thing.  <u>Doc. 18-5</u> at ¶ 14; <u>Doc. 18-4</u> at 18.  Defendants knew this, but nonetheless chose to create the false implication that Plaintiffs pocketed the money and withheld paying Tomlinson her share under the Tomlinson Agreement.  Doc. 18-4.

The defamatory import of **<u>Statement 1</u>** is not as described by Defendants in the MTD.  The defamatory import is that Plaintiffs falsely promised they would provide a guaranteed quota of brand deals that would generate sufficient revenue for the KND influencers to cover their share of the rent.  FAC ¶ 29.  But that is false.  The pre-publication materials demonstrate this, by informing Defendants that the agreement with the KND influencers was that they would pay half of the rent *and* create content for Plaintiffs in return for Plaintiffs providing the house and paying the other half of the rent.  <u>Doc. 18-3</u> at 4.  There was never any agreement wherein Plaintiffs guaranteed a number of deals that would enable the KND to pay their half of the rent.  *See id.;* Ex. A to Jacob Decl. at 1.

As for **<u>Statement 3</u>**, in the MTD, Defendants sneakily change the Article's gist from Plaintiffs demanded the influencer "cover a larger share of rent" (previously disclosing in

---

[12] And for these same reasons, the "fair report" privilege is inapplicable as discussed below.

[13] As the Court can see from the Tomlinson Complaint, the Complaint alleges that commissions were unlawfully taken from Tomlinson's previous brand payments because of the lack of a talent license in California and, therefore, those commissions should be forfeited.  *See generally* <u>Doc. 18-6</u>.

**Statement I** it was half of the rent) to "more than they had previously been paying" (MTD at 7-8).  Once again, this is an absurd equivocation.  The reasonable reading is that Plaintiffs "upped the rent" on an already struggling group of influencers who were supposedly falsely promised a quota of brand deals and were now in a "living nightmare".  Defendants completely defy all credulity by suggesting to the Court that the Article's **Statement 3** gist as written would strike the ordinary reader the same as "Plaintiffs had been letting the KND slide on paying their share of the rent until the end of July but were then asked to pay their contractually obligated share after being found breaching their agreements and hiding income".  Doc. 18-3 at 4.  Not only would it not strike the reader the same way, but it would also cut against Defendants' false narrative that Plaintiffs were oppressive to the influencers and making their experience a financial "nightmare".

As for **Statement 8**, Defendants claim that Plaintiffs' alleged promises to the GIV influencers of "brand deals, money and opportunities" and that "[e]veryone was promised income, but that never happened" are rendered substantially true by Doc. 18-3 at 3.  However, this reference does not even address this claim, nor do any others in the pre-publication documents.  As such, the MTD fails to establish substantial truth on this point.  Similarly, with **Statement 9**, Defendants claim that the pre-publication documents demonstrate the substantial truth of the false claim that Plaintiffs installed a camera in the GIV house without their consent.  But those documents (cited to Doc. 18-3 at 6 and Doc. 18-4 at 2) do not establish this.  To the contrary, the documents demonstrate the GIV girls were informed of the cameras, all in public areas.  Doc. 18-3 at 7.  Of course, because Defendant's used Tiana Singer, a non-GIV influencer, as a source, they set themselves up for failure to determine the accuracy of these statements.

Finally, **Statement 2** is not substantially true.  First, contrary to the MTD's assertion, Plaintiffs do not "admit" the KND had financial struggles, but rather admit the Article makes this

claim.  FAC at ¶ 31.  Second, **Statement 2** claims that the KND "didn't have working Wi-Fi for a month".  "Working Wi-Fi" suggests some problem with the Wi-Fi that is attributable to Plaintiffs' dereliction of duty, especially in the context of the parade of Plaintiffs' horribles that surround the statement.  Further, the pre-publication documents cited to in the MTD (Doc. 18-3 at 7) refers to the GIV house – not the KND house.  As such, the MTD fails to establish the substantial truth of the Statement.

