# EXHIBIT

# A

 Ariadna Jacob <ari@influences.com>

## NYT 8 Fwd: Ariadna Jacob/Influences allegations

1 message

---------- Forwarded message ---------
From: **Ben Walter** <benwalterlaw@gmail.com>
Date: Wed, Aug 12, 2020 at 9:15 AM
Subject: Re: Ariadna Jacob/Influences allegations
To: Taylor Lorenz <taylor.lorenz@nytimes.com>
CC: Laura Pallas <laura@pallasmanagementgroup.com>, Matt Shupe <matt@praetorianpr.com>, PMG ASST <assistant@pallasmanagementgroup.com>, Christal Bodie <christal@pallasmanagementgroup.com>, Ariadna Jacob <ari@influences.com>

Some additional context from Ari:

**If Ms Jacob wasn't the leaseholder of the Girls in the Valley house, how did she have the power to kick (and lock) the girls out of the house?** We did not kick them out of the house and lock the door and have witnesses to verify. We asked them to vacate over the next couple of days since they were never formally invited to move in longer than 2-3 weeks in the first place. They all said they would have no problem doing so and then proceeded to leave to go to the beach. We asked if anyone had a key, everyone said no, so we said we would lock the door to make sure the property was secure since the owner's belongings were still there etc. and that as soon as they got back to the house to call us and we were across the street to be able to let them in. When they returned, instead of unlocking the door, Justin and Nupur as well as Rachel Turner (who had been not been invited to stay overnight at the content house at that time and blatantly asked not to be there) broke through a side window on the bottom floor into one of the rooms a girl was staying in and then proceeded to vandalize the property, spray painting F*CK Ari on the walls.

Additionally, several people returned after they moved out, broke in, and stole some of the owner's belongings.

**How did she have the power to ask them for rent? Who sent in the rent? You say, "As Ms. Jacob was paying the rent and had all the liability on her, it would be improper if not grossly negligent of her to not have some type of security system on the property." Though a lease was not signed, she was liable for the property? Please clarify. Whose name was on the utility bills? If the girls were paying the utilities and Ms. Jacob wasn't on the lease, how could she insist they move out of the house?**
The home owner's name was on the utility bills starting in Jan 2020 when just myself and my business partner moved in. The owner encouraged us to invite TikTok stars over to experience the property. Emmy, Alex and Tanisha were the only ones initially invited to live on the property before the official launch of the content house. At that time they had no deliverables and were asked to contribute towards the rent $1500 per room. I was living in the house at the time. After Influences hosted a trip to Playlist in Orlando which the creators were ecstatic about at the time, Ari was asked by Emmy and Alex if they could take over the master bedroom, so Ari found a condo nearby and moved in early March. At that point, the owner said she would be cutting off the utilities and since Ari was not going to be there to monitor the use of such things as the pool etc. she asked that they (the girls) please make sure the utilities were transferred into one of their names. In fact when the service man came over to install them under the new names, the talent called her stating that there needed to be an adult present and Ari had to remind them that they are over 18 and in fact considered adults.

**- Is it correct that Ms. Jacob agreed to cover half the Kids Next Door house rent of $18,500 per month, provided the tenants produced content and fulfilled a certain number of brand deals as part of the terms of the production agreement? You didn't answer this question.**
Discussing if we can share the agreement with you.

**- Was Ms. Jacob's name on the Kids Next Door house lease? Was she the sole leaseholder?**
Kids Next Door is still an active brand with an active lease on the property. I am the lease holder here through May 2021

**- Was the amount of rent residents at Kids Next Door house were asked to pay per resident in August higher than the amount of rent they paid per resident in previous months?**
No, their rent was always $1,500 each and in fact, the kids that left did not even put in the full deposit they promised to pay. We have accounting for all of this.

