UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARIADNA JACOB and INFLUENCES, INC. | No.: 1:21-cv-06807-ER |
| Plaintiffs, | **SECOND AMENDED COMPLAINT** |
| -against- | |
| TAYLOR LORENZ, and THE NEW YORK TIMES COMPANY, | |
| Defendants. | |

Plaintiffs ARIADNA JACOB ("Jacob") and INFLUENCES, INC. ("Influences") (together, "Plaintiffs"), as and for their Second Amended Complaint ("SAC") against Defendants TAYLOR LORENZ ("Lorenz") and THE NEW YORK TIMES COMPANY ("*The Times*") (together, "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this action against Defendants for defamatory statements set forth in an article published by Defendants on August 14, 2020 (the "Article").[1]

2.      Plaintiffs bring claims for defamation, tortious interference with prospective economic advantage, and intentional infliction of emotional distress. Plaintiffs seek actual and compensatory damages for reputational injuries and mental anguish, special damages in the form of lost profits, and punitive damages sufficient to deter Defendants' tortious conduct.

## THE PARTIES

3.      Plaintiff Jacob is a natural person who is domiciled in the State of Nevada.

---

[1] Taylor Lorenz, *Trying to Make It Big Online? Getting Signed Isn't Everything*, THE NEW YORK TIMES (Aug. 14, 2020),  https://www.nytimes.com/2020/08/14/style/influences-tiktok-management-brittany-broski.html.

4.      Plaintiff Influences is a Delaware corporation with its principal place of business in Nevada.

5.      Defendant Lorenz is a natural person who is believed to be domiciled in the State of California and to maintain a place of employment at 1301 K St. NW, Washington, D.C. 20071.

6.      Defendant *The Times* is a New York corporation with its principal place of business in New York.

## JURISDICTION, VENUE AND CHOICE OF LAW

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332. There is complete diversity between the parties, and the amount in controversy exceeds $75,000.

8.      Personal jurisdiction over Defendants is proper under New York CPLR § 301. This Court has general personal jurisdiction over Defendant *The Times*, which is headquartered and incorporated in New York and regularly conducts business in New York. This Court has specific personal jurisdiction over Defendant Lorenz because she: (1) wrote, or at least began writing, the Article in New York; (2) acted in concert with and under the employ of *The Times,* a New York corporation, in writing the Article; and (3) used *The Times*' investigative and other resources—located in New York—to write the Article. These contacts with the State of New York create sufficient minimum contacts with New York so as not to offend traditional notions of fair play and substantial justice.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)-(2) because at least one Defendant resides in this district.

10.     California substantive law applies to Plaintiffs' claims. Both Plaintiffs were citizens of California at the time the Article was researched and published. Further, the Article

2

focused entirely on California: it reported on Plaintiffs' and other witnesses' activities in California; it referenced California labor laws and proceedings before the California Labor Commission; and it culled information from sources residing in California at the time it was written. On information and belief, every single source Defendants disclosed as being interviewed in the Article was a California resident at the time the Article was researched and written. Finally, Plaintiffs believe that for at least part of the researching and/or drafting of the Article, Defendant Lorenz resided in California.

## FACTUAL ALLEGATIONS

### Plaintiffs' Backgrounds

11.     Plaintiff Jacob was born in Mexico City, Mexico. She immigrated to the United States as a small child, having lost her father at a young age.

12.     Jacob was a pioneer in the now multi-billion-dollar influencer[2] industry on the TikTok social media application. In 2018 she became the founder and CEO of Influences (www.influences.com), a leading online creator management and influencer marketing company.

13.     Jacob has managed, counseled, and guided dozens of TikTok influencers, including some of the best-known names and faces in the industry. Indeed, at different points in time, Influences had a roster that boasted over 85 TikTok superstars, including five of the seven creators listed on the Forbes top earning TikTok creators list.

14.     Part of Jacob's business entailed managing what are known as "collaboration houses," where groups of influencers live and create content. Collaboration houses are designed

---

[2] Merriam Webster defines "influencer" as "a person who is able to generate interest in something (such as a consumer product) by posting about it on social media. *See https://www.merriam-webster.com/dictionary/influencer.*

to operate like incubators. The value of spending time in a collaboration house is to collaborate with other influencers who are committed to consistent content creation. In the same way a startup incubator provides guidance through experienced mentorship, Influences often coached the house members, helped them brainstorm ideas, and provided them with useful knowledge pertinent to their industry.

15.     Jacob was perfectly positioned to understand the emerging medium of TikTok. Her understanding of computer coding, search engine optimization (SEO), and social media gave her insight into the platform's more technical details, while her background in traditional marketing and branding, including her acclaimed work for household brand and advertising agency names such as L'Oréal, GoDaddy, Universal Music Group, the LA Chargers, MasterCard, Lids, and Vayner Media, gave her knowledge of (and relationships with) companies with substantial marketing budgets—budgets that increasingly reserved substantial funds for online social media marketing.

16.     Jacob provided a coveted, niche expertise. Prior to the events at issue in this lawsuit, well-known brands were willing to pay Jacob tens of thousands of dollars to consult with her on a single project for consulting services involving music licensing, directing creative, and finding and packaging influencers for Global ad campaigns. Jacob had been included to participate in very exclusive corporate service proposal requests worth millions of dollars in business. Moreover, social media in general has never been bigger, more ubiquitous, or more profitable than in the last several years, and its popularity continues to grow. Jacob was on the brink of making substantial profits until August 2020 when, as discussed below, her life's work was derailed by Defendants' defamation and other wrongful conduct.

17.     TikTok, in particular, became a cultural phenomenon over the last three years, driven not only by its features, marketing, and word-of-mouth, but by the COVID-19 lockdowns, which kept both kids and adults glued to screens more than ever before. As such, Ms. Jacob was uniquely situated to do something that others could not—build a bridge between the traditional world of marketing and branding, and the new, rapidly evolving world of TikTok, all while setting up her clients to make millions of dollars.

18.     Given her success, innovation, and impeccable timing, it is not at all surprising that some might envy Ms. Jacob for her success. Enter Taylor Lorenz.

**Lorenz Targets Jacob by Writing a "Hit Piece"**

19.     Lorenz was raised in Greenwich, Connecticut and attended boarding school in Switzerland. At the time she wrote the Article, Lorenz was a technology reporter for *The Times*. Currently, she is a technology columnist for the *Washington Post*. Her innovative reporting on internet culture—especially her nuanced understanding of the burgeoning TikTok industry—has positioned her as a distinctive voice in the rapidly evolving space of media and entertainment culture. Lorenz fancies herself to be "the Bob Woodward of the TikTok generation."[3] By her own account, Lorenz goes so far as to make a detailed record of "every single tweet" and "every post [she] see[s] on every platform"—a practice she finds "extremely useful and has saved [her] a million times in reporting."[4] Lorenz has boasted that her reporting methods include getting

---

[3] Taylor Lorenz (@TaylorLorenz), TWITTER (Sep. 29, 2022, 11:03 AM), https://twitter.com/TaylorLorenz/status/1575546908705071106.
[4] Taylor Lorenz (@TaylorLorenz), TWITTER (Sep. 28, 2022, 8:25 PM), https://twitter.com/TaylorLorenz/status/1575325823350865920.

teenagers to talk about their digital habits by "slid[ing] into these people's DMs,"[5] using a "burner phone" and using over 30 different Instagram accounts or aliases.[6]

20.     At the time of the events at issue, Lorenz was an aspiring "influencer journalist" who had aligned herself with one of Plaintiffs' top competitors (industry titan United Talent Agency or "UTA") for her own career advantage, and Lorenz was personally motivated to destroy Plaintiffs' reputation for the benefit of both herself and UTA.

