Exhibit 3



**Taylor Lorenz <taylor.lorenz@nytimes.com>**

## Ariadna Jacob/Influences allegations

**Laura Pallas** <laura@pallasmanagementgroup.com>        Thu, Aug 13, 2020 at 2:48 PM
To: Taylor Lorenz <taylor.lorenz@nytimes.com>
Cc: Ben Walter <benwalterlaw@gmail.com>, Matt Shupe <matt@praetorianpr.com>, PMG ASST
<assistant@pallasmanagementgroup.com>, Christal Bodie <christal@pallasmanagementgroup.com>, Ariadna Jacob
<ari@influences.com>, Choire Sicha <choire@nytimes.com>, Bonnie Wertheim <bonnie.wertheim@nytimes.com>

Please see below in response to your email - and once again I am attaching the original document for your
information.

Section 1

Ms. Jacob was the leaseholder at Kids Next Door house.
**- Please see response drafted by Ms Jacob's attorney**

The monthly rent at Kids Next Door was $18,500.
**- Please see response drafted by Ms Jacob's attorney**

Ms. Jacob agreed to pay half the monthly rent on the Kids Next Door house and, in exchange, the tenants would
produce content and fulfill a certain number of brand deals, obtained by the company.  -
**FALSE - Influences agreed to pay $8000 per month**

Did Influences agree to cover high-speed internet for the Kids Next Door? Was that agreement fulfilled?
**FALSE and defamatory**

At the end of July, the Kids Next Door house tenants were told that they would have to cover a larger share of rent.
**-Please see response drafted by Ms Jacob's attorney.**

Ms. Tomlinson stayed at Ms. Jacob's apartment in Los Angeles.
**- TRUE**

Ms. Jacob was mentored by Gary Vaynerchuk. **TRUE**

Ms. Jacob is withholding $23,683.82 in fees to Brittany Tomlinson.
**- Please see response drafted by Ms Jacob attorney**

Ms. Jacob has taken 20%,
**- Please see response drafted by Ms Jacob's attorney**

and in some cases 30%, commission on deals she secured for her clients.
**- FALSE and defamatory**

Ms. Jacob bought and is retaining the domain name brittanybroski.com.
**- Please see response to Ms Jacob's attorney**

Ms. Jacob asked talent to create free content as a favor to brands.
**- Please see response drafted by Ms Jacob's attorney**

Ms. Jacob showed up to the Girls in the Valley house late at night and sometimes texted talent until the very early morning (3 a.m. by one account).
**- Ms. Jacob runs a business that requires her to work 24-7. Often times there are exigencies that require an immediate answer. Without knowing what messages you are referring to, it is impossible for us to answer yes or no.**

Ms. Jacob brought guests to the Girls in the Valley house without informing the house's tenants. - **TRUE - Ms Jacob brought guests to her house. Please see response drafted by Ms Jacob's attorney.**

Ms. Jacob had a camera installed in the kitchen of the Girls in the Valley house that was connected to her phone.
**- Please see response drafted by Ms Jacob's attorney**

On June 7, Ms. Jacob told talent at Girls in the Valley they would be removed from the house if they did not post at least eight times a day on social media. **- Please see response drafted by Ms Jacob's attorney**

Ms. Jacob verbally fought with members of the Girls in the Valley house during their move-out. **- FALSE and defamatory-   Ms Jacob asked to not be filmed.**

Police were called twice to the Girls in the Valley house.
**- TRUE - Ms Jacob called the police twice.**

At different points in April, the water, Wi-Fi, and electricity were all temporarily shut off at the Girls in the Valley house.
**- Please see response drafted by Ms Jacob's attorney**

On June 9, Influences publicly split from Drip Crib over disputes about rent.
**- FALSE and defamatory**

Ms. Jacob created a fake Drip Crib Instagram account.
**- FALSE and defamatory**

Ms. Jacob privately distributed nude photos of Devion Young via text message.
**- Please see response drafted by Ms Jacob's attorney**

Ms. Jacob's landlord at 1600 Vine St. pursued legal action over $14,242.13 in back rent and subsequently sought to evict her.
**- Please see response drafted by Ms Jacob's attorney**

In 2019, Max Harrison, the owner of 6435 Weidlake Drive, sued Ms. Jacob, who was then subletting the property, claiming $46,001.69 of property damage.
**- Please see response drafted by Ms Jacob's attorney**

In March 2019, her landlord at the Avalon West Hollywood apartment building filed a claim against Ms. Jacob and sought to collect $3,200 in rent.
**- FALSE and defamatory - See documents**

Section 2

Influences has partnered with brands including Disney, Coca-Cola, Johnson & Johnson.
**- TRUE**

Influences says it has worked with The New York Times. Can Ms. Jacob describe the nature of that work? Is the relationship ongoing?