### IV.     The Fair Report/Rhetorical Hyperbole/Opinion Arguments Fail.

Consider the following hypothetical statement:

> In my opinion, John Doe felt the crunch of the COVID recession and appeared to explosively rob the Salvation Army Santa Claus yesterday with a shiny revolver at the corner of Park Avenue and 57th Street creating a living nightmare.

Clearly, if John Doe did not really rob the Salvation Army Santa Claus, then this statement is actionable for defamation.  Imagine, however, if John Doe attempted to defend the defamation action by claiming that words like 'in my opinion", "felt the crunch", "appeared", "explosive", "shiny", and "living nightmare" made the statement "non-actionable hyperbole and opinion".  That argument would be patently ridiculous because clearly John Doe was defamed by the factual implication that he committed an armed robbery at a specific time and place.  This is an objectively verifiable fact.  Whether he used a shiny or rusty revolver, or whether he did it because of a COVID recession or just for thrills, and what type of "nightmare" it created are all completely irrelevant to the objective verifiability of the statement and thus defamatory import.

Yet, these are exactly the arguments that Defendants make in the MTD.  Defendants claim that **Statements 1, 3, 8, 11**, and **12** are non-actionable opinion and rhetorical hyperbole.[14]

---

[14] Plaintiffs concede that **Statement 7** is, in and of itself, non-actionable.  However, as discussed above, the Statement is relevant to creating other defamatory gists and implication given its context and juxtaposition in the Article.

Plaintiffs have detailed above how they believe these Statements should be properly construed, in the context in which they were made, and what factual implications are created by them.  The fact that these Statements may include some rhetorical hyperbole and/or some opinion, does not magically insulate the factual claims made from actionable defamation.  Plaintiffs do not sue for defamation based on the "crunch" or "living nightmare" language but of other express and implied factual assertions created by Article.

In fact, *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) expressly rejected Defendants' argument.  *See id.* at 19 (refusing to create "an artificial dichotomy between 'opinion' and fact"). In that case, the Court held that context has nothing to do with whether a statement is opinion or fact but only what the statement actually says.  *See id.*, 497 U.S. at 18 ("[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.'") (quoting *Cianci v. New Times Publishing Co.*, 639 F.2d 54, 64 (2d Cir. 1980) (Friendly, J.).  *Milkovich* listed other types of "non-fact" speech that are worthy of constitutional protection, which were not opinion, such as "loose, figurative, or hyperbolic language".  *See id.* at 19.  Whether a statement should be read to actually assert facts or is instead "rhetorical hyperbole" must be determined by the context.  *See id.* at 16-17 (citing, *e.g.*, *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988) (holding ad parody "could not reasonably have been interpreted as stating actual facts about the public figure involved")).  The Court can read the plain language of the Statements in the Article in context, to easily make this determination that Article makes express and implied defamatory factual assertions against Plaintiffs as a "main course", regardless of whether it is dressed in rhetorical garnishments and opinion side dishes.  As such, Defendants' arguments should be rejected.

Finally, Defendants argue that **Statement 6** is protected by the fair report privilege under New York law.  MTD at 12-13.  But as discussed above, New York law does not apply.  Even if it did, however, Defendants' argument makes the same attempt to taint the entire Article with a pinch of privilege.  As discussed above, with respect to **Statement 6**, Plaintiffs do not complain of the fact that Defendants disclosed the existence of the Tomlinson Complaint, the proceeding, or the allegations that she claimed $23,000.00 – all of which Plaintiffs concede are covered by the fair report privilege.   However, Plaintiffs complain that by juxtaposing the statement from Tomlinson in January 2020 that she had not been paid since Halloween of 2019 next to the discussion of the Tomlinson Complaint, that Defendants created a false and misleading impression that Plaintiffs had money of Tomlinson's that they were keeping from her.  In reality, the "not been paid since Halloween" funds had not yet been paid by the brands yet and were not the subject of the Tomlinson Complaint, as the pre-publication documents show.  Doc. 18-4 at 18.  Accordingly, Defendants' arguments on "fair reporting" fail because the report on the Tomlinson proceeding is not, in and of itself, why Defendants are being sued.