**- You claim Ms. Jacob controlled 1/3 of Creator Edge. Did she have equity in the company? The former partners/founders of Creator Edge dispute that Ms. Jacob was ever a managing partner at Creator Edge as her LinkedIn states. Additionally, Jace Norman said that he left the company by January 2020 and that Ms. Jacob was the only one using the company's name. He was not involved in the company and had nothing to do with Ms. Tomlinson, who was managed by Ms. Jacob.**
This is false. Brittany was part of Creator Edge from Aug 2019 - Jan 2020 the entire time Jace Norman and their family was involved. In fact, the employee previously mentioned as causing issues didn't know Jace Norman prior to meeting Ari and insisted on developing a relationship with her.

On Wed, Aug 12, 2020 at 11:56 AM Ben Walter <benwalterlaw@gmail.com> wrote:

> I may be the first person up this morning, so I will attempt to reply, as I know this is a timely manner. However, I would like to reserve Ari's rights to clarify any comments I make below. Please see my responses below.
>
> On Wed, Aug 12, 2020 at 9:55 AM Taylor Lorenz <taylor.lorenz@nytimes.com> wrote:
>
> > Thanks all, I have several follow up questions below I hope you can respond to this morning.
> >
> > I would also welcome any emails, texts or documents Ms. Jacob is willing to share on the record.
> >
> > - If Ms Jacob wasn't the leaseholder of the Girls in the Valley house, how did she have the power to kick (and lock) the girls out of the house? How did she have the power to ask them for rent? Who sent in the rent? You say, "As Ms. Jacob was paying the rent and had all the liability on her, it would be improper if not grossly negligent of her to not have some type of security system on the property." Though a lease was not signed, she was liable for the property? Please clarify. Whose name was on the utility bills? If the girls were paying the utilities and Ms. Jacob wasn't on the lease, how could she insist they move out of the house?
>
> Under California law, agreements as they relate to real property need to be in writing in order for them to be valid. However, in the absence of a signed lease agreement, a tenant becomes a month to month tenant, notwithstanding the arrangement between the parties (e.g., if a landlord and tenant agree that the tenant will lease a property for 12 months but never formalize the arrangement in writing, the tenant under the eyes of the law becomes a month to month tenant). As Ari had taken possession of the house at this point, but no lease was formalized yet, she was legally in possession of the house as a month to month tenant. She was the "leaseholder," recognized in the eyes of the law as such. Ari was the party negotiating the lease directly with the landlord. It would be her name solely on the lease and not any of her clients. As such, if there was an issue with the house due to unpaid rent or if a guest was injured on the property, it would be her sole liability and responsibility.
>
> An analogy would be if I let you stay at my vacation property and, unbeknownst to me, you brought a friend with you. If your friend slipped and fell, they would sue me, the owner of the property, and not you, whether or not I knew they were on the property.
>
> If any of the tenants or their guests (whether known or unknown by Influences) were injured on the property, they would look to Ari for recourse (and the landlord would look to Ari for indemnification if necessary, since Ari was in possession of the property).
>
> > - Is it correct that Ms. Jacob agreed to cover half the Kids Next Door house rent of $18,500 per month, provided the tenants produced content and fulfilled a certain number of brand deals as part of the terms of the production agreement? You didn't answer this question.
>
> Yes, per the production agreements with the individuals living at the KND house, Influences would cover half the rent, with the kids being equally responsible for the other half of the rent. There was no obligation to fulfill a certain number of brand deals. The idea behind the content house was that, by living together and collaborating on content, the kids would grow the KND brand and, in addition to individual deals each was to potentially enter into with various third party brands, the KND brand would also enter into brand deals. The intent was that the brand deals would fund the kids share of the rent and costs and expenses. However, the kids decided that, in breach of the agreement, rather than refer deals to Ari to handle, they negotiated them by themselves, cutting Influences out of the deal and not paying Influences their commission, and not taking any of proceeds from these brand deals to pay their rent or bills. Per the agreement, they had a money manager who was going to handle the financials of their deals and reimburse Influences for rent and costs and expenses (such financial manager was brought to the table by them, not Influences). They didn't involve the financial manager, again in an effort to conceal these deals. However, since these opportunities are promotional opportunities on Instagram and TikTok, it is easy for Influences to see when a client is promoting/endorsing without telling Influences (especially when there is a #ad or #sponsored in the post to comply with FTC guidelines). Additionally, several of these kids admitted to Ari that they were purposefully concealing these brand deals from her.
>
> The only obligation per the production agreement on the kids was to make a certain amount of social media posts per month on the KND account. They could reject any brand deal that came through that they didn't wanyt.