21.     On August 10, 2020, Lorenz reached out to Jacob via text message saying she wanted to have a call with Jacob to "chat."

22.     Suspicious regarding Lorenz's intentions, Jacob asked one of her associates to reach out to Lorenz in response to Lorenz's request. Realizing she had been "made," Lorenz then disclosed that she was in the process of writing a story on allegations of impropriety against Jacob and Influences. Lorenz had planned to ambush Jacob with these questions over a phone interview disguised as a friendly "catch-up" phone call.

23.     Jacob, through her colleague, asked Lorenz for a list of questions so that Jacob could respond to the pertinent allegations. Lorenz then sent an email with a list of 27 questions, unreasonably demanding a response with a deadline of only five business hours. In other words, Lorenz put Plaintiffs through a last-minute fire drill in the hope that Plaintiffs would not respond, so that Lorenz could feign having done an "investigation," not to ensure she had obtained both sides of the story. (It has become industry standard for journalists to insist on unreasonable

---

[5] Kayleigh Barber, *How The New York Times' Taylor Lorenz gets teenagers to talk about their digital habits*, DIGIDAY (Mar. 24, 2020), https://digiday.com/media/dont-really-use-email-new-york-times-taylor-lorenz-works/.

[6] Karen Maniraho, *Five journalists on covering the internet in search of meaning, not viral trends*, VERY ONLINE (Jul. 19, 2022), https://www.cjr.org/special_report/internet-online-culture.php.

response times in a transparent scheme to say they conducted an "investigation" in order to satisfy *New York Times v. Sullivan*.)[7]

24.     Despite the impossible time frame, Jacob and her attorney responded to Lorenz's allegations, explained how they were factually inaccurate, and offered to provide evidence to Lorenz "on background" so that none of Influences' agreements would be breached by publishing private documents. Lorenz followed with an email that purported to summarize the facts but that actually introduced 12 additional questions, again giving Plaintiffs less than five hours to respond. Nonetheless, they did so, refuting several *additional* false accusations against them.

25.     In addition to their written responses, Plaintiffs also offered to provide copious amounts of documentary evidence to Lorenz that would have even more thoroughly refuted the allegations, but, because of Plaintiffs' contractual confidentiality restrictions, were only able to do so "on background" or "off the record." Although Lorenz had allowed and relied upon "on background" and "off the record" evidence from the many sources she had interviewed to create her mosaic of false allegations against Plaintiffs, Lorenz refused to consider the same type of information from Plaintiffs.

26.     In other words, Defendants set up the rules of the game to allow "off the record" evidence to *create* a defamatory story but refused to allow "off the record" evidence to *rebut* it. And despite the mountains of evidence available to Lorenz and *The Times* (through Plaintiffs, other sources, and publicly available information) that would cause any reasonable person to have serious doubts about what they were publishing, Defendants chose to publish the

---

[7]     On another similar occasion, Lorenz emailed Christina Pushaw (who at the time worked in communications for Florida Governor Ron DeSantis), giving her one hour to comment on her putative hit-piece on the "Libs of Tik Tok" twitter account.

defamatory Article anyway, believing their status and power within the mainstream media would armor them against liability for lying.

**Defendants Publish the Article**

27.     Defendants published the Article on August 14, 2020, just four days after Lorenz first contacted Jacob. The Article was titled "Trying to Make it Big Online? Getting Signed Isn't Everything," and the sub-headline read: "Young people come to Los Angeles in droves with dreams of fame and fortune. Once they're discovered, it's not always sunny."

28.     Despite purporting to be about the influencer industry more generally, the Article was nothing more than a hit piece about Jacob and Influences. Immediately below the headline is a picture of Jacob and some of the influencers she represented. The caption to the photo identifies both Jacob and Influences and says that they turned their clients' dream into "a living nightmare." This sets the tone and provides the context for the defamatory assertions and impressions that the Article goes on to make.

29.     Many of the false statements in the Article involve the intentional misuse of industry terms to suggest a malicious motive on the part of Plaintiffs. For example, Defendants quote one of Plaintiffs' former clients, Marcus Olin, who lived in the "Kids Next Door" ("KND") influencer house that Plaintiffs managed, as claiming that he was misled by Plaintiffs into believing that Plaintiffs would provide a guaranteed quota of "brand deals" that would generate sufficient revenue for the KND influencers to cover their share of the rent.

30.     This was false: in truth, the KND influencers had signed a production agreement that required them to post a certain number of *social media posts* (not brand deals) and pay their share of the rent. As Defendants well knew, production agreements of this type are common in the entertainment industry, as they enable an aspiring influencer to live in a mansion in the

Hollywood hills in exchange for (a) contributing to rent and (b) posting on their social media accounts for the mutual benefit of the collaboration house and themselves. By stark contrast, "brand deals" are when a company pays a creator to advertise its product, thereby generating income for the creator.

31.    Lorenz is deeply familiar with the influencer industry. She is even the author of a book devoted to the subject, entitled "Extremely Online: Gen Z, the Rise of Influencers, and the Creation of a New American Dream." Given her industry expertise, Lorenz knew that a "social media post" is different than a "brand deal" post. Moreover, Jacob, through her attorney, had put Lorenz on notice, prepublication, of the existence and nature of their industry-standard production agreement with the influencers.

32.    Despite this, Defendants falsely stated that Plaintiffs had guaranteed "brand deals" sufficient to pay the influencers' rent.

33.    In addition, the Article then quotes Olin further as claiming that the KND influencers were not getting enough brand deals to cover their half of the rent. This is also false - Olin and the other KND influencers were, in fact, getting substantial brand deals at the time, as Lorenz and *The Times* would have easily discovered had they bothered to check their sources' social media pages. Indeed, it is apparent from Olin's Instagram and TikTok accounts that he had over 20 brand deals between May and August 2020. As but a few examples:

[continued on following page]



[continued on following page]



34.     Indeed, at the time Olin posted these brand deals, he had over ten million followers and his posts were getting more than twenty million impressions each. In the summer of 2020, several of the KND creators had engagement similar to that of celebrities who made more than $75,000 per post. Defendants could have easily confirmed these facts.

35.     Lorenz's failure to check Olin's (and the other influencers') social media pages in order to verify the claim of "not having enough brand deals to pay rent" further evinces a reckless disregard for the truth of her publication. Since Lorenz claims to keep a meticulous daily

record of "every post [she] see[s] on every platform," and finds this practice "extremely

useful...in reporting," it is obvious that she failed to fact-check this claim in her Article.

36.      Moreover, given her familiarity with the industry, Lorenz also knew that

influencers have several different revenue streams, including TikTok live streaming, YouTube

advertising revenue, and selling merchandise. Influencers are known to make thousands of

dollars through "gifts" that are sent to them on TikTok livestreams. Olin, Underhill and others

livestreamed daily, and the gifts they received were public for anyone to see. Lorenz would have

only had to watch one of these livestreams to see that the KND influencers were generating

significant income from their livestreams. Her failure to do so was a reckless disregard of her

duty to adequately fact-check the Article, before stating that the influencers lacked the means to

pay the rent and implying that Plaintiffs were therefore taking advantage of them.