- TRUE - **Ms Jacob worked with YOU - a writer with the New York Times on several articles that were published with quotes with Ms Jacob.**

Ms. Jacob told others in the industry that she had a management relationship with Ellie Zeiler when she did not.
**- FALSE and defamatory**

Ms. Jacob included Ellie Zeiler in a Girls in the Valley marketing deck without her mother's consent.
**- FALSE and defamatory**

Ms. Jacob has claimed to manage SpencerX but does not manage him.
**- FALSE and defamatory**

Several people Ms. Jacob manages are in the process of trying to break their Influences contracts.
**- Please see response drafted by Ms Jacob's attorney**

Ms. Jacob has refused to release the Lopez Brothers from their contracts.
**- Please see response drafted by Ms Jacob's attorney**

Of the people named on the Influences website, whom does Ms. Jacobs currently manage? https://influences.com/influencers

**If the question is, who are the influencers, currently signed (pen to paper) with Ms.Jacob and still in business with her with active engagements please refer to the current website.**

Ms. Jacob launched Kids Next Door in May and relaunched Girls in the Valley that same month. - **FALSE**

Ms. Jacob claims she had to "shut down houses due to parties during the COVID-19 pandemic." What houses did Ms. Jacob shut down, and why? **Please see response drafted by Ms Jacob's attorney**

Ms. Jacob has pursued a management relationship with the Alpha house, which launched last weekend. **- Please see response drafted by Ms Jacob's attorney**

What professional publicists worked with Influences's talent and when? **- Influences engages a number of different professionals, including without limitation, lawyers, publicists, photographers, whose services have all been made available to clients.**

On Aug 13, 2020, at 12:16 PM, Taylor Lorenz <taylor.lorenz@nytimes.com> wrote:

Hi all,

I haven't heard back from you, but I wanted to reiterate that we need a response by **4 p.m. Pacific time today.**

This is Ms. Jacob's last chance to reply with any clarifications or corrections.

Taylor

On Thu, Aug 13, 2020 at 11:26 AM Taylor Lorenz <taylor.lorenz@nytimes.com> wrote:

Hi all,

Thank you for your cooperation with my reporting. I have listed some points below for your review. This is one more chance for Ms. Jacob to reply with any clarifications or corrections. I need a response by **4 p.m. Pacific time today.**

The questions and statements in Section 1 will look familiar, but I would like to give Ms. Jacob the opportunity to give them another look. Section 2 is a list of new queries.

I'm sending these now because I want to make sure Ms. Jacob has time to speak to anything she wants to address. Please confirm that I will hear from you by 3 p.m. your time.

Thank you,

Taylor

Section 1

Ms. Jacob was the leaseholder at Kids Next Door house.

The monthly rent at Kids Next Door was $18,500.

Ms. Jacob agreed to pay half the monthly rent on the Kids Next Door house and, in exchange, the tenants would produce content and fulfill a certain number of brand deals, obtained by the company.

Did Influences agree to cover high-speed internet for the Kids Next Door? Was that agreement fulfilled?

At the end of July, the Kids Next Door house tenants were told that they would have to cover a larger share of rent.

Ms. Tomlinson stayed at Ms. Jacob's apartment in Los Angeles.

Ms. Jacob was mentored by Gary Vaynerchuk.

Ms. Jacob is withholding $23,683.82 in fees to Brittany Tomlinson.

Ms. Jacob has taken 20%, and in some cases 30%, commission on deals she secured for her clients.

Ms. Jacob bought and is retaining the domain name brittanybroski.com.

Ms. Jacob asked talent to create free content as a favor to brands.

Ms. Jacob showed up to the Girls in the Valley house late at night and sometimes texted talent until the very early morning (3 a.m. by one account).

Ms. Jacob brought guests to the Girls in the Valley house without informing the house's tenants.

Ms. Jacob had a camera installed in the kitchen of the Girls in the Valley house that was connected to her phone.

On June 7, Ms. Jacob told talent at Girls in the Valley they would be removed from the house if they did not post at least eight times a day on social media.

Ms. Jacob verbally fought with members of the Girls in the Valley house during their move-out.

Police were called twice to the Girls in the Valley house.

At different points in April, the water, Wi-Fi, and electricity were all temporarily shut off at the Girls in the Valley house.

On June 9, Influences publicly split from Drip Crib over disputes about rent.

Ms. Jacob created a fake Drip Crib Instagram account.

Ms. Jacob privately distributed nude photos of Devion Young via text message.

Ms. Jacob's landlord at 1600 Vine St. pursued legal action over $14,242.13 in back rent and subsequently sought to evict her.

In 2019, Max Harrison, the owner of 6435 Weidlake Drive, sued Ms. Jacob, who was then subletting the property, claiming $46,001.69 of property damage.

In March 2019, her landlord at the Avalon West Hollywood apartment building filed a claim against Ms. Jacob and sought to collect $3,200 in rent.

<u>Section 2</u>

Influences has partnered with brands including Disney, Coca-Cola, Johnson & Johnson.

Influences says it has worked with The New York Times. Can Ms. Jacob describe the nature of that work? Is the relationship ongoing?

Ms. Jacob told others in the industry that she had a management relationship with Ellie Zeiler when she did not.

Ms. Jacob included Ellie Zeiler in a Girls in the Valley marketing deck without her mother's consent.

Ms. Jacob has claimed to manage SpencerX but does not manage him.

Several people Ms. Jacobs manages are in the process of trying to break their Influences contracts.

Ms. Jacobs has refused to release the Lopez Brothers from their contracts.

Of the people named on the Influences website, whom does Ms. Jacobs currently manage?
https://influences.com/influencers

Ms. Jacob launched Kids Next Door in May and relaunched Girls in the Valley that same month.

Ms. Jacob claims she had to "shut down houses due to parties during the COVID-19 pandemic." What houses did Ms. Jacob shut down, and why?

Ms. Jacob has pursued a management relationship with the Alpha house, which launched last weekend.

What professional publicists worked with Influences's talent and when?