## V.      Plaintiffs Adequately Pleaded Actual Malice.

As discussed above, Plaintiffs contend that California law applies.  Defendants concede in the MTD that, if California law applies, the only way that actual malice is a requirement for Plaintiffs' libel claims is if she is a public figure.  Defendants argue that Plaintiffs are limited purpose public figures by suggesting that California has adopted some categorical rule that sports and entertainment managers are necessarily public figures.  *See* MTD at 18-19.  This is flat wrong.  Defendants first cite to *Roe v. Doe*, No. C 09-0682 PJH, 2009 WL 1883752, at *13 (N.D. Cal. June 30, 2009).  But that case did not hold, as Defendants suggest, that *any* manager in sports or entertainment became a limited purpose public figure.  Rather it held that Don Nelson, who

"voluntarily entered the public arena as a basketball coach and/or general manager for several NBA franchises" was a public figure for purposes made regarding his performance of those duties. *Id.* There was also a public controversy over Nelson's contract with the Dallas Mavericks. *Id.* It strains credulity, at best, to suggest that Plaintiffs' private interactions with TikTok influencers rose to the level of an NBA general manager. There is no evidence that, prior to the Article, there was any "public controversy" regarding Plaintiffs.

Likewise, in *Peterson v. Gannett Co., Inc.*, No. 21-15057, 2021 WL 5507338, at *1 (9th Cir. Nov. 24, 2021), there was an existing public controversy surrounding the plaintiff prior to the defamatory publication. As such, like in *Roe*, the court in *Peterson* engaged in a fact-specific analysis and not on some categorical rule that managers or CEOs of companies that are involved in public or entertainment issues are categorically public figures. Here, while Plaintiffs were on the cutting edge of the intersection between TikTok and influencing, there was no pre-existing controversy surrounding them prior the Article's publication and, therefore, they are not public figures.

However, even if Plaintiff was a public figure or even if New York law applied, Plaintiff has, in fact, adequately pleaded actual malice. As detailed in the FAC, Plaintiffs have pleaded the following facts that would establish actual malice:

(1) Defendants acted with a pre-conceived narrative and storyline that Plaintiffs acted in conformity with the defamatory gists of the Article (*see Project Veritas v. N.Y. Times Co.,* 2021 N.Y. Misc. LEXIS 2264 at *22 2021 NY Slip Op 31908(U) (Sup. Ct.) (recognizing pre-conceived narrative by *The Times* relevant to purposeful avoidance of the truth inquiry);

(2) that Defendants ambushed Plaintiffs with a barrage of questions with an unreasonably short time frame to respond to questions, in a calculated attempt to purposefully avoid truth as to

multiple implausible allegations by third-party witnesses alleging things like Plaintiffs "leaking" revenge porn (*cf. Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 872 (W.D. Virg. 2016) (citations omitted) (holding a defendant's "[r]epitition of another's words" that the "repeater knows" are "false or inherently improbable" is similarly non-dispositive but relevant, as is "evidence that a defendant conceived a story line in advance" and then "set out to make the evidence conform" to that story);

(3) that, despite Defendants' attempt to purposefully avoid the truth through their eleventh-hour "fact-check", that Plaintiffs nonetheless studiously and diligently responded to dozens of questions that Defendants had been compiling, providing evidence that would cause a person of ordinary prudence and diligence to entertain serious doubts about the truth of the allegations and implications contained in the Article (*see Palin*, 940 F.3d at 815 (recognizing that being provided with contradictory information, but still publishing is evidence of actual malice));

(4) that Defendants' pre-conceived narrative is underscored by the fact that they applied a double standard, allowing the sources for the narrative they preferred to provide information off the record, while refusing to afford Plaintiffs that same courtesy when said information would further demonstrate the falsity of Defendants' narrative (*cf. Harte-Hanks Commc'ns., Inc. v. Connaughton*, 491 U.S. 657, 668 (1989) (finding that evidence of deviation of journalistic standards relevant to actual malice determination);

(5) that Plaintiffs vehemently denied the truth of the defamatory statements in the Article to Defendants prior to publication (*see id.* at 691-92) (ignoring plaintiff denials of the defamatory statements evidence of actual malice); and