- Was Ms. Jacob's name on the Kids Next Door house lease? Was she the sole leaseholder?

Yes. The leader of KND, Marcus Olin, identified a property, the Parva house where the KND lived, that he wanted. However, for various different reasons, the owner of the property was unwilling to lease the property to Marcus. He instructed Ari to secure the property for the KND and induced her with the promises of building a brand with her to enter into the lease. Even during the negotiations with the owner, he again tried to cut her out by contacting the owner directly (while we were dealing with the owner's real estate agent and our real estate agent). The high level understanding how the rent was to be split was agreed to prior to Ari actually signing the lease.

- Was the amount of rent residents at Kids Next Door house were asked to pay per resident in August higher than the amount of rent they paid per resident in previous months?

I defer to Ari, but my understanding is no. The residents moved in and paid Ari a rental deposit, which was to cover the first month's rent, with the remainder going towards an actual deposit. Thereafter, several, if not all, of the kids stopped paying their monthly rent and expenses. As Ari's name was on the lease, Ari continued making the payments so as not to default. Ari repeatedly requested the kids pay the rent. She also requested that, per the agreement, they promote the KND account, which they never did. However, the kids had no problem promoting their own accounts and that they were living in a mansion in the Hollywood hills, again, freeloading off of Ari.

- You claim Ms. Jacob controlled 1/3 of Creator Edge. Did she have equity in the company? The former partners/founders of Creator Edge dispute that Ms. Jacob was ever a managing partner at Creator Edge as her LinkedIn states. Additionally, Jace Norman said that he left the company by January 2020 and that Ms. Jacob was the only one using the company's name. He was not involved in the company and had nothing to do with Ms. Tomlinson, who was managed by Ms. Jacob.

I would need Ari to weigh in on this one.

- You claim that her landlord at the Avalon West Hollywood apartment building never sought to collect $3,200 in unpaid rent. See attached documents. Can you elaborate?

Will need to discuss with Ari, but in any event, I fail to see the relevance to the claim here, where she has actually timely paid her rent on all content houses and it is the kids who have in fact not paid rent at all. While I understand we aren't in a court of law, this would be deemed character evidence, and circumstantial at best, and would be inadmissible in an actual claim. If factual, which I do not admit it is, it is purely "dirt" being used to paint Ari in a negative light. Everyone has baggage (e.g., issues from their past, etc.) that someone could raise, but the relevance here is immaterial.

Please advise,

Thanks

On Tue, Aug 11, 2020 at 11:57 PM Laura Pallas <laura@pallasmanagementgroup.com> wrote:

Hi Taylor

Please read the attached document in its entirety in response to your previous email. If you have any questions or need any further clarification please email us directly.

Many thanks

Laura

On Aug 11, 2020, at 11:47 AM, Taylor Lorenz <taylor.lorenz@nytimes.com> wrote:

Hi Laura,

Thanks. Send through any corrections by **9:00am EST tomorrow**. We will likely have follow ups and want to ensure ample time to address them.

On Tue, Aug 11, 2020 at 2:36 PM Laura Pallas <laura@pallasmanagementgroup.com> wrote:

Hi Taylor

Thank you for your email.

We will need a reasonable deadline to get back to you.

Please advise

Laura
<Screen Shot 2018-11-15 at 11.37.35 AM.png>

On Aug 11, 2020, at 9:58 AM, Taylor Lorenz <taylor.lorenz@nytimes.com> wrote:

Hi all,

I'm disappointed that Ms. Jacob declined the opportunity to chat things over and provide background context for this piece by phone.