37.      Defendants then quoted Jesse Underhill and another member of the KND house as

falsely claiming that the KND influencers were without WiFi for a month, which prevented them

from "going live" with their influencer content. This is false, as Defendants knew or should have

known – indeed, when *The Times* came to the KND house in May 2020 (shortly after the KND

residents moved in), in preparation for the piece they published later that month on the state of

TikTok collaboration houses during the COVID-19 pandemic,[8] they were able to connect to the

WiFi. Defendants displayed reckless disregard for the truth of these "no WiFi" statements by

intentionally failing to ask Plaintiffs about this issue prior to publication of her Article, and

failing to ask her employer, *The Times,* about this issue – which would have easily proven her

statement false.

---

[8] Taylor Lorenz, *Delayed Moves, Poolside Videos and Postmates Spon: The State of TikTok Collab Houses*, THE NEW YORK TIMES (May 21, 2020),
https://www.nytimes.com/2020/05/21/style/tiktok-collab-houses-quarantine-coronavirus.html.

38.     Defendants then claimed that at the end of July 2020, Plaintiffs informed the KND influencers that they would have to "cover a larger share of the rent." This was false – the contractual rent owed by the influencers never changed, notwithstanding that the influencers routinely flouted the terms of the production agreement and generally took advantage of Plaintiffs' grace and leniency – and Plaintiffs corrected Defendants on this point on three separate occasions, pre-publication.  Yet Defendants recklessly published this statement to further their preconceived narrative, and then doubled down on it with tweets that further labeled Plaintiffs as the "bad actors" who "t[ook] advantage" of young professionals, as seen here:



39.     The Article then included a section heading entitled, "Have You Made Any Money?," and quoted Plaintiffs' former client, Brittany Tomlinson, as stating that Jacob had asked her, "have you made any money," after one of Tomlinson's videos went viral.

40.     One of Defendants' preconceived goals in writing the Article was to paint Plaintiffs as liars, including about their professional affiliations. To this end, they deceptively juxtaposed two facts: first, quoting Tomlinson as saying that Jacob told her she had been mentored by entrepreneur Gary Vaynerchuk, and then stating in the same paragraph that "Mr. Vaynerchuk said he has no affiliation with Influences." Defendants' juxtaposition gave the impression that Jacob had misrepresented her relationship with Vaynerchuk. But the truth – which Defendants knew, and which they could have easily confirmed by review of public sources – is that Vaynerchuk *had* mentored Jacob and held Jacob in extremely high regard. As but a few examples from the public record:

a)  In July 2020, Influences posted a video on YouTube entitled, "Meeting My Hero," proving that Vaynerchuk and Jacob's friendship began in 2009.[9]

b)  Another video, which was livestreamed publicly to the Influences Instagram page in the summer of 2020, shows Vaynerchuk and his business partner, Ryan Harwood, introducing themselves to the group. In the video, Harwood says, "Gary and I have both known Ari for a very very long time. We're huge fans of everything that she's up to out there and just her and just her [sic] as a human being."[10]

---

[9] *Meeting My Hero*, YOUTUBE (Jul. 20, 2018),
https://www.youtube.com/watch?v=6jsOT1agFbw .
[10] *Gary Vee Zoom + Influences TikTok Creators and Friends*, YOUTUBE (Aug. 16, 2020),
https://www.youtube.com/watch?v=tlwf1whqvi8.

c)  In fact, Vaynerchuk respected Jacob so much that he eventually offered
Tomlinson a spot on a Super Bowl commercial expressly because of Tomlinson's
relationship with his friend and protégé, Jacob.[11]

41.  Lorenz was aware of these facts prior to publishing the Article, yet chose to
ignore them in yet another instance of reckless disregard for the truth. And in sourcing the
Article, Lorenz purposefully manufactured an apparent inconsistency between "mentorship by
Vaynerchuk of Jacob" and "affiliation between Vaynerchuk and Influences" to fit Lorenz's
preconceived narrative that Plaintiffs were dishonest.

42.  Defendants then deceptively purported to answer the rhetorical question they had
posed as to whether Tomlinson had "made any money," by falsely suggesting that Plaintiffs had
been withholding or delaying payment to Tomlinson of "tens of thousands of dollars." They
quote Tomlinson as stating that "[b]y January, I realized I hadn't been paid since Halloween."
Defendants then claim that Tomlinson "reached out to the brands she'd worked with and
discovered that she was owed tens of thousands of dollars." These claims are false, as Plaintiffs
notified Defendants pre-publication. First, Influences was not responsible for paying fees to
Tomlinson (who was signed to a separate company, CreatorEdge), and second, Tomlinson had
been paid during the months of November and December – and any delay in payment stemmed
not from Plaintiffs, but from the general delay that influencers were suffering in receiving
payment from brands at that time. Defendants knew this, both because they had been put on

---

[11] *See Gary Vee offers talent a Super Bowl commercial*, YOUTUBE (Oct. 1, 2022),
https://youtu.be/2djxS7tABU0 (video posted by Influences in fall of 2019, in which Vaynerchuk
gauges Tomlinson's interest in appearing in a Super Bowl commercial. Vaynerchuk says "To be
very frank, because of my relationship with Ari, I want to help my friend just a bit…I couldn't
wait to do this phone call because I get to pay back a friend who I adore and change the course of
somebody else's career who I enjoyed meeting very quickly…")

prepublication notice of falsity by Plaintiffs, and because they were aware of the general

payment delay industry-wide; in fact, Lorenz had authored an article in The Atlantic in

November 2018, in which she lamented the delay that influencers suffer in submitting content

and receiving payment from brands. [12] Yet Defendants recklessly ignored these facts to instead

create a false and misleading impression about Plaintiffs.

43.     Defendants then claim that in April 2021, Tomlinson filed a complaint with the

California Labor Commission alleging that Jacob had violated California law by operating as a

talent agency without a license. What Lorenz could easily have established but recklessly failed

to include in her Article, was the fact that Jacob *did* have a talent agency license at the time the

Article was published, and that California law allows individuals and corporations who are not

licensed talent agencies to negotiate employment contracts in conjunction with and at the request

of a licensed talent agent.[13] Further, Lorenz knew as early as May 2020 that Influences was

properly working with a licensed talent agent because Jacob had emailed her with this

information on May 14, 2020. Lorenz's decision to mention Tomlinson's California Labor

Commission complaint against Jacob, but not key facts she was aware of that tended to establish

that Jacob had fully complied with California labor law in her dealings with Tomlinson, showed

reckless disregard for truth and a commitment to her preconceived narrative of Jacob as an

unscrupulous businessperson.

44.     The Article then goes on to quote Tianna Singer as stating that Plaintiffs had

"promised brand deals, money and opportunities" and that "everyone was promised income, but

that never happened." Contrary to Defendants' misleading implication in the Article, Singer was

---

[12] Taylor Lorenz, *When a Sponsored Facebook Post Doesn't Pay Off*, THE ATLANTIC (Dec. 26, 2018), https://amp.theatlantic.com/amp/article/578767/.
[13] *See* Cal. Lab. Code § 1700.44(d).

not even managed by Plaintiffs – indeed, Plaintiffs chose not to sign her as a client because of her meager social media following. Instead, Singer was simply allowed to be a *guest* of the "The Girls in the Valley ("GIV") influencer house if she produced content and agreed to the terms of Influences' standard release and non-disclosure agreement. Moreover, the GIV residents who *were* signed to Plaintiffs at the time were aware through their signed agreements that Plaintiffs had not promised to procure brand deals. Defendants never investigated or asked Plaintiffs about these issues prior to publishing the Article, instead choosing to carefully parse their words to leave the reader with the false impression that Singer was "yet another" client who was lied to and disappointed by Plaintiffs' "promises."