On Wed, Aug 12, 2020 at 1:16 PM Laura Pallas <laura@pallasmanagementgroup.com> wrote:

Taylor

We would like to refer you to our original statement provided by our attorney -

Thank you

Laura

On Aug 12, 2020, at 8:52 AM, Taylor Lorenz <taylor.lorenz@nytimes.com> wrote:

No, we are not able to share materials obtained through our reporting.

Mr. Young and others are alleging that Ms. Jacob privatley distributed Mr. Young's illicit photos to others. No one is alleging that she publicly leaked them. Does Ms. Jacob care to comment, clarify, or respond to this?

On Wed, Aug 12, 2020 at 11:25 AM Ben Walter <benwalterlaw@gmail.com> wrote:

Before responding to this point, are you able to share the videos referenced here for accuracy and validity?

On Wed, Aug 12, 2020 at 11:12 AM Taylor Lorenz <taylor.lorenz@nytimes.com> wrote:

Hi all, hoping you can provide clarity on one more point.

Regarding Mr. Young's illicit photos, Mr. Young is not alleging that Ms. Jacob publicly "leaked" photos. Rather, we have screen recordings showing that Ms. Jacob distributed these photos to others via text message. Does Ms. Jacob care to comment, clarify, or respond to this?

Thanks again and will be in touch with any other follow ups,

Taylor

On Wed, Aug 12, 2020 at 9:54 AM Taylor Lorenz <taylor.lorenz@nytimes.com> wrote:

Thanks all, I have several follow up questions below I hope you can respond to this morning.

I would also welcome any emails, texts or documents Ms. Jacob is willing to share on the record.

- If Ms Jacob wasn't the leaseholder of the Girls in the Valley house, how did she have the power to kick (and lock) the girls out of the house? How did she have the power to ask them for rent? Who sent in the rent? You say, "As Ms. Jacob was paying the rent and had all the liability on her, it would be improper if not grossly negligent of her to not have some type of security system on the property." Though a lease was not signed, she was liable for the property? Please clarify. Whose name was on the utility bills? If the girls were paying the utilities and Ms. Jacob wasn't on the lease, how could she insist they move out of the house?

- Is it correct that Ms. Jacob agreed to cover half the Kids Next Door house rent of $18,500 per month, provided the tenants produced content and fulfilled a certain number of brand deals as part of the terms of the production agreement? You didn't answer this question.

- Was Ms. Jacob's name on the Kids Next Door house lease? Was she the sole leaseholder?

- Was the amount of rent residents at Kids Next Door house were asked to pay per resident in August higher than the amount of rent they paid per resident in previous months?

- You claim Ms. Jacob controlled 1/3 of Creator Edge. Did she have equity in the company? The former partners/founders of Creator Edge dispute that Ms. Jacob was ever a managing partner at Creator Edge as her LinkedIn states. Additionally, Jace Norman said that he left the company by January 2020 and that Ms. Jacob was the only one using the company's name. He was not involved in the company and had nothing to do with Ms. Tomlinson, who was managed by Ms. Jacob.

- You claim that her landlord at the Avalon West Hollywood apartment building never sought to collect $3,200 in unpaid rent. See attached documents. Can you elaborate?

Please advise,

Thanks

On Tue, Aug 11, 2020 at 11:57 PM Laura Pallas <laura@pallasmanagementgroup.com> wrote:
> Hi Taylor
>
> Please read the attached document in its entirety in response to your previous email. If you have any questions or need any further clarification please email us directly.
>
> Many thanks
>
> Laura
>
>
>
> On Aug 11, 2020, at 11:47 AM, Taylor Lorenz <taylor.lorenz@nytimes.com> wrote:
>
> Hi Laura,
>
> Thanks. Send through any corrections by **9:00am EST tomorrow**. We will likely have follow ups and want to ensure ample time to address them.
>
> On Tue, Aug 11, 2020 at 2:36 PM Laura Pallas <laura@pallasmanagementgroup.com> wrote:
>> Hi Taylor
>>
>> Thank you for your email.
>>
>> We will need a reasonable deadline to get back to you.
>>
>> Please advise
>>
>> Laura
>> <Screen Shot 2018-11-15 at 11.37.35 AM.png>
>>
>> On Aug 11, 2020, at 9:58 AM, Taylor Lorenz <taylor.lorenz@nytimes.com> wrote:
>>
>> Hi all,
>>
>> I'm disappointed that Ms. Jacob declined the opportunity to chat things over and provide background context for this piece by phone.
>>
>> I'd love to hear back with any corrections on the below points today as I'm sure I'll have follow ups and clarifications.
>>
>> Through dozens of conversations with former employees, former business partners, current and former talent under Ariadna Jacob/Influences management, as well as those who have worked with her, we are planning to report the following.

Thank you and look forward to your response.

Influences was founded in 2017 (per LinkedIn)

Ariadna Jacob was the leaseholder for the Kids Next Door content house.

Ariadna Jacob was the leaseholder for the Girls in the Valley house.

Ariadna Jacob/Influences attempted to get involved with the Alpha House.

Ms. Jacob agreed to cover half the Kids Next Door house rent of $18,500 per month, provided the tenants produced content and fulfilled a certain number of brand deals.

At the end of July, residents at Kids Next Door house were asked to pay higher rent than previously agreed upon.

Ms. Jacob failed to immediately release Brittany Tomlinson from her contract.

In January, Ms. Tomlinson was owed nearly $100,000 in outstanding payments from brands. Influences had failed to invoice some of these brands for Ms. Tomlinson's work.