(6) that Lorenz had a personal motivation to disparage Plaintiffs because Plaintiffs are competitors with UTA, her agency, and with whom she had a book deal to write about the very

subject matter of the Article and Plaintiffs' business because having Plaintiffs' clients break free

of Plaintiffs and go to UTA—which, in fact, happened in many cases--would mean easier access

for Lorenz (*see id.* at 668 (noting that, although "courts must be careful not to place too much

reliance on such factors," it "cannot be said that evidence concerning motive or care never bears

any relation to the actual malice inquiry"); *see also Greenberg v. Spitzer*, 155 A.D.3d 27, 55 (2d

Dep't 2017) (malice adequately alleged where defendant published statements to discredit plaintiff

and damage his reputation and career while attempting to bolster his own).

　　While no single one of these factors may be sufficient, standing alone, to demonstrate

actual malice,[15] where a plaintiff has plausibly alleged a multiplicity of these factors, there is a

plausible basis to infer the publisher entertained serious doubts as to the truth of the statements.

*See Brimelow v. N.Y. Times Co.*, No. 21-66-cv, 2021 U.S. App. LEXIS 31672, at *11 (2d Cir. Oct.

21, 2021) (recognizing that in a *Harte-Hanks* situation, like here, allegations of deviation of

journalistic standards, motive, and being confronted with denials of the defamatory statements

may give rise to the plausible inference of actual malice).  If Defendants did not, in fact, entertain

serious doubts about the truth of the factual claims in the Article and have a high degree of

awareness of their probable falsity, why did they keep sending wave after wave of questions and

seeking information about the truth of those claims just hours before publication?  *See* Docs. 18-

3; 18-4; Ex. A to Jacob Decl.  So much, in fact, that Defendants apparently did not recall everything

that was sent by Plaintiffs, having neglected to include it in their MTD.  *See* Jacob Decl. at ¶ 3;

Ex. A to Jacob Decl.  This was clearly a rush job to churn out Defendants' pre-conceived story,

---

[15] Defendants' case law in the MTD does not hold that these factors are not relevant – merely that they cannot, standing alone, create actual malice.  *See, e.g., Loeb v. New Times Comms. Corp.,* 497 F. Supp. 85, 93 (S.D.N.Y. 1980) ("[F]ailure to verify statements with the plaintiff and reliance upon some biased sources, ***in themselves***, do not amount to reckless disregard of the truth[.]") (emphasis added).  Here, Plaintiffs have pleaded a plethora of these "malice factors".

with the "fact-checking" becoming a last-minute fire drill to create a shield for any ensuing defamation claim and was not a serious endeavor as is indicated by the fact that Defendants ignored all contradictory evidence and published the libel anyway.

Accordingly, Plaintiffs have plausibly pleaded Defendants published the Article with actual malice.

## **CONCLUSION**

For all of the reasons discussed above, the Court should deny the MTD.  In the alternative, Plaintiffs request leave to replead, especially should the Court determine that New York law and/or nuances of New York defamation law apply to Plaintiffs' claims given that Plaintiffs have pleaded for relief under California law.

Dated: New York, New York
        January 24, 2022

                                    **REISS SHEPPE LLP**


                                    __/s/ Matt Sheppe__
                                    By:    Matthew Sheppe

                                    425 Madison Avenue, 19th Floor
                                    New York, New York 10017
                                    Tel: (212) 753-2424
                                    Fax: (347) 348-0731
                                    Email: msheppe@reisssheppe.com


                                    Joseph Sibley, Esq. (admitted *pro hac vice*)
                                    **CAMARA & SIBLEY LLP**
                                    1108 Lavaca St., Ste 110263
                                    Austin, Texas 78701
                                    Tel: (713) 966-6789
                                    Fax: (713) 583-1131
                                    Email: sibley@camarasibley.com

                                    *Attorneys for Plaintiffs*


                        **<u>CERTIFICATE OF SERVICE</u>**

        I hereby certify that on this 24th day of January 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which I understand to have caused service on all counsel of record.



                            */s/ Joe Sibley*

                            Joseph Sibley