I'd love to hear back with any corrections on the below points today as I'm sure I'll have follow ups and clarifications.

Through dozens of conversations with former employees, former business partners, current and former talent under Ariadna Jacob/Influences management, as well as those who have worked with her, we are planning to report the following.

Thank you and look forward to your response.

Influences was founded in 2017 (per LinkedIn)

Ariadna Jacob was the leaseholder for the Kids Next Door content house.

Ariadna Jacob was the leaseholder for the Girls in the Valley house.

Ariadna Jacob/Influences attempted to get involved with the Alpha House.

Ms. Jacob agreed to cover half the Kids Next Door house rent of $18,500 per month, provided the tenants produced content and fulfilled a certain number of brand deals.

At the end of July, residents at Kids Next Door house were asked to pay higher rent than previously agreed upon.

Ms. Jacob failed to immediately release Brittany Tomlinson from her contract.

In January, Ms. Tomlinson was owed nearly $100,000 in outstanding payments from brands. Influences had failed to invoice some of these brands for Ms. Tomlinson's work.

Ms Jacob has failed to pay Ms. Tomlinson $23,683.82 for brand campaigns she completed while managed by Influences.

Ms. Jacob took 20% commission from Ms. Tomlinson's deals.

Ms. Jacob has failed to turn over http://brittanybroski.com to Ms. Tomlinson.

Ms. Jacob has demanded that clients sign formal contracts to work with her, has failed to release clients from those contracts when requested and has threatened talent with legal action.

Talent managed by Influences has been asked to create brand content for free.

Influences failed to pay talent on time for their work. Ms. Jacobs encouraged talent to accept below market rates.

Cameras are installed in the Girls in the Valley house and at least one camera was connected to Ms. Jacobs phone.

On June 7th, members of Girls in the Valley house were told that they would be asked to leave the house if they didn't post at least eight times per day on social media.

Ms. Jacob made a racist comment to a Girls in the Valley house manager claiming "there's a big black man on the staircase yelling at me."

Ms. Jacob has raised her voice at talent and frequently sent talent long, inflammatory text messages.

At different points in April, the water, Wi-Fi, and electricity were all temporarily shut off at the Girls in the Valley house.

On June 9, Influences publicly disassociated from Drip Crib over disputes about rent.

Ms. Jacob owes Drip Crib founder Devion Young roughly $50,000.

Ms. Jacob distributed illicit photos of Mr. Young to others (Note: we have screen recordings showing these messages).

Ms. Jacob barred members of her content houses from living together for a year and a half after they left.

Ms. Jacob forced talent to sign NDAs.

In October 2018, Ms. Jacob's landlord at 1600 Vine St. sued her over $14,242.13 in back rent and subsequently sought to evict her.

In 2019, Max Harrison, the owner of 6435 Weidlake Drive sued Ms. Jacob, who was then subletting the property, claiming $46,001.69 of property damage.

In March 2019, her landlord at the Avalon West Hollywood apartment building sued her over $3,200 in rent.

--
**Taylor Lorenz**
Reporter

The New York Times

620 Eighth Avenue
New York, NY 10018
taylor.lorenz@nytimes.com

--
**Taylor Lorenz**
Reporter

The New York Times

620 Eighth Avenue
New York, NY 10018
taylor.lorenz@nytimes.com

--
**Taylor Lorenz**
Reporter

The New York Times

620 Eighth Avenue
New York, NY 10018
taylor.lorenz@nytimes.com

--

**Ariadna Jacob** *CEO/Founder - Influences, We Create People Brands*
619.206.9593 | Roster: http://www.influences.com/influencers
ari@influences.com | influences.com

Did you see us featured on New York Post, Fox Business and USA Today?

IMPORTANT: The contents of this email and any attachments are confidential. They are intended for the named recipient(s) only. If you have received this email by mistake, please notify the sender immediately and do not disclose the contents to anyone or make copies thereof.