45.     Singer's statement that "brand deals and opportunities never materialized" is also false, and Defendants could have easily confirmed this fact by reviewing the social media accounts of the influencers Plaintiffs managed, which boasted about multiple opportunities. Jacob even directly notified Lorenz of one especially big opportunity called "Playlist Live" and sent Lorenz detailed information about a trip organized by Influences and sponsored through a brand deal that dozens of influencers (and Singer) were set to take to the Playlist Creator Conference in Orlando, as follows:

[continued on following page]



46.     In addition, in Lorenz's May 2020 "Delayed Moves" article, Lorenz published statements that confirm that Lorenz was aware of the opportunities available to the GIV influencers, which undermines Defendants' false statement that such opportunities "never materialized":

[continued on following page]

## Business as Usual?

Many creators have pushed back their plans in light of the pandemic. The Girls in the Valley, a female-only TikTok house, was on track for a late-March move and even held an opening party on March 12 at the Sugar Factory in Los Angeles featuring the pop star Doja Cat. Now, with their move-in date to be determined, the house's members have turned to weekly Zoom calls to stay in touch.

47.     Further, the Article alleges that Plaintiffs installed a security camera in the kitchen "without the consent" of the GIV house members. This is patently false: in fact, the GIV house (and the other collaboration houses managed by Plaintiffs) had an iPad at the entrance with a system that required any entrants – whether house members or guests – to sign in and sign a liability release and waiver stating that the house has video surveillance in all rooms other than the restrooms and showers, as follows:

[continued on following page]



I further understand that in order to promote the safety of employees and visitors, as well as the security of the Property, that this Property has video surveillance inclusive of any bedrooms, the only exception being private areas of restrooms and showers. I hereby give my consent to such video surveillance at any time Influences may choose.

I understand that if I post social media content I am required to tag the house accounts (@girlsinthevalley) and the individuals shown in the content as well as my host.

I have read and understood this agreement and I am over the age of 18.

SIGNATURE

Tianna Singer
NAME

May 23, 2020
DATE

48.     It was well known across the content creator industry that Influences required guests of the content houses to sign an agreement of this type, and this was also common practice at other collaboration houses that existed at that time.

49.     Defendants were made aware of these facts in prepublication communications. What's more, Lorenz and *The Times*, by virtue of their deep knowledge of the industry, knew that security cameras were industry standard in influencer houses such as KND. Indeed, when a photographer from *The Times* visited the KND house in May 2020, they asked if they needed to sign in on the iPad, indicating *The Times'* knowledge of this industry-standard practice. Moreover, evidence of videotaping was visually apparent from the iPad that was installed on the walls of the house. That Defendants nonetheless published this baseless accusation shows the

20

extent to which they recklessly disregarded what they knew to be true, out of their desire to

smear Plaintiffs.

50.     Defendants also misleadingly suggest that Jacob threatened to throw all the GIV

girls out of the house unless they posted content "at least eight times a day." This was false, and

Defendants knew it. First, Singer and the members of the GIV house *themselves* came up with

the posting schedule in June 2020, as they wanted to be on the same schedule as the KND

influencers going forward. This can be seen by the following text, sent by Singer:



51.     Second, in light of Defendants' extensive knowledge of the influencer industry,

they knew that it was perfectly reasonable for Plaintiffs to encourage their house members to

consistently post content on social media every week, and that this formula is precisely how

collectives such as GIV typically operate. Defendants knew that the value of spending time in a collaboration house is to collaborate with other influencers who are committed to consistent content creation, and that posting regularly on social media is the only way for influencers with small followers to grow. To suggest that Plaintiffs' encouragement of regular posting was oppressive demonstrates Defendants' dogged determination to create a false impression of Plaintiffs. Defendants never even asked Plaintiffs about this issue before posting the Article.

52.     Moreover, Singer was ultimately asked to leave due to breaking rules such as hosting parties during the COVID-19 shelter-in-place, underage drinking, and essentially becoming a problematic influencer who took advantage of Plaintiffs' creator house without generating results.

53.     Defendants then claim that the GIV girls got into an "escalating verbal fight" with Jacob "that resulted in several calls to local authorities to intervene." This statement, when juxtaposed with Defendants' statements that the GIV girls were "intimidated" by "explosive" conversations with Jacob, creates the clear impression that Jacob's aggression and intimidation caused the GIV girls to call the police. This is a lie and Defendants knew it. This is because prior to publication of the Article, Defendants were informed that it was *Jacob* who called the police on the girls—twice—because of *their* threatening and aggressive behavior. Defendants were also informed of the "farewell vandalism" the GIV girls performed days before their move-out date, which also prompted Jacob's calls to the police, as shown by the following documents:

[continued on following page]

---------- Forwarded message ----------
From: **Ben Walter** <benwalterlaw@gmail.com>
Date: Wed, Aug 12, 2020 at 9:15 AM
Subject: Re: Ariadna Jacob/Influences allegations
To: Taylor Lorenz <taylor.lorenz@nytimes.com>
CC: Laura Pallas <laura@pallasmanagementgroup.com>, Matt Shupe <matt@praetorianpr.com>, PMG ASST <assistant@pallasmanagementgroup.com>, Christal Bodie <christal@pallasmanagementgroup.com>, Ariadna Jacob <ari@influences.com>

Some additional context from Ari:

**If Ms Jacob wasn't the leaseholder of the Girls in the Valley house, how did she have the power to kick (and lock) the girls out of the house?** We did not kick them out of the house and lock the door and have witnesses to verify. We asked them to vacate over the next couple of days since they were never formally invited to move in longer than 2-3 weeks in the first place. They all said they would have no problem doing so and then proceeded to leave to go to the beach. We asked if anyone had a key, everyone said no, so we said we would lock the door to make sure the property was secure since the owner's belongings were still there etc. and that as soon as they got back to the house to call us and we were across the street to be able to let them in. When they returned, instead of unlocking the door, Justin and Nupur as well as Rachel Turner (who had been not been invited to stay overnight at the content house at that time and blatantly asked not to be there) broke through a side window on the bottom floor into one of the rooms a girl was staying in and then proceeded to vandalize the property, spray painting F*CK Ari on the walls.

Additionally, several people returned after they moved out, broke in, and stole some of the owner's belongings.

 

[continued on following page]

54.     The fact that Lorenz suggested that *Jacob* was somehow responsible for the police being called, while ignoring the clear evidence to the contrary that was presented to her, once again displays Defendant's purposeful plan to smear Plaintiffs regardless of the truth.

55.     Defendants then quote Dayna Marie, another of the GIV girls who was signed to Influences, as claiming that Plaintiffs failed to pay utility bills in April 2020, such that the "water, WiFi and electricity went off," and they were using "water from the pool to flush the toilets." Defendants further claimed that Jacob had agreed to pay for utilities only "up to a certain point," and that she "was under no obligation to pay the bills." These statements are false:

the utilities never went off for any reason in April, let alone due to bills being unpaid. Indeed, in

March 2020, the California Public Utilities Commission (CPUC) instituted a moratorium on

disconnections for non-payment of utilities, as seen by the following CPUC press release

excerpt:



**California Public Utilities Commission**
**505 Van Ness Ave., San Francisco**

**FOR IMMEDIATE RELEASE**                                                            **PRESS RELEASE**
Media Contact: Terrie Prosper, 415.703.1366, news@cpuc.ca.gov

### CPUC ENSURES ESSENTIAL UTILITY SERVICES FOR CONSUMERS
### TO ASSIST IN COVID-19 MITIGATION

SAN FRANCISCO, March 17, 2020 – The California Public Utilities Commission's (CPUC)
Executive Director today determined that energy, water, sewer, and communications companies
under CPUC jurisdiction should halt customer disconnections for non-payment as a result of the
State of Emergency called by Gov. Gavin Newsom due to COVID-19.