Ms Jacob has failed to pay Ms. Tomlinson $23,683.82 for brand campaigns she completed while managed by Influences.

Ms. Jacob took 20% commission from Ms. Tomlinson's deals.

Ms. Jacob has failed to turn over http://brittanybroski.com to Ms. Tomlinson.

Ms. Jacob has demanded that clients sign formal contracts to work with her, has failed to release clients from those contracts when requested and has threatened talent with legal action.

Talent managed by Influences has been asked to create brand content for free.

Influences failed to pay talent on time for their work, Ms. Jacobs encouraged talent to accept below market rates.

Cameras are installed in the Girls in the Valley house and at least one camera was connected to Ms. Jacobs phone.

On June 7th, members of Girls in the Valley house were told that they would be asked to leave the house if they didn't post at least eight times per day on social media.

Ms. Jacob made a racist comment to a Girls in the Valley house manager claiming "there's a big black man on the staircase yelling at me."

Ms. Jacob has raised her voice at talent and frequently sent talent long, inflammatory text messages.

At different points in April, the water, Wi-Fi, and electricity were all temporarily shut off at the Girls in the Valley house.

On June 9, Influences publicly disassociated from Drip Crib over disputes about rent.

Ms. Jacob owes Drip Crib founder Devion Young roughly $50,000.

Ms. Jacob distributed illicit photos of Mr. Young to others (Note: we have screen recordings showing these messages).

Ms. Jacob barred members of her content houses from living together for a year and a half after they left.

Ms. Jacob forced talent to sign NDAs.

In October 2018, Ms. Jacob's landlord at 1600 Vine St. sued her over $14,242.13 in back rent and subsequently sought to evict her.

In 2019, Max Harrison, the owner of 6435 Weidlake Drive sued Ms. Jacob, who was then subletting the property, claiming $46,001.69 of property damage.

In March 2019, her landlord at the Avalon West Hollywood apartment building sued her over $3,200 in rent.


--
**Taylor Lorenz**
Reporter

620 Eighth Avenue
New York, NY 10018
taylor.lorenz@nytimes.com


--
**Taylor Lorenz**
Reporter

620 Eighth Avenue
New York, NY 10018
taylor.lorenz@nytimes.com


--
**Taylor Lorenz**
Reporter

620 Eighth Avenue
New York, NY 10018
taylor.lorenz@nytimes.com


--
**Taylor Lorenz**
Reporter

620 Eighth Avenue
New York, NY 10018

taylor.lorenz@nytimes.com

--
**Taylor Lorenz**
Reporter



620 Eighth Avenue
New York, NY 10018
taylor.lorenz@nytimes.com

--
**Taylor Lorenz**
Reporter

620 Eighth Avenue
New York, NY 10018
taylor.lorenz@nytimes.com

--
**Taylor Lorenz**
Reporter

620 Eighth Avenue
New York, NY 10018
taylor.lorenz@nytimes.com

**4 attachments**



**IMG_2773.png**
859K



Laura Pallas
Office: 818.398.5566
Mobile: 818.203.0810
laura@pallasmanagementgroup.com

CONFIDENTIALITY NOTICE: This e-mail message is intended only for the person or entity to which it is addressed and may contain CONFIDENTIAL or PRIVILEGED material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please destroy all copies of the original message and contact the sender immediately at 818.398.5566.

**Screen Shot 2018-11-15 at 11.37.35 AM.png**
50K

 **Statements for NYT - 11_20_20.pdf**
130K

 **42785894.pdf**
24K

Kimball, Tirey & St. John LLP
Chris Evans, SBN 202135
Serena Yun, SBN 310841
Valerie Sparks, SBN 313312
915 Wilshire Boulevard, Suite 1650
Los Angeles, CA 90017
(213) 337-0050
FAX (213) 337-0080
Attorney for Plaintiff

**FILED**
Superior Court of California
County of Los Angeles

12/14/2019

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____ Deputy
        Michael Lee

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES, SANTA MONICA JUDICIAL DISTRICT

AVALON WEST HOLLYWOOD, L.P.

                      Plaintiff,

    vs.

ARIADNA JACOB, and DOES 1 to 10 inclusive,

               Defendant(s).

Case No.:  19SMUD00491

**ORDER TO SET ASIDE / VACATE
JUDGMENT AND TO DISMISS CASE**

IT IS SO ORDERED that the Default and Default Judgment entered on March 28, 2019 is hereby vacated as to Defendant ARIADNA JACOB and that Defendant ARIADNA JACOB is hereby dismissed without prejudice.

Dated:  12/14/2019

_____
Lisa Sepe Wiesenfeld
JUDGE/COMMISSIONER OF THE SUPERIOR COURT

APPLICATION/DECLARATION TO VACATE DEFAULT AND DEFAULT JUDGMENT; ORDER



3:01

On Tue, Oct 29, 2019 at 12:   PM,

Hey Ariadna,

So, I just spoke with loss mitigation and I confirmed with them that you were not at fault for the legal charge you received. I will be crediting the $590 in legal cost that was never credited back to you and my legal team will be drafting a letter for you and removing the legal alert on your credit report so it doesn't show up anymore. I will have someone from loss mitigation reach out to you tomorrow to confirm everything they will be doing. I am so sorry you had to deal with this and I am glad I was able to assist you with this issue.