-



Ariadna Jacob <ari@influences.com>

**NYT 7 Fwd: Ariadna Jacob/Influences allegations**
1 message

---------- Forwarded message ---------
From: **Ben Walter** <benwalterlaw@gmail.com>
Date: Wed, Aug 12, 2020 at 8:57 AM
Subject: Re: Ariadna Jacob/Influences allegations
To: Taylor Lorenz <taylor.lorenz@nytimes.com>
CC: Laura Pallas <laura@pallasmanagementgroup.com>, Matt Shupe <matt@praetorianpr.com>, PMG ASST <assistant@pallasmanagementgroup.com>, Christal Bodie <christal@pallasmanagementgroup.com>, Ariadna Jacob <ari@influences.com>

I may be the first person up this morning, so I will attempt to reply, as I know this is a timely manner. However, I would like to reserve Ari's rights to clarify any comments I make below. Please see my responses below.

On Wed, Aug 12, 2020 at 9:55 AM Taylor Lorenz <taylor.lorenz@nytimes.com> wrote:

> Thanks all, I have several follow up questions below I hope you can respond to this morning.
>
> I would also welcome any emails, texts or documents Ms. Jacob is willing to share on the record.
>
> - If Ms Jacob wasn't the leaseholder of the Girls in the Valley house, how did she have the power to kick (and lock) the girls out of the house? How did she have the power to ask them for rent? Who sent in the rent? You say, "As Ms. Jacob was paying the rent and had all the liability on her, it would be improper if not grossly negligent of her to not have some type of security system on the property." Though a lease was not signed, she was liable for the property? Please clarify. Whose name was on the utility bills? If the girls were paying the utilities and Ms. Jacob wasn't on the lease, how could she insist they move out of the house?

Under California law, agreements as they relate to real property need to be in writing in order for them to be valid. However, in the absence of a signed lease agreement, a tenant becomes a month to month tenant, notwithstanding the arrangement between the parties (e.g., if a landlord and tenant agree that the tenant will lease a property for 12 months but never formalize the arrangement in writing, the tenant under the eyes of the law becomes a month to month tenant). As Ari had taken possession of the house at this point, but no lease was formalized yet, she was legally in possession of the house as a month to month tenant. She was the "leaseholder," recognized in the eyes of the law as such. Ari was the party negotiating the lease directly with the landlord. It would be her name solely on the lease and not any of her clients. As such, if there was an issue with the house due to unpaid rent or if a guest was injured on the property, it would be her sole liability and responsibility.

An analogy would be if I let you stay at my vacation property and, unbeknownst to me, you brought a friend with you. If your friend slipped and fell, they would sue me, the owner of the property, and not you, whether or not I knew they were on the property.

If any of the tenants or their guests (whether known or unknown by Influences) were injured on the property, they would look to Ari for recourse (and the landlord would look to Ari for indemnification if necessary, since Ari was in possession of the property).

> - Is it correct that Ms. Jacob agreed to cover half the Kids Next Door house rent of $18,500 per month, provided the tenants produced content and fulfilled a certain number of brand deals as part of the terms of the production agreement? You didn't answer this question.

Yes, per the production agreements with the individuals living at the KND house, Influences would cover half the rent, with the kids being equally responsible for the other half of the rent. There was no obligation to fulfill a certain number of brand deals. The idea behind the content house was that, by living together and collaborating on content, the kids would grow the KND brand and, in addition to individual deals each was to potentially enter into with various third party brands, the KND brand would also enter into brand deals. The intent was that the brand deals would fund the kids share of the rent and costs and expenses. However, the kids decided that, in breach of the agreement, rather than refer deals to Ari to handle, they negotiated them by themselves, cutting Influences out of the deal and not paying Influences their commission, and not taking any of proceeds from these brand deals to pay their rent or bills. Per the agreement, they had a money manager who was going to handle the financials of their deals and reimburse Influences for rent and costs and expenses (such financial manager was brought to the table by them, not Influences). They didn't involve the financial manager, again in an effort to conceal these deals. However, since these opportunities are promotional opportunities on Instagram and TikTok, it is easy for Influences to see when a client is promoting/endorsing without telling Influences (especially when there is a #ad or #sponsored in the post to comply with FTC guidelines). Additionally, several of these kids admitted to Ari that they were purposefully concealing these brand deals from her.