56.     Moreover, an archive of the CPUC website shows that this information was

readily available for Lorenz or fact-checkers from *The Times* to consult during the months of

April through August 2020. Yet once again, Defendants failed to conduct even the most basic

fact-checking and instead chose to recklessly report their false statements about Plaintiffs,

despite the existence of readily available information online to show they were false. They did

this to further their preconceived narrative of Plaintiffs as abusers of influencer talent, who

callously subjected the GIV residents to unsanitary conditions during a national pandemic.

57.     Defendants then falsely suggest that Jacob manipulated a former client, Devion

Young, by having "used nude photos of his to shame him" – and quotes Young as saying that

"Right before we parted ways she leaked my nudes and sent them to business partners, people in

my house and potential investors to slander my name, saying I was unprofessional." In other

words, Defendants alleged that Jacob leaked the photos to industry people for leverage because Young wanted to leave. This is completely false, and Defendants knew it.

58.     First, the "nudes" had been circulating for weeks before Young and Plaintiffs had decided to part ways, and this timing is something Defendants could and should have confirmed. Jacob could not have "leaked" the photographs in retaliation or manipulation, because the photographs had already been made public weeks earlier. Second, Influences had no "business partners" at that time to which Jacob could have "leaked" the photographs, which is information that was readily available online.

59.     The fact that Jacob only learned about the photographs well after they had gone public is apparent from the following text message between Jacob and a manager (not connected to Influences) who alerted Jacob about the photographs' existence and publication:

[continued on following page]

26



Walter ›

May 15, 2020 at 9:57 PM

Hey Ari, one of my clients just sent me some VERY disturbing items. If you can take a call, please let me know.

Hey there, what is it concerning?

Is everyone ok?

The client sent me screen shots of Devion posting self made porn on telegram. Someone then called him out for sending it to a 14 year old... further they take both Drip Crip and Influences

Tagged* not take

I know I would want to know about it if it was my company. You are still helping Tyler, so I have nothing against you. I was just super concerned when Jake sent that to me

Can u send it to me? I'm confused what it is



Let me get all the screen shots for you from him. Give me a few. Devion posted full nudes, understand the screen shots will show it all.





60.     Further, as Plaintiffs informed Defendants prior to publication of the Article:

when Jacobs became aware of the illicit photographs, and because Influences was working on

multiple business transactions with Young, Jacob informed an Influences staff member – who

was (and is) under a non-disclosure agreement with Influences – about the photographs'

existence. Further, after Jacob received a text message alerting her to an allegation that Young

was sending nude photos to an underage girl and posting them all over the internet, she

immediately forwarded the screenshots of those text messages to the house manager for Drip

Crib (the influencer house where Young resided) as a matter of pressing ethical concern. Jacob

also immediately confronted Young about the allegations and informed him of her conversation

with the talent manager.

61.     At no point did Jacob publicly disseminate or "leak" the photographs, as Young

and Defendants falsely claimed. The screenshots Jacob forwarded to Young's house manager

were taken from the very messaging forums where the photographs had already been leaked to

over 200,000 people, and did not include the nude portions of the photographs. In Young's text

messages to Jacob, he explains to her how the photographs may have been leaked (which has

nothing to do with Jacob), as follows:

[continued on following page]



62.    Yet Lorenz and *The Times* ignored the inconvenient facts that they knew about the timing and dissemination of the nude photographs, and instead published the false narrative that Jacob had "leaked" them to her "business partners" – then doubled down on this false

allegation in subsequent statements:



63.     The final section heading in Defendants' hit piece Article is entitled "Parenting in the Influencer Age." Defendants quote Singer's mother describing Jacob's behavior as "shameful" for "taking advantage" of her daughter's "access to a lot of money." (In fact, Singer was not even under contract with Plaintiffs, and Singer was unable to generate enough followers or revenue-producing content to justify her staying at the GIV house past a trial run.)

64.     Defendants then claim that Plaintiffs "attempted to sign Ms. Zeiler's 16-year-old daughter, Ellie, to a management contract," and that "Ms. Zeiler declined but soon discovered that Ms. Jacob had already added Ellie to the talent portion of an Influences marketing deck." This is false, as Defendants knew.

65.    The true facts and sequencing, as Plaintiffs informed Defendants prior to publication, are as follows: Plaintiffs never presented Ms. Zeiler or her daughter with a management contract, and never represented to anyone in the industry that Plaintiffs had a management contract with the Zeilers. Further, Defendants knew that Zeiler was not on any "marketing deck" for Influences, as no such deck existed. Rather, Zeiler was initially listed on the GIV informational deck, *with the consent of Zeiler's mother,* who even provided suggestions and input about the deck, as seen from the following text screenshots between Jacob and Ellie's mother, Sarah Zeiler:



[continued on following page]



66.     Subsequently, Lorenz texted Jacob asking for all her decks for the influencer houses in connection with the "Delayed Moves" article Lorenz was working on at the time, and Jacob provided Lorenz with the informational deck, which at that time included Ellie's name.

67.     As a courtesy, Jacob then texted Ms. Zeiler to explain that Lorenz was doing a story about content houses and that Jacob had sent her the GIV informational deck that had previously been approved by Ms. Zeiler. This text opened a conversation between Jacob and Ms. Zeiler concerning Ellie's future, and Jacob for the first time asked Ms. Zeiler if she would consider Influences as Ellie's manager. Zeiler's mother responded by saying that they weren't interested in retaining management, and by offering that if joining GIV meant Ellie had to sign to Influences, that Jacob didn't have to include Ellie in the deck if she didn't want to. Jacob responded to clarify that Ellie's joining GIV was not contingent on her signing with Influences. Ms. Zeiler responded saying, "I think to keep it clean you can take Ellie out of the GITV deck

for now but when the time comes to make it happen we can revisit." Jacob promptly did so, and

updated Lorenz that Zeiler was no longer involved with the project, as seen in the following text:



68.     Jacob also offered to set up a phone call between Lorenz and Ms. Zeiler (who had offered to be an advisor to GIV), as seen from the following:[14]



69.     Thus, Lorenz knew that Jacob was being transparent about Plaintiffs' relationship with Ellie Zeiler, and Lorenz was put on notice of the true facts prior to publishing the Article. Despite knowledge of these facts, Defendants published the Article falsely claiming that Plaintiffs had tried to circumvent Ellie's mother by leaving Ellie on the deck after the mother had requested her name be taken off. The Article twisted the facts to make Jacob seem predatory toward young talent and dishonest with potential clients about who Influences represents. Yet

---

[14] Moreover, Ms. Zeiler asked for and signed a contract with Influences for a lucrative, one-off brand deal for Ellie, further dispelling any notion that Ms. Zeiler or her daughter were being unilaterally pursued by Plaintiffs.

none of this ever happened: indeed, Jacob never even referred to herself as Zeiler's "manager,"

and when Zeiler was scheduled to join in on any Influences opportunities, Jacob always made

that clear, as seen from the following:

### 2. Email from Jacob to clients joining GaryVee call on May 30, 2020



me   May 30, 2020
to Christal, Collins, Devan, Laura, Laura,...

Thanks again guys for the call today with Alex - was super helpful and we are so appreciative.

If you guys want to join on Wednesday at 1PM - we have a 45min session Zoom with GaryVee.