Please free to reach out to me with you need anything else. I will go ahead and process your notice to vacate today. Thank you and have a wonderful rest of your day.   J

**Nicolle** A. Beiza
Community Supervisor

**Avalon West Hollywood**
7316 Santa Monica Blvd.
West Hollywood, CA 90046
**Phone:** 323-883-0820
nicolle_beiza@avalonbay.com



**\*\*If time permits please leave me a review at the**

**STATEMENT FROM ARIADNA JACOB**

When I bought Influences.com in 2013, it was for an app to help people reach their full potential. My purpose has always been to tell compelling stories and to help young people with big ideas.

On my entrepreneurial journey I didn't take investment to support my innovative projects. Instead of giving up on them, I've leaned on mentors, books, videos as well as my ability to connect the dots and build relationships.

When TikTok was gaining steam, I followed a path I was made for given my prior experience in social media and marketing. Little did I know that I would be entering what would become one of the most competitive, cutthroat industries I've ever participated in.

I had to make tough decisions, often unpopular, such as shutting down houses due to parties during the Covid-19 pandemic, working with uncontrollable adolescents, and a multitude of potential liabilities that I did not want to undertake. In January 2020, I advised some clients not to invest a great deal of personal equity into promoting a popular TikTok collective unless proper paperwork had been put in place because I had previously witnessed former members of social media collectives such as Team10 exit and leave brands they spent years building without vested equity that I believe they should have earned. I wanted to protect the creators from making the mistakes of the past since they were not privy to the inside business world of social media.

I think we became a target when we had signed creators that no one cared about one day and a month later they became the biggest stars in the world. Young creators and their parents are bombarded with so much so fast as overnight sensations that it's easy for our competitors to knock us down by banning together in a blatant smear campaign.

I've sent in all the paperwork because I have nothing to hide. Anything I don't want printed is to protect my IP and the privacy of those involved.

This is the ugly part of Hollywood, dramatized by Jerry McGuire, Ari Gold, Team10, the Call Her Daddy drama and more. None of the creators who have left Influences were ever harmed - instead some received free rent, a spot on a Superbowl commercial, trips on jets, private estates, professional publicists and mentoring from the best in the business. None of them have yet been sued and we have not hindered any of their careers in any way whatsoever.

We are focused on building talent who has their goals aligned with something much more meaningful than "clout" and I think that's what this is - a desperate and sinister chase for clout at my expense. Despite what's being said, my integrity is intact and I don't think anyone should condone, especially the New York Times, opportunistic bullying.

**STATEMENT FROM BEN WALTER, ATTORNEY**
**Walter Entertainment & Media Law, Inc.**
**Contact: 443-604-4776**
**benwalterlaw@gmail.com**

At a high level, Ari has emails, texts and documents that support her claims and/or discredit the claims against her, which she is happy to share, but only on off the record or on background, as they are not for public consumption/release. While happy to share to exonerate her name, many of these documents are of a confidential basis, as you can imagine, including confidential work product owned by Influences. Please let us know what type of protection you can offer to allow us to share these documents, texts, and emails with you.

Additionally, and as more. Fully discussed herein below, Ms. Jacob has conducted herself with the utmost professionalism and courage in the face of individuals who attack her both personally and professionally. These individuals attacking her don't want to play by the rules of decent individuals in society, but want to attack Ms. Jacob publicly from the shadows, talking to any individual who is willing to listen to them. Ms. Jacob is constantly being contacted by various individuals, ranging from restaurant owners to other reps, informing her of the various comments being shared about her. Her peers will gladly provide any references as needed in this situation to give background to her tenacity in representing her clients and her general desire to help people grow.

### Influences was founded in 2017 (per LinkedIn)
• Bought Domain for app in 2013,
• Influences was incorporated in February 2018, Ms.Jacob was consulting on social media prior working with celebrities such as Canelo Alvarez and others.

### Ariadna Jacob was the leaseholder for the Kids Next Door content house.
• As discussed in more detail below, Ari secured the house on behalf of the individuals who were to live at the KND house because they could not get approved for the house themselves. Ari and the creators who were to live there entered into a production agreement together, the terms of which were heavily negotiated by the parties, and which the individuals never honored.

### Ariadna Jacob was the leaseholder for the Girls in the Valley house.

• False. A formal lease for the property was never executed. It was being negotiated as the brand crumbled and has since been vacated by Ari and her clients.

### Ariadna Jacob/Influences attempted to get involved with the Alpha House.

• Ari, through her experience and knowledge in the influencer world, is approached to assist on numerous projects (including, without limitation, Drip Crib). Ari was approached by Adam Cohen to advise Adam on the house and members. Adam, who signed with Ari in 2020, has been working with Adam on numerous ventures since February. However, we fail to see the relevance here.

***Ms. Jacob agreed to cover half the Kids Next Door house rent of $18,500 per month, provided the tenants produced content and fulfilled a certain number of brand deals.***

• In what is known as a production agreement, which are common in the entertainment industry, Ms. Jacob entered into an agreement with several individuals where she would secure a property (which the individuals selected) to create a content house. The requirements of the agreement were that each individual would create and post a certain number of contractual social media posts and pay their share of the rent. This is common practice in the influencer house industry. The kids stopped paying their rent and never promoted the house, essentially living in a mansion in the hills for free, taking full advantage of Ms. Jacob. Additionally, they continued to breach their agreements by having parties (during COVID), not maintaining the property in a sanitary manner (on more than one occasion, dog feces was found in and around the property, including in living areas), and just generally disrespecting the property (one individual's dog scratched a sofa). Each kid was represented during the negotiation process by a representative of their choice, who heavily negotiated the terms of the agreement. There is no legal issue here or claim against Ari. Additionally, each kid has an NDA, with the terms of the agreement being covered by the NDA, so whomever provided this information breached their agreement (again).