The only obligation per the production agreement on the kids was to make a certain amount of social media posts per month on the KND account. They could reject any brand deal that came through that they didn't wanyt.

> - Was Ms. Jacob's name on the Kids Next Door house lease? Was she the sole leaseholder?

Yes. The leader of KND, Marcus Olin, identified a property, the Parva house where the KND lived, that he wanted. However, for various different reasons, the owner of the property was unwilling to lease the property to Marcus. He instructed Ari to secure the property for the KND and induced her with the promises of building a brand with her to enter into the lease. Even during the negotiations with the owner, he again tried to cut her out by contacting the owner directly (while we were dealing with the owner's real estate agent and our real estate agent). The high level understanding how the rent was to be split was agreed to prior to Ari actually signing the lease.

> - Was the amount of rent residents at Kids Next Door house were asked to pay per resident in August higher than the amount of rent they paid per resident in previous months?

I defer to Ari, but my understanding is no. The residents moved in and paid Ari a rental deposit, which was to cover the first month's rent, with the remainder going towards an actual deposit. Thereafter, several, if not all, of the kids stopped paying their monthly rent and expenses. As Ari's name was on the lease, Ari continued making the payments so as not to default. Ari repeatedly requested the kids pay the rent. She also requested that, per the agreement, they promote the KND account, which they never did. However, the kids had no problem promoting their own accounts and that they were living in a mansion in the Hollywood hills, again, freeloading off of Ari.

> - You claim Ms. Jacob controlled 1/3 of Creator Edge. Did she have equity in the company? The former partners/founders of Creator Edge dispute that Ms. Jacob was ever a managing partner at Creator Edge as her LinkedIn states. Additionally, Jace Norman said that he left the company by January 2020 and that Ms. Jacob was the only one using the company's name. He was not involved in the company and had nothing to do with Ms. Tomlinson, who was managed by Ms. Jacob.

I would need Ari to weigh in on this one.

> - You claim that her landlord at the Avalon West Hollywood apartment building never sought to collect $3,200 in unpaid rent. See attached documents. Can you elaborate?

Will need to discuss with Ari, but in any event, I fail to see the relevance to the claim here, where she has actually timely paid her rent on all content houses and it is the kids who have in fact not paid rent at all. While I understand we aren't in a court of law, this would be deemed character evidence, and circumstantial at best, and would be inadmissible in an actual claim. If factual, which I do not admit it is, it is purely "dirt" being used to paint Ari in a negative light. Everyone has baggage (e.g., issues from their past, etc.) that someone could raise, but the relevance here is immaterial.

> Please advise,
>
> Thanks
>
> On Tue, Aug 11, 2020 at 11:57 PM Laura Pallas <laura@pallasmanagementgroup.com> wrote:
>
>> Hi Taylor
>>
>> Please read the attached document in its entirety in response to your previous email. If you have any questions or need any further clarification please email us directly.
>>
>> Many thanks

Laura

On Aug 11, 2020, at 11:47 AM, Taylor Lorenz <taylor.lorenz@nytimes.com> wrote:

Hi Laura,

Thanks. Send through any corrections by **9:00am EST tomorrow**. We will likely have follow ups and want to ensure ample time to address them.

On Tue, Aug 11, 2020 at 2:36 PM Laura Pallas <laura@pallasmanagementgroup.com> wrote:

Hi Taylor

Thank you for your email.

We will need a reasonable deadline to get back to you.

Please advise

Laura
<Screen Shot 2018-11-15 at 11.37.35 AM.png>

On Aug 11, 2020, at 9:58 AM, Taylor Lorenz <taylor.lorenz@nytimes.com> wrote:

Hi all,

I'm disappointed that Ms. Jacob declined the opportunity to chat things over and provide background context for this piece by phone.