Some of the attendees from our roster will be:

Jason Coffee - @jasoncoffee
Peyton Coffee - @peytoncoffee
Caleb Coffee - @calebcoffee
SpencerX - @SpencerX
Marcus Olin - @marcusolin
Stephanie Margarucci - @BeastEater
Hailey Orona - @real.ona
Jesse Underhill - @jesseunderhill
Alex French - @alexfrench
Jay Nagy - @jaynagy
Ben Winters - @thebentist
Nupur Sharma - @its_nupur
Abel Carden - @abelcarden
Giovanny Valencia - @giovanny
Brandon Westenberg - @beyondbrandon
Randy Gonzalez - @enkyboys
QPark - @qpark
Ellie Zeiler - @elliezeiler (we don't manage Ellie we just love her and her mom so we invited them to join)

Let me know and I can send you the invite and link to join and if you have anything in particular you want to bring up lmk and I can plug you in to discuss your question or topic.

37

70.     Defendants were expressly made aware of these inaccuracies but left them in the

published Article. Lorenz then doubled down to accuse Plaintiffs of being "people who exploit

child stars" (which is not only grossly defamatory, but factually indefensible given that Lorenz

had only one source who was under eighteen):



**The Devastating Aftermath of Defendants' Lies**

71.     Within a matter of days after the Article was published, L'Oréal informed

Plaintiffs that it was no longer proceeding with its branding agreement with Influences.

Numerous influencers under contract with Influences breached their agreements, citing

Defendants' false allegations of illegal and unethical conduct against Plaintiffs.

72.     Influencers, brands, and social media platforms now refuse to work with Plaintiffs based on the false allegations in the Article. Influences lost all its creator and consulting clients as a result of the Article. Jacob had to seek mental health treatment and had suicidal ideations after seeing her life's work destroyed by a dishonest, agenda-driven journalist who used the megaphone of *The Times* to send shockwaves through Plaintiff's world and destroy her career.

73.     As a result of the defamatory Article and the ensuing devastation of Plaintiffs' business and finances, Jacob—who lived in California at the time the Article was published— was forced to relocate to Las Vegas, Nevada to seek a new career and business ventures.

**Lorenz Had Been Plotting Her "Hit Piece" Article Since as Early as April 2020**

74.     But the damage wrought to Defendants' business and reputation is not limited to the immediate aftermath of the Article being published. It traces back to the spring of that year, as Lorenz had begun to poison the well with Jacob's clients as early as April 2020.

75.     Lorenz began contacting many of Plaintiffs' clients to press them for negative information about Jacob and Influences. For example, Lorenz ruined Plaintiffs' reputation with everyone who was living with Diomi Cordero, one of Plaintiffs' former independent contractors overseeing several creators at the time. Lorenz spread rumors that Influences' agreements were invalid and that Jacob had exhibited "shady" behavior the influencers should be concerned about.

76.     As a result, Plaintiffs lost $5.4 million due to additional contract breaches during the end of April to late July 2020.

77.     The influencers that breached their contracts with Plaintiffs left either because they were involved in the Cordero/Lorenz interactions, or because they were pressured by the influencers who were involved. Some of them said they went along with Lorenz and Cordero's scheme because Cordero threatened them with kicking them out of the house if they did not go

39

along with it. One recalls speaking to Lorenz twice. The first time was prior to the May article

Lorenz published in the context of an interview between Lorenz and members of the North

Hollywood house who were also Influences' clients. The person recalls, during a phone call with

Lorenz, Cordero "passing the phone around for people to say anything negative about

Ari/Influences." The same person recalls Lorenz having similar conversations with the GIV girls

in late May. The person further recalls that the girls "must have" spoken to Lorenz in late May

"because I felt like I remember that being a thing as well. That it was like, um, you know, this

need for as many people, you know, to communicate, like to give, you know to add more beef to

the story."

78.     As it happens, Lorenz applied the same pressure campaign to members of the

KND house, to get them to reveal "dirt" on Jacob as well. Around March 2021, Underhill spoke

to one Connor McCrory. McCrory transcribed the following conversation where Underhill

admits (1) that Lorenz "harassed him inadvertently" by "constantly asking for dirt on Ari

[Jacob]," and (2) that Olin advised him to speak to Lorenz as a way to get out of his contract

with Plaintiffs:

[continued on following page]



CM: Is it true that Taylor harassed, I am using that term closely, you to get negative info/dirt on Ari? JH: **Silcence** **Mumbels** Ummm inadvertently yes, she constantly asked for "Dirt" on Ari, and said that my statement would make or break the case.



CM: Is it true that Marcus advised you to talk to NYT to get out of your contract? JH Yes, I wasn't to happy with Ari at the time, and didn't want to be in the contract anymore.

79.     Lorenz's approach of pressuring and lying to her sources to get them to affirm her preconceived narrative was again applied in August 2020, when Lorenz called Adam Cohen, a client of Plaintiffs from January through August 2020. During this phone call, Lorenz asked Cohen if he had "heard about all the stuff going on with" Plaintiffs, including whether Cohen had heard that Jacob had "manipulated talent" or otherwise "behaved badly." When Cohen told Lorenz that he had never had a poor experience with Jacob, Lorenz pressed him for information by continuing to make false allegations about Jacob and asking Cohen whether they were true. When Cohen refused to play along with Lorenz's narrative about Plaintiffs, Lorenz's demeanor changed, and she appeared to Cohen to sound angry and "pissed." She got very short with Cohen and the conversation ended. A true and correct copy of Cohen's signed declaration attesting to these facts is attached hereto as **Exhibit A.**

80.     Lorenz's plot to write a hit piece disguised as a neutral story about the KND

house—similar to the one she had written in January about Hype House[15]—reflects the conniving

mentality with which Lorenz approached this piece of "reporting." It also shows the depth of her

commitment to a preconceived narrative, painting Jacob as an unscrupulous businessperson who

preyed on talented young people who were eager to make it big in the glamorous world of being

a TikTok influencer. Lorenz even went so far as to use the language of "predatory" to describe

Plaintiffs in a retweet of her own Article on Twitter:



81.     In using the word "predatory," she claimed to be merely quoting one of her

sources in the Article, but she intentionally misrepresented what Singer's mother said. As is

evident from the following snapshot of the Article, Singer's mother had referred to the *industry*

as a "predatory environment":

---

[15] Taylor Lorenz, *Hype House and the Los Angeles TikTok Mansion Gold Rush*, THE NEW YORK TIMES (Jan. 3, 2020), https://www.nytimes.com/2020/01/03/style/hype-house-los-angeles-tik-tok.html.

"It's a very predatory environment," Ms. Singer said of the industry. "You have a situation where you have young vulnerable people with the potential to access a lot of money, then you have older people who are going to take advantage of the situation. Tianna's not going to be the first or the last."

Yet Lorenz intentionally misattributed this label to "the management company," Influences. This misrepresentation was not only false, but clearly defamatory to Plaintiffs.

**Lorenz Acted Intentionally to Harm to Plaintiffs**

82.      Lorenz caused further harm to Plaintiffs by intentionally doxing them in the Article. She did this by disclosing the address of the KND house—where Jacob was living at the time—despite Plaintiffs' express reservations about letting the address be publicized. In preparation for her May 2020 article, Lorenz group-texted Jacob and three of her colleagues asking for the addresses of the KND, Drip Crib and GIV houses. In the texts pictured below, Lorenz specified that the addresses were "[n]ot for publication," and that she needed the addresses just to "fact check" her article:

[continued on following page]

iMessage
May 13, 2020 at 1:04 PM

Taylor Lorenz

Hi! It's Taylor Lorenz with the NYT. Can someone please send me me the address for the:
-Kids next door house
-drip crib
-girls in the valley house?

 Not for publication. Thanks!!