***At the end of July, residents at Kids Next Door house were asked to pay higher rent than previously agreed upon.***

• 100% False. The kids were asked to actually pay their share of rent and expenses per the terms of their agreement. It had come to Ari's attention, and was admitted by several of the individuals living at the house, that they were taking side deals without including Influences, effectively getting paid for services that, per their contract, Influences held exclusively, getting paid directly from the brand, not paying Influences their commission, and not paying their share of the rent, all in breach of the agreement. Rather than claim that the kids were in breach, Ms. Jacob took the easier path and tried to have a conversation with the individuals, all who refused to continue to pay their bills, despite their contractual obligation.

***Ms. Jacob failed to immediately release Brittany Tomlinson from her contract.***

• As discussed below, Ms. Jacob was under no obligation to immediately release Brittany from her agreement. Not only that, but there were a number of deals then currently pending that needed to be closed out before the issue could be resolved. Ms. Jacob had received a demand letter from Brittany's attorney and engaged attorneys of her own to resolve the situation. No one is under an obligation to do what is stated in a demand letter, especially if they believe that they are within their rights. Influences's legal team assessed the situation, taking into account all the relevant facts, and have been taking action to resolve the

Brittany issue.

*In January, Ms. Tomlinson was owed nearly $100,000 in outstanding payments from brands. Influences had failed to invoice some of these brands for Ms. Tomlinson's work.*

• This is false. Brittany was paid for all her outstanding brand deals. The manager who was point with Brittany withheld contracts from Creator Edge and he only had access to them, which was done in an attempt to sabotage Creator Edge and have the clients leave with him (he has since been fired). Additionally, Brittany was never signed to Influences, but was signed to Creator Edge (a company that Ari controlled 1/3rd of. Since then, the employee in question was hired and subsequently fired from Sony Music for fraud. This individual, while working with Ari, forged documents, used Ari's social security number without permission to create a PayPal account, destroyed the company's proprietary accounting Quickbooks account, etc. For the record, this individual and Brittany still work together.

*Ms Jacob has failed to pay Ms. Tomlinson $23,683.82 for brand campaigns she completed while managed by Influences.*

• Ms. Jacob is still tentatively attempting to resolve this issue with Brittany, so we would prefer to maintain the confidentiality of these discussions. However, we can share that a number of these issues are based on either money not being paid from a brand yet (based on a net30 or net60 payment plan discussed below) or resulted due to a turnover in the manager directly interfacing with Brittany (who was fired). Influences is discussing the issue with Brittany's attorney.

*Ms. Jacob took 20% commission from Ms. Tomlinson's deals.*

• As is common in the entertainment industry, representatives work off a commission basis, with lawyers typically taking 5% of talent deals, agents taking 10-20% depending on the industry, and managers collecting 10-20%. Creator Edge, who actually represented Brittany, taking a 20% in exchange for their services is nothing out of the ordinary. In fact, there are managers who take 50% of what their clients earn. We fail to see the relevance to this statement.

*Ms. Jacob has failed to turn over http://brittanybroski.com to Ms. Tomlinson.*

• During the course of representing Brittany, Ari purchased the website. As such, she was never under any obligation to turn over the account to Brittany following Brittany's termination of the agreement. The website was never Brittany's property to begin with.

*Ms. Jacob has demanded that clients sign formal contracts to work with her, has failed to release clients from those contracts when requested and has threatened talent with legal action.*

• As is common place in the entertainment agreement, whereby companies of all sizes, from WME to solo managers, Influences had its clients sign a representation agreement. As par for the course, these agreements lay out the relationship between the parties, what is expected of

each, and what Influences would be entitled to for their services. Often times, many of Influences clients had representatives (e.g., lawyers, agents, parents) review these agreements and the terms were negotiated in good faith with the clients. While some managers do not have physical contracts with their clients, they leave themselves open to liability in the event a client defects and/or terminates their services. From an evidentiary standpoint, it's easier for the parties to resolve a claim with a written contract than to make arguments based on a he-said-she-said position. Within each agreement, there is specific language regarding termination. In this situation, Influences clients, many of whom owed Ms. Jacob rent and reimbursement for bills (particularly in the case of Kids Next Door), decided, without any justification, that they were terminating their agreements and no longer wished to be bound by them. In many cases, these individuals are over the age of majority and have the capacity to contract. Ms. Jacob has tried multiple times to discuss ways to unwind the agreements and let the kids leave (even though she wasn't under any obligation to do so), but many of the clients refuse to engage in any conversation or to recognize her entitlement to potential compensation they generate during the term. As Influences has the right to enforce many of these contracts, if the clients are unwilling to have a conversation, Influences is left with no option but to threaten legal action (despite it never being Ms. Jacob's intent and/or desire to do so). However, the reality is that, when these individuals said they didn't want to play ball, Ms. Jacob advised them to seek out legal counsel who could advise them of their rights. However, rather than unwind these deals, these individuals have launched a campaign to torment and harass Ms. Jacob (including, without. Limitation, initiating this article) in an attempt to ruin Ms. Jacob both personally and professionally.