I'd love to hear back with any corrections on the below points today as I'm sure I'll have follow ups and clarifications.

Through dozens of conversations with former employees, former business partners, current and former talent under Ariadna Jacob/Influences management, as well as those who have worked with her, we are planning to report the following.

Thank you and look forward to your response.

Influences was founded in 2017 (per LinkedIn)

Ariadna Jacob was the leaseholder for the Kids Next Door content house.

Ariadna Jacob was the leaseholder for the Girls in the Valley house.

Ariadna Jacob/Influences attempted to get involved with the Alpha House.

Ms. Jacob agreed to cover half the Kids Next Door house rent of $18,500 per month, provided the tenants produced content and fulfilled a certain number of brand deals.

At the end of July, residents at Kids Next Door house were asked to pay higher rent than previously agreed upon.

Ms. Jacob failed to immediately release Brittany Tomlinson from her contract.

In January, Ms. Tomlinson was owed nearly $100,000 in outstanding payments from brands. Influences had failed to invoice some of these brands for Ms. Tomlinson's work.

Ms Jacob has failed to pay Ms. Tomlinson $23,683.82 for brand campaigns she completed while managed by Influences.

Ms. Jacob took 20% commission from Ms. Tomlinson's deals.

Ms. Jacob has failed to turn over http://brittanybroski.com to Ms. Tomlinson.

Ms. Jacob has demanded that clients sign formal contracts to work with her, has failed to release clients from those contracts when requested and has threatened talent with legal action.

Talent managed by Influences has been asked to create brand content for free.

Influences failed to pay talent on time for their work, Ms. Jacobs encouraged talent to accept below market rates.

Cameras are installed in the Girls in the Valley house and at least one camera was connected to Ms. Jacobs phone.

On June 7th, members of Girls in the Valley house were told that they would be asked to leave the house if they didn't post at least eight times per day on social media.

Ms. Jacob made a racist comment to a Girls in the Valley house manager claiming "there's a big black man on the staircase yelling at me."

Ms. Jacob has raised her voice at talent and frequently sent talent long, inflammatory text messages.

At different points in April, the water, Wi-Fi, and electricity were all temporarily shut off at the Girls in the Valley house.

On June 9, Influences publicly disassociated from Drip Crib over disputes about rent.

Ms. Jacob owes Drip Crib founder Devion Young roughly $50,000.

Ms. Jacob distributed illicit photos of Mr. Young to others (Note: we have screen recordings showing these messages).

Ms. Jacob barred members of her content houses from living together for a year and a half after they left.

Ms. Jacob forced talent to sign NDAs.

In October 2018, Ms. Jacob's landlord at 1600 Vine St. sued her over $14,242.13 in back rent and subsequently sought to evict her.

In 2019, Max Harrison, the owner of 6435 Weidlake Drive sued Ms. Jacob, who was then subletting the property, claiming $46,001.69 of property damage.

In March 2019, her landlord at the Avalon West Hollywood apartment building sued her over $3,200 in rent.

--
**Taylor Lorenz**
Reporter

The New York Times

620 Eighth Avenue
New York, NY 10018
taylor.lorenz@nytimes.com

--

> **Taylor Lorenz**
> Reporter
>
> The New York Times
>
> 620 Eighth Avenue
> New York, NY 10018
> taylor.lorenz@nytimes.com

--
**Taylor Lorenz**
Reporter

The New York Times

620 Eighth Avenue
New York, NY 10018
taylor.lorenz@nytimes.com

--

**Ariadna Jacob** *CEO/Founder - Influences, We Create People Brands*
619.206.9593 | Roster: http://www.influences.com/influencers
ari@influences.com | influences.com

Did you see us featured on New York Post, Fox Business and USA Today?

---

IMPORTANT: The contents of this email and any attachments are confidential. They are intended for the named recipient(s) only. If you have received this email by mistake, please notify the sender immediately and do not disclose the contents to anyone or make copies thereof.

–