 Hi Taylor.
Not a prob. Will do.

 Hi Taylor, if you're not going to publish the addresses, why would you like them?

Taylor Lorenz

Because we need to fact check

83.     Despite this assurance, however, in her August 2020 Article Lorenz included a hyperlink to an address on Zillow which turned out to be none other than that of the KND house where Jacob was living at the time:

> At the end of July, the influencers were told that they would have to cover a larger share of rent. They all felt the crunch, and the dream of living and working in a mansion with friends turned into "a living nightmare," Mr. Underhill said. By early August, half of the residents had moved out. The house itself has been re-listed for sale on Zillow.

By publishing the address where Jacob (a single woman) resided, Lorenz knew that she was reneging on her assurance. That she did so anyway evinced a malicious desire to harm Plaintiffs; particularly because when Lorenz herself faced online harassment, she said—in a teary interview on national television—that she suffered "severe PTSD" and "fe[lt] like any little piece of information that gets out on you will be used by the worst people on the internet to destroy your life."[16] Evidently, she did not mind subjecting Jacob to the same fate.

**Lorenz Has a Lengthy History of Reckless, Bad Faith "Reporting"**

84.     This is not the first time Lorenz has been known to fabricate a story for purposes of publishing a "hit piece" against those she stands to benefit by ruining their reputation. In a notarized letter written by Kyle Orrefice, the president of Quantum Stocks, he describes his experience serving as source for an article Lorenz and *The Time* published in November 2019, in which Lorenz accused Arya Toufanian, CEO of a digital media company called "I'm Shmacked," of being a fraud, scamming his customers, and of operating a "pyramid scheme of

---

[16] *Journalists Face Online Harassment*, YouTube (Apr. 8, 2022), https://www.youtube.com/watch?v=TkZ5tnV3zT0.

scams." Orrefice explains a significant disconnect between what he told Lorenz and what eventually appeared in the article and confirms that Lorenz never asked him for any documentary proof showing that Mr. Toufanian defrauded or scammed anyone. A true and correct copy of this notarized letter is attached hereto as **Exhibit B.**

85.     That one of Lorenz's own sources has accused her of fabricating allegations out of whole cloth while neglecting to fact-check any of them, speaks volumes as to Lorenz's integrity as a journalist. Given the plethora of documentary evidence that exists in this case as to her purposeful and reckless reporting—in the form of screenshots of text message conversations, pre-publication communications between Lorenz and Jacob (and her attorney), receipts, public records, communications with third parties, and more, all of which thoroughly undermine her factual allegations—it comes as no surprise to learn that Lorenz has engaged in this kind of reckless and defamatory "reporting" before—it is her modus operandi.

86.     It is unclear precisely why Lorenz left the employ of the *The Times*. Despite living in Los Angeles and specializing in covering social media, she left *The Times* for *The Washington Post* – not an obvious choice for someone with Lorenz' background. It has been well documented that she is not respected by her peers. She claimed she left *The Times* because it could not fully appreciate her talent, whatever that means. Former colleagues at *The Times* – including highly respected journalist Maggie Haberman – and current colleagues at *The Washington Post* – including Jacqueline Alemany -- have publicly called her out for self-promotion. She has criticized her own colleagues at *The Washington Post*, specifically when she took sides in the rivalry between Facebook and TikTok. On one occasion she falsely reported that she reached out to the target of one of her standard hit pieces and false attributed a quote to the wrong source. After being called out publicly, Lorenz failed to take responsibility and instead

blamed her *Washington Post* editors. Lorenz' actions were so far outside journalist norms that CNN's then-media reporter Brian Stelter and CNN's Oliver Darcy publicly called her out. Again, rather than take responsibility, Lorenz attacked Darcy and CNN for engaging in "a smear campaign."

87.      Above all, Lorenz is interested in developing and promoting "her own brand." She holds herself out as an "influencer journalist," essentially making her a competitor with the very people she claims to write about. Lorenz does not even attempt to operate within the boundaries of journalistic norms. Bob Woodward she is not.

**Lorenz's Hunger for Fame and Loyalty to UTA Motivated Her to Defame Plaintiffs**

88.      Lorenz also had a compelling, self-interested reason to use her platform as a reporter at *The Times* to ruin Plaintiffs' reputation.

89.      It is hardly an accident that just before publishing the Article, Lorenz had signed a book deal with a Simon and Shuster imprint to write content regarding social media. None other than United Talent Agency – one of the largest talent-representation firms in the world, and Plaintiffs' direct competitor – represented Lorenz in procuring that deal.[17]

90.      In 2020, UTA was one of the most prominent brands in digital innovation, and Lorenz knew it. Lorenz also knew that UTA sought to increase its presence in the TikTok influencer industry, a sector of digital media that traditional talent agencies had been slow to penetrate, but that Lorenz knew well.

---

[17] Rachel Deahl, *UTA Publishing Builds Its Client List,* Publishers Weekly (Sept. 17, 2021), https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/87404-uta-publishing-builds-its-client-list.html.

91.     In her hunger to become an "influencer journalist" in her own right, and in light of the value UTA was bringing and could bring to her career, Lorenz sought to ingratiate herself with UTA by smearing Plaintiffs for UTA's benefit.

92.     On April 6, 2020, four months before the Article about Plaintiffs was published, Lorenz published a hagiography about UTA entitled, "These Top Hollywood Agents Are Signing All The Influencers."[18] In it, she highlights UTA and three of its executives, and closes with a quote from a UTA client declaring the agency to be the most relevant in the industry. At no time does Lorenz disclose her relationship with UTA.

93.     Moreover, in signing her book deal—then publishing an article featuring UTA—Lorenz openly flouted *The Times'* ethical journalism standards, which are contained in an employee manual titled, "Ethical Journalism Guidebook."[19] *The Times'* website says that the Guidebook serves as "a handbook of values and practices for the News and Opinion departments."[20] The Guidebook explicitly states that "[s]taff members may not accept employment or compensation of any sort from individuals or organizations who figure or are likely to figure in coverage they provide, edit, package or supervise."[21] Yet that is precisely what Lorenz did in procuring a book deal with UTA and then publishing an article in which they were favorably featured.

---

[18] Taylor Lorenz, *These Top Hollywood Agents Are Signing All the Influencers*, THE NEW YORK TIMES (Apr. 6, 2020), https://www.nytimes.com/2020/04/06/style/hollywood-agents-influencers.html.

[19] *Ethical Journalism: A Handbook of Values and Practices for the News and Opinion Departments*, THE NEW YORK TIMES, https://www.nytimes.com/editorial-standards/ethical-journalism.html#.

[20] *Id.*

[21] *Id.*

94.     One of the UTA executives Lorenz touts in her article is its Head of Digital Talent, Greg Goodfried. Goodfried was the same agent that ended up poaching Plaintiffs' former and most promising client, Charli D'Amelio. Another UTA executive touted by Lorenz was its Head of Innovation, Brent Weinstein who – according to Plaintiffs' former client, Tomlinson – consistently "strongarmed" Tomlinson to leave Influences.

95.     Lorenz's ingratiating relationship with UTA ended up affording Lorenz access to more sources for her August 14, 2020 hit piece about Plaintiffs, as several of Lorenz's sources for the Article were working with UTA during her reporting.

96.     On August 11, 2020 – three days before the Article was published – Goodfried called Jacob and encouraged her to speak directly with Lorenz, instead of through Jacob's attorneys and representatives. By then it had become clear that Lorenz was working on a feature in the *New York Times*, and there was a distinct possibility that Plaintiffs would be cast in a negative light. In this discussion, Goodfried did not tell Jacob that Lorenz was a UTA client but instead stated that Lorenz had indicated that she "really liked" Jacob and had good intentions. This attempt by UTA to bait-and-switch Jacob into speaking openly with Lorenz further confirms that Lorenz and UTA were working together and shared a motive to harm Plaintiffs.