### Talent managed by Influences has been asked to create brand content for free.

• As further discussed below, in exchange for living in an Influences content house (sometimes rent free, which would be considered "consideration" and therefore not "for free"), a client would be required to make a certain number of social media posts to promote the house brand (e.g., Girls In The Valley, Kids Next Door, etc.) to a house brand social media channel. This is commonplace in the content house industry and can be seen utilized at the Sway House and other houses. The posts are in consideration of living at the house (again, sometimes rent free) and to be a part of the project.

### Influences failed to pay talent on time for their work, Ms. Jacob encouraged talent to accept below market rates.

• Social media endorsement opportunities are based on numerous factors, including, without limitation, a brand's budget to actually pay talent. While it is up to a talent's representatives to attempt to get their clients the best deal possible, a rep cannot make money appear where it doesn't exist. Additionally, each client

was solely responsible in determining whether or not they wanted to accept a deal. Ms. Jacob didn't force anyone to accept anything they didn't want to. As a counter note, several of Ms. Jacob's clients believe that they are entitled to fees far beyond what a brand would be willing to pay them based on their social media statistics (e.g., number of followers, engagement, etc.). Ms. Jacob always encouraged her clients to work on their individual brands so that they could command a higher fee in negotiations. Payment

terms are often dictated by the brand (e.g., net30, net60, etc.). Many clients were upset when payments were still pending due to these terms. While we can certainly state that Ms. Jacob endeavored to make sure that once the money timely hit the Influences account she paid out her clients, many of these deals were taking place during March and April, the early months of COVID, making companies adjusting to the "new normal" difficult. If a payment was late, it was not done purposefully but was quickly rectified.

**Cameras are installed in the Girls in the Valley house and at least one camera was connected to Ms. Jacob phone.**

• The Girls In The Valley house is a multi million dollar property, owned by someone who values their safety and privacy. As such, said individual installed security cameras on the property, which Ms. Jacob did not have access to. There was one camera installed in the kitchen in June-July for the safety of the individuals living there. As the person facing liability in the event something happened on the property, Ms. Jacob had instilled several house rules, which were seldom followed (e.g., no overnight guests, no drinking, no drugs, no parties, etc.). These events also took place during the initial outbreak of COVID. The cameras were all in public spaces which each individual was informed about and not in any areas where one would have an expectation of privacy (e.g., a bathroom). As Ms. Jacob was paying the rent and had all the liability on her, it would be improper if not grossly negligent of her to not have some type of security system on the property.

**On June 7th, members of Girls in the Valley house were told that they would be asked to leave the house if they didn't post at least eight times per day on social media.**

• Frustrated that the individuals living at the house were not making the agreed upon posts to not only grow their individual accounts but the brand account, Ms. Jacob had a conversation with the individuals, stating that they needed to perform their obligations; otherwise, if they refused, they would need to leave the content house. If an individual is not rendering services that they agreed to in order to be permitted to stay at the house and grow the brand, they are taking the space of another influencer who will help Ms. Jacob see an ROI on her investment. In order to live at the content house, one has to agree to render services (e.g., the free promotional posts mentioned herein) to promote the brand. Leading up to this point, the individuals living in the house were requested multiple times to make posts (which Ms. Jacob has text messages and emails showing). The individuals refused and were eventually asked to leave. Additionally, these individuals claimed that they were terminating their agreement(s) with Ms. Jacob and refused to leave the house or pay rent. None would acknowledge that Ms. Jacob had spent money paying the rent and (up to a certain point, utilities) and other costs and expenses associated with the house all of which were done in an effort for Ms. Jacob to see an ROI on her investment. Notwithstanding the fact that several of these individuals were terminating their agreements not for cause (which wasn't permitted), they refused to engage in any conversation to resolve the issue.

**Ms. Jacob made a racist comment to a Girls in the Valley house manager claiming "there's a big black man on the staircase yelling at me."**

• This is patently false and Ms. Jacob has text messages and video from individuals at the house who confirmed that she never said anything racist. Not only is this baseless, it is also a defamatory statement given to smear Ms. Jacob's name.

**Ms. Jacob has raised her voice at talent and frequently sent talent long, inflammatory text messages.**

• In the natural course of heated conversations regarding clients/former clients and individuals who Ms. Jacob had no association with, who were all living without permission at Ms. Jacob's content house, the parties all engaged in conversation which became quite heated. At one point, a young man who was not permitted by Ms. Jacob to be on the property, nor was he a client of Influences, informed Ms. Jacob that he was taking over her Girls Next Door brand, including all of her clients, in an effort to elicit a response from Ms. Jacob. Frustrated for numerous reasons, including, without limitation, the fact that if anything happened on the property to any of these uninvited individuals, she would be held liable, emotions flared between all parties. To say that it was just Ms. Jacob is false. Ms. Jacob, who was justifiably upset, became frustrated with the predicament, as all reasonably people in her shoes would (e.g., where you are paying thousands of dollars a month to rent a luxury house and can potentially be exposed to personal liability due to immature young adults partying at the property, which individuals have zero disregard towards you and/or following any rules). Ms. Jacob can provide text messages from individuals who were at the house who expressed sympathy towards her, confirming that certain individuals were "freeloading" off of her and not shooting their content, and their general disrespect towards her.