97.     Notably, several influencers who were formerly affiliated with Influences landed at UTA as a result of Defendants publishing their Article.

98.     In short: Lorenz was personally motivated to destroy the reputation of one of UTA's competitors with a "news story" riddled with defamatory allegations of illegal and unethical conduct, because the Article would give Plaintiffs' clients an excuse to breach their contracts and land at UTA, thereby cementing Lorenz's position and favor with the industry titan who could potentially cause Lorenz's career to skyrocket.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Defamation**

**(By Plaintiffs Against Defendants)**

99.     Plaintiffs repeat and incorporate each paragraph above as if fully set forth here.

100.     Defendants made the following provably false statements of fact about Plaintiffs (collectively, the "Statements"):

a)  That Jacob told the KND residents that they would have to cover a larger share of the rent;

b)  That Jacob promised Singer and the rest of the GIV residents "brand deals, money and opportunities" that never materialized;

c)  That Jacob installed a security camera in the kitchen of the GIV house without the residents' consent;

d)  That Jacob leaked Young's nude photographs to her business partners;

e)  That Jacob made false representations that she was managing Ellie Zeiler and had added her name and photograph to the Influences marketing deck without Ellie's mother's permission;

f)  That in April 2020, the water and electricity in the GIV house went off.

101.     The Statements were provably false, for the reasons discussed above, and including but not limited to the following:

a)  The residents were never asked to pay more rent than what was contractually agreed;

50

b)  The influencers' signed agreements with Plaintiffs did not promise brand deals, nor was Singer even a client of Plaintiffs. Moreover, Plaintiffs did provide the influencers with a variety of opportunities, many of which materialized;

c)  The GIV residents all agreed, in writing, to have a security camera installed in the kitchen;

d)  Jacob did not leak Young's nude photos, which were already circulating to hundreds of thousands of people before Jacob became aware of them;

e)  Jacob never referred to herself as Zeiler's manager. Furthermore, Zeiler was listed on the GIV informational deck (not a marketing deck), which Zeiler's mother knew about, approved of, and even gave advice about;

f)  The utilities never went off for any reason in April or during the COVID-19 lockdowns, let alone due to bills being unpaid – indeed, the CPUC had instituted a moratorium on disconnections for non-payment of utilities at the time.

102.    The Statements were published to third parties and were not privileged.

103.    The Statements were *per se* defamatory. Each of them accused Plaintiffs of having engaged in unfair, unscrupulous, and/or fraudulent business dealings (including but not limited to breach of contract, manipulation, lying, invasion of privacy, and other misconduct) with their own clientele and with their industry colleagues, which naturally caused harm to Plaintiffs' professional reputations and ability to earn a living. Further, the Statements caused Plaintiffs special damages in the ways discussed above.

104.    Defendants made the Statements either knowing they were false, or with reckless disregard for their falsity. As discussed above, defendants had a preconceived narrative about Plaintiffs that they pressured their sources to confirm. Where necessary to avoid disrupting their

51

narrative, Defendants either (a) intentionally ignored contradictory facts that they were told about (by Plaintiffs or others), or that they knew from firsthand observation, or that they inherently were aware of by virtue of their deep industry knowledge, or (b) refused to perform simple fact-checking efforts (including reviewing the very types of social media posts and other public sources that Defendants claim to be experts in) that would have proven their statements to be false.

105.     In the alternative, Plaintiffs plead defamation by implication. Each of the Statements, when read in the context of the Article as a whole, may reasonably be read to impart a false innuendo about Plaintiffs – namely, that Plaintiffs intentionally take advantage of their clients, abuse young talent for their own financial gain, lie about and breach the terms of their contracts, and generally commit unethical and fraudulent business practices.

106.     Defendants intended to convey the defamatory meaning. They deliberately cast their Statements in an equivocal fashion in the hopes of insinuating these defamatory meanings about Plaintiffs to the reader. They clearly endorsed the defamatory implications they made, as discussed in detail above, and as particularly evident from Lorenz's subsequent tweets that highlight and intentionally take out of context the worst allegations ("predatory," "retaliatory" etc.) from the Article.

107.     As a result of this defamation, Plaintiffs seek actual damages for reputational injury, compensatory damages, and special damages for lost contracts resulting from the defamatory Article, in amounts to be proven at trial but anticipated to exceed $11 million. Further, Plaintiffs seek an award of punitive damages against Defendants sufficient to deter their conduct in the future.

**SECOND CAUSE OF ACTION**

**Tortious Interference with Prospective Economic Advantage**

**(By Plaintiffs Against Defendants)**

108.    Plaintiffs repeat and incorporate each paragraph above as if fully set forth here.

109.    Plaintiffs had business relationships with third parties, including multiple influencers.

110.    Defendants knew about these relationships and deliberately sabotaged them, by defaming Plaintiffs under the guise of interviewing influencers for their story, and by subsequently publishing the false and defamatory Article about Plaintiffs.

111.    Defendants acted with malice, with the express purpose of harming Plaintiffs' business, and used dishonest, unfair or improper means in generating the Article.

112.    Defendants' interference caused severe economic injury to Plaintiffs, fundamentally destroying their business.

113.    Plaintiffs seek compensatory damages, special damages, and punitive damages for the harm caused by Defendants.

**THIRD CAUSE OF ACTION**

**Intentional Infliction of Emotional Distress**

**(By Jacob Against Defendants)**

114.    Plaintiffs repeat and incorporate each paragraph above as if fully set forth here.

115.    Defendants are liable for the tort of intentional infliction of emotional distress because they took the extreme and outrageous course of action of fabricating a false narrative about Jacob–one deliberately calculated to cause her economic ruin—and used their powerful

platform as the most prestigious newspaper in the country to propagate this false and defamatory narrative to the world.

116.    This action caused extreme emotional distress to Jacob, as evidenced by her need to seek out mental health treatment and her suicidal ideations in the aftermath of watching her business—her life's work—go up in smoke overnight.

117.    Jacob seeks compensatory damages, special damages, and punitive damages for the harm caused by Defendants.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment in their favor and against Defendants awarding to Plaintiffs the following relief:

a.  An award of compensatory damages for reputational injury to both Jacob and Influences in an amount exceeding $75,000 each, and mental anguish damages for Jacob to the maximum extent allowed by law;

b.  Special damages for lost profits in an amount exceeding $11,600,000.00;

c.  An award of pre-judgment and post-judgment interest in the maximum amount allowed under law;

d.  Punitive and/or exemplary damages; and

e.  An award of such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all of their claims so triable.

Dated: October 5, 2022

Dhillon Law Group Inc.

/s/ Harmeet K. Dhillon
By: Harmeet K. Dhillon

177 Post St., Ste. 700
San Francisco, CA 94108
Tel: (415) 443-1700
Fax: (415) 520-6593
Email: harmeet@dhillonlaw.com
*Attorney for Plaintiffs*

Camara & Sibley LLP

/s/ Joseph Sibley
By: Joseph Sibley

1108 Lacava St., Ste 110263
Austin, TX 78701
Tel: (713) 966-6789
Fax: (713) 583-1131
Email: sibley@camarasibley.com
*Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of October 2022, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which I understand to have caused service on all

counsel of record.

*/s/ Harmeet K. Dhillon*
Harmeet K. Dhillon