**At different points in April, the water, Wi-Fi, and electricity were all temporarily shut off at the Girls in the Valley house.**

• While this is factually true (the water, wifi, and electricity were turned off), the facts behind the events are not being communicated. Ms. Jacob was under no obligation to pay the bills and, after moving out of the content house, informed the individuals living there multiple times that they would need to transfer the bills into their names and continue to make payments. From a client perspective aside, this is the normal course of action when one roommate moves out of a shared space. As Ms. Jacob moved out, there was never an intention that she should continue to pay the bills. Any assumption that she would is baseless. As the individuals living in the house were busy with their own personal endeavors/agendas, they neglected to take care of the bills and the utilities were turned off. Ms. Jacob did not vindictively have the utilities turned off, as the above

statement potentially infers, and if any individual claims otherwise, such statements are patently false and baseless.

**On June 9, Influences publicly disassociated from Drip Crib over disputes about rent.**

• Influences was negotiating a partnership with Mr. Young in connection with the Drip Crib. Mr.

Young was having difficulties getting brand deals on behalf of clients he signed to the Drip Crib and requested that Influences assist in that area. He was also seeking assistance in managing the Drip Crib house and brand. Mr. Young negotiated and signed an agreement with Influences, commemorating the terms agreed to between the parties. However, and notwithstanding the binding nature of the agreement, Mr. Young demanded that the deal terms be altered. When Influences commenced discussions regarding the agreement, Mr. Young denied the agreement existed. During this period of time, Influences was communicating directly with Drip Crib clients, per the agreement (the Drip Crib clients were to sign a management agreement with Influences per the agreement). Several of the Drip Crib members informed Ms. Jacob about several incidents that took place on the property, including a fight which resulted in an arrest. Mr. Young permitted the kids to throw multiple parties, all during COVID, and several Drip Crib members informed Ms. Jacob regarding Mr. Young's illicit photos. For whatever his reasons were, Mr. Young backed out of the partnership with Influences. As it had become public knowledge that Influences and Drip Crib were forming a partnership, Ms. Jacob released a social media post stating that Influences was no longer connected to the Drip Crib, as she did not want her or Influences name dragged through the mud in connection with any of Mr. Young's actions.

### *Ms. Jacob owes Drip Crib founder Devion Young roughly $50,000.*

• This is patently false. Ms. Jacob has never borrowed money from Mr. Young, nor has he invested or provided her with funds for any venture. In fact, it's the opposite; Influences and Mr. Young entered into a collaboration agreement, whereby Mr. Young would grant Influences a percentage of all income derived from the Drip Crib. Mr. Young denies the existence of this agreement, which he negotiated directly with Influences and signed, which Influences is happy to provide.

### *Ms. Jacob distributed illicit photos of Mr. Young to others (Note: we have screen recordings showing these messages).*

• Illicit photos of Mr. Young were brought to Ms. Jacob's attention. As Influences was working on multiple business transactions with Mr. Young, Ms. Jacob informed an internal consultant of the pictures existence, but at no point did she publicly "leak" the photos, as Mr. Young has claimed. Chris Weaver, the Influences staff member, was (and is) under an NDA. We have yet to see any proof to this claim and is pure defamation.

### *Ms. Jacob barred members of her content houses from living together for a year and a half after they left.*

• The language you are referring to is within the production agreement that individuals sign a production agreement with Influences sign, which enable them to enter and live in one of the content houses. The language is actually for six (6) months (please see language below), not a year and a half. The purpose of this provision is no different than a non-compete within an employment agreement; if Influences puts in the labor to grow a follower (e.g., works on raising their followers from 100k to 1M, thereby increasing their ability to charge brands more money per post), an Influencer shall not be permitted from leaving the Influences content house and either (a) starting their own or (b) utilizing the brand build by Influences for

commercial exploitation within the limited area of Los Angeles and its surrounding areas. This provision was narrowly tailored to protect Influences interest, again, no different than a non-compete in an employment agreement, for the very reason Influences currently finds itself in: a number of individuals that signed this production agreement have since vacated an Influences content house and set up their own house. In connection with the Girls Next Door house, the individuals living there contacted the landlord in an attempt to rent the house away from Ms. Jacob. Each individual signing this agreement for the Kids Next Door content house was properly represented and the terms of the agreement were heavily negotiated. Each individual knew about this term and did not raise the issue when signing.

"You agree and covenant not to move to or live in, or be associated with in any way, another so-called "content house" or "influencer house" in the city of Los Angeles, CA or its immediate surrounding areas (e.g., Calabasas, Orange County, etc.) for a period of six (6) months after the expiration or termination of this Agreement for any reason."

### *Ms. Jacob forced talent to sign NDAs.*

• In the normal course of business, Influences had prospective clients sign a non- disclosure. Among other things, in pitching Influences services to a client, they will be exposed to potential confidential information, which would be shared with a prospective client in order to entice them to sign to Influences. NDAs are not only common practice in the influencer world (e.g., the Club House, TalentX, and countless other representatives have clients sign them), they are common in business in general to protect a disclosing party's interest.

*In October 2018, Ms. Jacob's landlord at 1600 Vine St. sued her over $14,242.13 in back rent and subsequently sought to evict her.*

• While Ms. Jacob was served papers, she was never sued and a claim never commenced.

### *In 2019, Max Harrison, the owner of 6435 Weidlake Drive sued Ms. Jacob, who was then subletting the property, claiming $46,001.69 of property damage.*
• Ms. Jacob took Mr. Harrison to small claims court and, in an effort to avoid paying Ms. Jacob, they filed a claim in the superior court. The evidence of damages was from 2017, before Ms. Jacob lived in the property. The parties settled the dispute with neither party paying the other any damages.

### In March 2019, her landlord at the Avalon West Hollywood apartment building sued her over $3,200 in rent.

• This statement is false and baseless.