UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARIADNA JACOB and INFLUENCES, INC.

                                    Plaintiffs,

        -against-

TAYLOR LORENZ, and THE NEW YORK TIMES
COMPANY,

                                    Defendants.

No.: 1:21-cv-06807-ER

**ORAL ARGUMENT
REQUESTED**

**PLAINTIFFS ARIADNA JACOB AND INFLUENCES, INC.'S
MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS THE NEW YORK TIMES COMPANY AND TAYLOR LORENZ'S
MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

Harmeet K. Dhillon
Krista L. Baughman
Jesse D. Franklin-Murdock*
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Tel: (415) 443-1700
Fax: (415) 520-6593
Email: Harmeet@dhillonlaw.com;
KBaughman@dhillonlaw.com;
JFranklin-Murdock@dhillonlaw.com

Ronald D. Coleman
DHILLON LAW GROUP INC.
50 Park Place, Suite 1105
Newark, New Jersey 07102
Tel: (973) 298-1723
Fax: (415) 520-6593
Email: RColeman@dhillonlaw.com

Matthew S. Sarelson
DHILLON LAW GROUP INC.
1601 Forum Place, Suite 403
West Palm Beach, Florida 33401
Tel: (415) 682-6827
Fax: (305) 448-5800
Email: MSarelson@dhillonlaw.com

Joseph Sibley*
CAMARA & SIBLEY LLP
1108 Lacava Street, Suite 110263
Austin, Texas 78701
Tel: (713) 966-6789
Fax: (713) 583-1131
Email: sibley@camarasibley.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs
Ariadna Jacob and Influences, Inc.*

i

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 2

LEGAL STANDARD...................................................................................................... 6

ARGUMENT ................................................................................................................... 6

    A.  The Court May Not Reach Factual Conclusions Based Solely on Extraneous Information Outside the Four Corners of the Complaint.....................................6

    B.  Plaintiffs Carried Their Burden of Alleging Actual Malice. .............................6

        1.  Actual malice can be pleaded with circumstantial evidence. ...........................7

        2.  Defendants published Statement 3 with actual malice. ...................................10

        3.  Defendants published Statement 8 with actual malice. ...................................11

        4.  Defendants published Statement 9 with actual malice. ...................................12

        5.  Defendants published Statement 12 with actual malice. .................................14

        6.  Defendants published statement 14 with actual malice. ..................................15

        7.  The SAC contains ample circumstantial evidence as to Lorenz's state of mind.....................................................................................................16

    C.  The Article's Treatment of the Utility Outage Constitutes Defamation and Defamation by Implication. .............................................................................19

    D.  Plaintiffs State a Claim for Tortious Interference with Prospective Economic Advantage. .......................................................................................................21

    E.  Jacob States a Claim for Intentional Infliction of Emotional Distress........................23

CONCLUSION.............................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................................. 6

*Babb v. Minder*,
    806 F.2d 749 (7th Cir. 1986)...................................................................................... 9

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................................. 6

*Bement v. N.Y.P. Holdings*,
    307 A.D.2d 86 (2003) .............................................................................................. 24

*Biro v. Conde Nast*,
    807 F.3d 541 (2d. Cir. 2015)......................................................................... 7, 8, 10

*BYD Co. Ltd. v. VICE Media LLC*,
    531 F. Supp. 3d 810 (S.D.N.Y. 2021) ................................................................. 8, 10

*Cantrell v. Forest City Publishing Co.*,
    419 U.S. 245 (1974) ................................................................................................ 14

*Cassini v. Advance Publ'ns, Inc.*,
    125 A.D.3d 467 (2015) ............................................................................................ 25

*Catskill Dev., L.L.C. v. Park Place Entm't Corp.*,
    547 F.3d 115 (2d Cir. 2008)..................................................................................... 23

*Celle v. Filipino Rep. Enterprises Inc.*,
    209 F.3d 163 (2d Cir. 2000)......................................................................... 8, 13, 15

*Church of Scientology Int'l v. Behar*,
    238 F.3d 168 (2d Cir. 2001)...................................................................................... 8

*Doe v. Alsaud*,
    224 F. Supp. 3d 286 (S.D.N.Y. 2016).................................................................... 23

*Dongguk Univ. v. Yale Univ.*,
   734 F.3d 113 (2d Cir. 2013) ................................................................................. 8

*Goldwater v. Ginzburg*,
   414 F.2d 324 (2d Cir. 1969) ............................................................................. 9, 11

*Hanly v. Powell Goldstein, LLP,*
   No. 05 CV 5089 (KMW), 2007 WL 747806 (S.D.N.Y. Mar. 9, 2007) .................................... 23

*Harte-Hanks Commc'ns v. Connaughton*,
   491 U.S. 657 (1989) ............................................................... 7, 8, 9, 16, 18

*Herbert v. Lando*,
   441 U.S. 153 (1979) ............................................................................................ 7

*Holmes v. Town of East Lyme*,
   866 F. Supp. 2d 108 (D. Conn. 2012) .................................................................. 24

*In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351 (S.D.N.Y. 2003) ..................................... 12

*Kerwick v. Orange Cnty. Publications Div. of Ottaway Newspapers, Inc.*,
   53 N.Y.2d 625 (1981) ........................................................................................ 9

*Kesner v. Dow Jones & Co., Inc.*,
   515 F. Supp. 3d 149 (S.D.N.Y. 2021) ................................................................. 20

*Klinge v. Ithaca College*,
   634 N.Y.S.2d 1000 (N.Y. Sup. Ct. 1995) .......................................................... 25

*Koch v. Christie's Int'l PLC*,
   699 F.3d 141 (2d Cir. 2012) ............................................................................... 6

*Lindberg v. Dow Jones & Co., Inc.*,
   No. 20-CV-8231 (LAK), 2021 WL 5450617 (S.D.N.Y. Nov. 22, 2021) ................................ 16

*Martin v. Hearst Corp.*,
   777 F.3d 546 (2d Cir. 2015) ............................................................................. 21

*McDougal v. Fox News Network, LLC*,
   489 F. Supp. 3d 174 (S.D.N.Y. 2020) ................................................................. 16

*PKG Grp., LLC v. Gamma Croma, S.p.A.*,
    446 F. Supp. 2d 249 (S.D.N.Y. 2006) ................................................................. 22

*Savor Health, LLC v. Day*,
    No. 19-cv-9798 (RA), 2022 WL 1599782 (S.D.N.Y. May 12, 2022) ..................................... 19

*Shapira v. Charles Schwab & Co., Inc.*,
    187 F. Supp. 2d 188 (S.D.N.Y. 2002) ................................................................. 23

*Sharon v. Time, Inc.*,
    599 F. Supp. 538 (S.D.N.Y. 1984) ............................................................. 7, 8, 14

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ................................................................................. 24

*St. Amant v. Thompson*,
    390 U.S. 727 (1968) ............................................................................... 7, 8

*Stern v. Cosby*,
    645 F. Supp. 2d 258 (S.D.N.Y. 2009) ................................................................ 7, 9

*Tavoulareas v. Piro*,
    817 F.2d 762 (D.C. Cir. 1987) ......................................................................... 7

*Tiversa Holding Corp. v. LabMD, Inc.*,
    No. CIV.A. 13-1296 (W.D. Pa. Apr. 21, 2014). ....................................................... 10

Plaintiffs Ariadna Jacob ("Jacob") and Influences, Inc. ("Influences") (together, "Plaintiffs"), hereby file their Memorandum of Law in Opposition to Defendants The New York Times Company ("*The Times*") and Taylor Lorenz's ("Lorenz") (together, "Defendants") Motion to Dismiss Plaintiffs' Second Amended Complaint (the "Motion").

## I.      INTRODUCTION

With a single six-page article (the "Article"), Defendants destroyed Jacob's livelihood. The so-called "Paper of Record" sold its readers a bill of lies about Plaintiffs, and Lorenz's deceptive reporting tactics, willful ignorance of critical facts, and deliberate distortion all contributed to the false narrative about Plaintiffs that *The Times* published.

To reach a contrary conclusion, Defendants advance the ridiculous proposition that a reporter for one of the world's most prestigious and influential newspapers should not be expected to (a) check her facts in any way before reporting them; (b) click on hyperlinks sent to her directly from her sources; (c) come to reasonable conclusions about information she observed firsthand; or (d) have any pre-existing knowledge of the industry on which she reports and holds herself out as an expert (according to a tweet she endorsed, "the Bob Woodward of the TikTok generation"). In one particularly egregious example, Lorenz assured Jacob pre-publication that she was not accusing Jacob of "leaking" nude photographs. After Jacob provided Lorenz information making clear that Jacob was not the source of the leak, Lorenz went on to accuse Jacob of leaking nude photographs (a devastating accusation for a manager of young content creators), both in the Article and on Twitter. This is just one of the six defamatory statements Defendants published.

The Second Amended Complaint ("SAC") cured the one and only defect in Plaintiffs' defamation claim: actual malice. Defendants attempt to obfuscate Plaintiffs' actual malice allegations by lumping them together and discussing them in isolation, without their surrounding

1

context or nuance. This turns the legal standard of actual malice allegations on its head. Ultimately, the Court's examination of actual malice will depend on this question: would the facts pled allow a reasonable juror to find that Lorenz's countless reporting errors—all of which resulted in a false and crippling negative portrayal of Plaintiffs—were done intentionally or with reckless disregard for the truth? The answer is plainly yes. In fact, it is the alternative explanation—that Lorenz simply made mistake after innocent mistake—that is implausible. Plaintiffs thus carried their burden of raising a reasonable expectation that discovery will reveal evidence of actual malice.

Defendants also complain about Plaintiffs' amendment to address a sixth defamatory statement and claims for tortious interference with prospective economic advantage and intentional infliction of emotional distress, yet these claims are both procedurally sound and substantively meritorious. Defendants' argument that the latter two claims are duplicative of Plaintiffs' defamation claim fails for the simple reason that it ignores the factual bases for these claims, which are separate from the lies told in the Article and the business losses those lies caused.

For the reasons discussed herein, Plaintiffs respectfully submit that the Court should deny the Motion in full and allow this case finally to proceed.

## II.      STATEMENT OF FACTS

After immigrating to the United States from Mexico City at a young age, Jacob founded Influences, a leading online creator management and influencer marketing company. SAC ¶¶ 11–12. Jacob managed "collaboration houses," residences designed like start-up incubators where groups of social media influencers live and create content. *Id.* ¶ 14.

Plaintiffs' burgeoning success in the online content creation industry following the rise of the TikTok social media application put her on a collision course with Lorenz, who was then *The Times*' technology reporter. *See id.* ¶¶ 14–19. Unbeknownst to Plaintiffs, Lorenz began targeting

2

Jacob's clients as early as April 2020, pressing them for negative information about Plaintiffs and spreading false rumors that Influences' agreements were invalid, and that Jacob's behavior was "shady." *Id.* ¶¶ 74–75. Lorenz contacted members of the Kids Next Door ("KND") house, harassing them "to get negative info/dirt on [Jacob]." *Id.* ¶ 78. When one of Plaintiffs' clients had nothing negative to say about Plaintiffs, Lorenz pressed him for information by continuing to make false allegations about Jacob, and when Plaintiffs' client refused, Lorenz appeared angry. *Id.* ¶ 79.

Lorenz's reporting techniques include creating a digital record of every single social media post she sees, operating over thirty different Instagram accounts or aliases, using a "burner phone," and cultivating teenager sources by "slid[ing] into these people's DMs." *Id.* ¶ 19. Lorenz not only saw herself as "the Bob Woodward of the TikTok generation" in her reporting on internet trends, but she also had a direct financial stake in some of the subjects she covered, as she had aligned herself with United Talent Agency ("UTA"), which was not only an industry titan, but one of Plaintiffs' top competitors. *Id.* ¶¶ 19–20. In contrast to the hit piece on Plaintiffs, Lorenz published a gushing hagiography about UTA, entitled, "These Top Hollywood Agents Are Signing All The Influencers," thus violating *The Times*' "Ethical Journalism Guidebook's" policies. *Id.* ¶¶ 92–93.

On August 10, 2020, Lorenz sent Jacob a text message under the guise of setting up a call where they could "chat." *Id.* ¶ 21. Jacob saw the trap Lorenz was laying and subsequently learned that Lorenz was in the process of writing a story on allegations of impropriety against Plaintiffs. *Id.* ¶ 22. Prior to publication, Jacob's attorney put Lorenz on notice of the nature and existence of Plaintiffs' industry-standard production agreements with influencers. *Id.* ¶ 31. Lorenz proceeded to create a paper trail that would create the impression of a journalistic investigation, peppering Jacob with questions (but giving Jacob mere hours to answer), corresponding with Jacob and her attorney (but refusing to consider critical documents and sources they offered), and interrogating

3

Jacob about Plaintiffs' contracts (but declining to consider any materials provided "on background" or "off the record"). *Id.* ¶¶ 22–26.

Four days after Lorenz contacted Jacob, *The Times* published the Article, titled "Trying to Make it Big Online? Getting Signed Isn't Everything[.]" *Id.* ¶ 27. Far from a "balanced" report of the influencer industry, the Article was a hit piece about Plaintiffs. Lorenz misused industry terms (and even commonly understood terms like "leaked") in order to obfuscate the truth and paint Plaintiffs in a negative light, despite being so familiar with the influencer industry that she authored a book on the subject.[1] *Id.* ¶¶ 29–31. (And none other than UTA represented Lorenz in negotiating her book deal with Simon & Schuster. *Id.* ¶ 89.)

The SAC addresses six defamatory statements set forth in the Article (*id.* ¶ 100(a–e)):

| | |
|---|---|
| Statement 3 | At the end of July, the influencers were told that they would have to cover a larger share of the rent. |
| Statement 8 | Tianna Singer, 19, moved into the Girls in the Valley ("GIV") house, also managed by Ms. Jacob, in late May. "She promised brand deals, money and opportunities," Ms. Singer said. "Everyone was promised income, but that never happened." |
| Statement 9 | There was a security camera in the kitchen of the house, which Ms. Singer said was installed "without our consent" and connected to Ms. Jacob's phone. Ms. Jacob said that the cameras were installed by the property owner for security purposes. |
| Statement 12 | "Right before we parted ways she leaked my nudes and sent them to business partners, people in my house and potential investors to slander my name, saying I was unprofessional," Mr. Young said. "Ms. Jacob informed an internal consultant of the picture's existence," Ms. Jacob's lawyer wrote, and clarified that she did not "publicly" leak the photos. |
| Statement 14 | Sarah Zeiler, 46, met Ms. Jacob in April when Ms. Jacob attempted to sign Ms. Zeiler's 16-year-old daughter, Ellie, to a management contract. Ms. Zeiler declined but soon discovered that Ms. Jacob had already added Ellie to the talent portion of an Influences marketing deck. Ms. Zeiler emailed Ms. Jacob |

---

[1] At the pre-motion conference, Defendants' counsel asserted that Lorenz's book does not exist. Yet, *The Washington Post*, Lorenz's present employer, stated in its press release announcing Lorenz's hire that her "first book, 'Extremely Online: Gen Z, the Rise of Online Creators and the Selling of a New American Dream,' will be published by Simon & Schuster in 2023." WashPostPR, *Taylor Lorenz joins The Washington Post as a columnist*, THE WASHINGTON POST, Feb. 1, 2022, https://www.washingtonpost.com/pr/2022/02/01/taylor-lorenz-joins-washington-post-columnist/.

|  | and asked her to remove Ellie's name and image from the deck and to stop referring to herself as Ellie's manager. "Ellie had heard from a few different notable people to be careful because Ari will tell everyone she represents you, and that's exactly what happened," Ms. Zeiler said. Last week, Ms. Zeiler discovered that Ms. Jacob was still telling people that she had a management relationship with Ellie. "For any parent to know that someone is out there saying that they're close with your child and they represent them is uncomfortable and unsettling," she said, adding: "I didn't hire her for a reason." |
|---|---|

Lorenz's vendetta against Plaintiffs continued after *The Times* published the Article. On August 29, 2020, Lorenz disparaged a *Reuters* article about a collaboration house Plaintiffs managed, doubling down on her false statement that Jacob is "the manager one talent said leaked his nudes as retaliation when he tried to leave"—even though Lorenz knew before publishing the Article that Jacob did not leak the nude photographs, and instead took action to cure the ethical breach she knew the leaked photos presented. *Id.* ¶¶ 60–62. Lorenz described Plaintiffs to her several hundred thousand Twitter followers as "people who exploit child internet stars." *Id.* ¶ 70. In yet another tweet, Lorenz stated creators called Influences "predatory"—distorting a statement from a creator's mother, who described the *industry* as predatory. *Id.* ¶¶ 80–81.

In addition to defaming Plaintiffs, Lorenz doxed Jacob by luring her into giving her the collaboration houses' addresses, promising that they were "[n]ot for publication," and then linking to a Zillow listing for the KND house (where Jacob was living alone) in the Article. *Id.* ¶¶ 82–83.

The defamatory Article had a devastating impact on Plaintiffs' business. Mere days after publication of the Article, L'Oréal informed Plaintiffs that it was no longer proceeding with its branding agreement with Influences, and numerous influencers under contract with Influences breached their agreements, citing Defendants' false accusations of illegal and unethical conduct. *Id.* ¶ 71. Influencers, brands, and social media platforms continue to refuse to work with Plaintiffs to this day because of the false allegations in the Article. *Id.* ¶ 72.

### III.    LEGAL STANDARD

When ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

### IV.    ARGUMENT

#### A.    The Court May Not Reach Factual Conclusions Based Solely on Extraneous Information Outside the Four Corners of the Complaint.

Defendants ask the Court to look outside the four corners of the SAC and consider email communications that Defendants attached to the motion. *See* ECF No. 43 at 6 n.2.  Defendants refer to these emails as if they are the entire universe of discussions between the parties, but that is simply wrong and intentionally misleading because the SAC makes clear that Jacob and Lorenz also corresponded by text message and by phone. *See* SAC ¶¶ 21, 45, 67–68. Thus, to the extent the Court considers the email communications, the Court must not infer that any communications alleged in the SAC did not take place simply because they did not appear in the select emails that Defendants attached to the motion.

#### B.    Plaintiffs Carried Their Burden of Alleging Actual Malice.

The SAC makes clear that Lorenz set out to write a hit piece about Plaintiffs. Prior to publishing the Article, Lorenz pressured sources into providing any dirt they had on Jacob (true or untrue) and disregarded facts that placed Plaintiffs in a positive light. The Article itself is rife with

6

errors that nobody with Lorenz's deep knowledge of the online content creation industry (let alone the resources of America's most prominent newspaper) could plausibly have made by accident. The errors Lorenz made with respect to each of the defamatory statements coupled with her abject bias and gross reporting failures compel the conclusion that there is a "reasonable expectation that discovery will reveal evidence of actual malice," which is all Plaintiffs must do at the pleading stage. *See* ECF No. 26 at 16 (quoting *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d. Cir. 2015)).

### 1.  **Actual malice can be pleaded with circumstantial evidence.**

It is well-established that actual malice can be inferred from circumstantial evidence, particularly at the pleading stage. Despite the "deceptive simplicity" of the actual malice standard, "'[r]eckless disregard' … cannot be fully encompassed in one infallible definition," and its "outer limits will be marked out through case-by-case adjudication[.]" *Sharon v. Time, Inc.*, 599 F. Supp. 538, 564 (S.D.N.Y. 1984) (citing *St. Amant v. Thompson*, 390 U.S. 727, 730–31 (1968)) (ellipsis in original). Even at the more exacting summary judgment stage, "[i]n determining whether a plaintiff has adduced sufficient evidence to reach a jury, the Court may consider plaintiff's evidence of actual malice in the aggregate." *Stern v. Cosby*, 645 F. Supp. 2d 258, 278 (S.D.N.Y. 2009) (citing *Tavoulareas v. Piro,* 817 F.2d 762, 794 n.43 (D.C. Cir. 1987) (en banc)).

As "plaintiffs will rarely be successful in proving awareness of falsehood from the mouth of the defendant himself," *Herbert v. Lando*, 441 U.S. 153, 170 (1979), "a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence." *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 668 (1989).  The following factors are each probative of actual malice:

> (1) whether a story is fabricated or is based wholly on an unverified, anonymous source, (2) whether the defendant's allegations are so inherently improbable that only a reckless person would have put them in circulation,

or (3) whether there are obvious reasons to doubt the veracity of the
informant or the accuracy of his reports.

*Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001) (citing *St. Amant*, 390 U.S.
at 732). A showing of any one of these factors will defeat a motion to dismiss based on actual
malice. *BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 822 (S.D.N.Y. 2021), *aff'd*, No.
21-1097, 2022 WL 598973 (2d Cir. Mar. 1, 2022), *cert. denied*, 143 S. Ct. 103 (2022) (citation
omitted).

While the "'[f]ailure to investigate does not in itself establish bad faith,'" "reliance on
anonymous or unreliable sources without further investigation may support an inference of actual
malice." *Biro*, 807 F.3d at 546 (quoting *St. Amant*, 390 U.S. at 733) (brackets in original).
Similarly, "potential bias on the part of sources does not necessarily create an issue of actual
malice," but that rule applies in "cases where sources were sufficiently identified to permit
assessment of the potential effect of their biases." *See Sharon*, 599 F. Supp. at 583 (citations
omitted). "'[E]vidence of an intent to avoid the truth … [can be] sufficient to satisfy the [actual
malice standard]." *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 124 (2d Cir. 2013) (quoting *Harte-
Hanks Commcn's, Inc.*, 491 U.S. at 693) (alterations in original). A defendant's "'purposeful
avoidance of the truth'" coupled with "the defendant's failure to investigate can demonstrate actual
malice." *Id.* (quoting *Harte-Hanks Commcn's, Inc.*, 491 U.S. at 692).

For example, the dubiousness of a source coupled with a reporter's failure to investigate
and that same reporter's ill will toward the subject could lead "a reasonable juror [to] conclude
that [the defendant] knowingly and recklessly ignored the probable falsity of the story[.]" *Celle v.
Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 190 (2d Cir. 2000) (citing *St. Amant*, 390 U.S. at
732). The *Celle* court further explained that "[r]eckless conduct may be evidenced in part by failure
to investigate thoroughly and verify the facts ... particularly where the material is peculiarly

harmful or damaging to the plaintiff's reputation or good name." *Id.* (quoting *Babb v. Minder,* 806 F.2d 749, 755 (7th Cir. 1986)) (ellipsis in original). Allegations regarding a defendant's post-publication actions, namely allegations showing the defendant's ill will toward the plaintiff, are relevant to whether the defendant spoke with actual malice. *See Stern v. Cosby*, 645 F. Supp. 2d 258, 280 n.14 (S.D.N.Y. 2009) (citations omitted).

A "newspaper's departure from accepted standards and . . . evidence of motive" can support a finding of actual malice; "it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry." *Harte-Hanks*, 491 U.S. 657 at 667–68; *see also Kerwick v. Orange Cnty. Publications Div. of Ottaway Newspapers, Inc.*, 53 N.Y.2d 625, 527 (1981) (explaining that a journalist's failure to comply with "the standards of [the] profession in information gathering and dissemination" is circumstantial evidence of actual malice).

In another case involving a defamatory news article, the Second Circuit explained that the following factors, among others, justified a possible jury verdict  in favor of the plaintiff (again, a far more exacting standard) on the issue of actual malice: the article did not contain "hot news;" the speaker was "very much aware of the possible resulting harm;" the "seriousness of the charges called for a thorough investigation," but only "slipshod and sketchy investigative techniques" were utilized; and the existence of a "possible preconceived plan to attack [the plaintiff] regardless of the facts." *See Goldwater v. Ginzburg*, 414 F.2d 324, 339–40 (2d Cir. 1969) (citing *Curtis Publishing Co. v. Butts*, 388 U.S. 130 (1967)); *see also Vandenburg v. Newsweek, Inc.*, 441 F.2d 378, 380 (5th Cir. 1971) ("[A]ctual malice may be inferred when the investigation for a story which is not 'hot news' was grossly inadequate in the circumstances." (citing *Curtis Publishing Co.*, 388 U.S. at 156–58)). Another court concluded that actual malice was alleged when the plaintiffs put the defendants on notice before publication of a book that the defendants' source was spreading

false information about them, and when the defendants consciously disregarded contrary information from the plaintiffs. *Tiversa Holding Corp. v. LabMD, Inc.*, No. CIV.A. 13-1296, 2014 WL 1584211, at *7 (W.D. Pa. Apr. 21, 2014).

When the Court considers the various kinds of circumstantial *and* direct evidence of actual malice on Defendants' part, it becomes apparent that denial of Defendants' motion is in accord with the wealth of Second Circuit caselaw on the issue of actual malice.

### 2.  Defendants published Statement 3 with actual malice.

Statement 3 asserts that Jacob told the KND residents that they would have to cover a larger portion of the rent. SAC ¶ 100(a). But the contractual rent owed by the influencers never changed, and Plaintiffs corrected Defendants on this point *three times* prior to publication. *Id.* Defendants try to skirt liability by relying on the Court's previous holding that denial is insufficient to show actual malice. Defs. Mem. of Law, ECF No. 43 ("Mem.") at 14. The prior complaint merely stated that Jacob denied this contention prior to publication. ECF No. 13 ¶ 32. However, the additional detail that Plaintiffs corrected Defendants *three times* is material. What's more, the Article simply states that unnamed "influencers" were told that they would have to cover a larger share of the rent, without naming any influencer that allegedly conveyed this falsehood to Lorenz—in fact, there is no indication Lorenz received this information from an actual KND resident.

Given that (a) Plaintiffs have demonstrated the false nature of this statement regarding the rent; (b) Jacob, the individual best-positioned to speak as to the rent in the KND house, thrice denied the false claim about the rent; and (c) the Article's contrary contention is based on an unnamed source, the Court should infer Defendants had serious doubts as to its truth given that there were "'obvious [specified] reasons to doubt the veracity of the informant or the accuracy of his reports.'" *See BYD Co. Ltd.*, 531 F. Supp. 3d at 822 (quoting *Biro* 807 F.3d at 545–46).

### 3.   Defendants published Statement 8 with actual malice.

Statement 8 asserts that Jacob promised Tianna Singer and the rest of the GIV influencers "brand deals, money and opportunities" that never materialized." SAC ¶ 100(b). While Defendants carefully parsed their words to give their readers the false impression that Singer was yet "another client" affected by Plaintiffs' alleged lies, Singer was not managed by Plaintiffs. *Id.* ¶ 44. By quoting Singer regarding the "promised income" that "never happened," Lorenz gave readers the false impression that Plaintiffs failed to deliver results for their clients. Further, Defendants declined to publish the fact that Plaintiffs' signed agreements with the GIV influencers did not contain any promises regarding brand deals. *Id.*

Even worse, Lorenz had knowledge of contrary facts. Plaintiffs' influencers frequently posted about brand deals and other opportunities on their social media pages. *Id.* ¶ 45. Lorenz's social media trawling is so essential to her reportage that she keeps a detailed record of every single tweet and social media post she sees on every platform and uses over thirty Instagram accounts. *Id.* ¶ 19. Based on these allegations, the Court can reasonably infer (indeed, it is the *only* reasonable inference) that Lorenz did in fact see activity on the influencers' social media pages that demonstrated that Plaintiffs had helped the influencers obtain brand deals.

And even the opposite inference—that Lorenz published the Article without once consulting the influencers' social media pages—would itself establish actual malice. In this scenario, Lorenz would have published injurious falsehoods about Plaintiffs without doing the basic research that quickly would have disproven her reporting, despite the fact that Lorenz herself publicly boasts about how she meticulously reviews and keeps records of the subjects of her reporting. *See Goldwater*, 414 F.3d at 339–30 (explaining that "slipshod and sketchy" investigative techniques about an item that was not "hot news" regarding serious charges can give rise to a

11

finding of actual malice). Discovery will thus show Lorenz either intentionally hid her head in the sand on this occasion or that she published the Article despite knowledge that the influencers' social media pages directly contradicted her reporting. Both scenarios reflect actual malice.

Moreover, Plaintiffs sufficiently allege that Lorenz knew about specific opportunities Plaintiffs created for the influencers. Jacob told Lorenz over text message about a big opportunity, the Playlist Creator Conference in Orlando, and an accompanying trip Influences organized with sponsorship from a brand deal. *Id.* ¶ 45. Defendants try to downplay Jacob and Lorenz's text message as just a "hyperlink to a Google Doc . . . with no reference to any purported sponsorship of the trip or that any influencers, including Singer, would be in attendance." Mem. at 10. The Google Doc that Jacob sent Lorenz, however, does establish that Singer was scheduled to travel to Orlando for the event. *See* Declaration of Ariadna Jacob ¶ 4, Exh. A. Lorenz thus published falsehoods contradicted by evidence that was directly sent to her. And several months prior to publishing the Article, Lorenz herself reported that GIV "held an opening party on March 12 at the Sugar Factory in Los Angeles featuring the pop star Doja Cat,"[2] which independently confirms Lorenz's knowledge of the opportunities Plaintiffs provided to their clients. The importance of the Playlist Creator Conference and the GIV opening party as it pertains to Statement 8 is an issue of fact that the Court must not resolve at the pleading stage.

### 4. Defendants published Statement 9 with actual malice.

The third defamatory statement Defendants published with actual malice was the statement in the Article that Jacob installed a security camera in the GIV house without residents' consent.

---

[2] Taylor Lorenz, "Delayed Moves, Poolside Videos and Postmates Spon: The State of TikTok Collab Houses, THE NEW YORK TIMES, May 21, 2020, https://www.nytimes.com/2020/05/21/style/tiktok-collab-houses-quarantine-coronavirus.html. The Court may consider this article because its contents are alleged in the SAC (*see* SAC ¶ 46). *See In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 356–57 (S.D.N.Y. 2003).

SAC ¶ 100(c). Plaintiffs allege that everyone who entered the GIV house signed a release and waiver noting the existence of video surveillance when they signed in on an iPad, and that it was well-known in the content creator industry (including by Defendants) that this was a common practice at collaboration houses. *Id.* ¶¶ 47–48. Defendants contend that these allegations fail to show specific facts bearing on Lorenz's knowledge. Mem. at 9. Once again, Defendants are asking the Court to flip the governing legal standard by making an inference in their favor on a motion to dismiss. Plaintiffs' allegations demonstrate that a reporter with deep knowledge of the content creator industry (so much so that she is publishing a book on the subject) reported an unremarkable and industry-standard practice as if it were scandal, and the Court should infer from these facts that discovery will produce evidence of further reckless conduct. Given all the glaring clues that the residents had consented to filming (including the obvious presence of iPads mounted on the collaboration houses' walls), even Lorenz's "failure to investigate thoroughly and verify the facts" shows actual malice given the "peculiarly harmful or damaging" nature of the allegation that Jacob filmed young influencers in their home without consent. *See Celle*, 209 F.3d at 190. Plaintiffs could further amend their complaint to explain that Jacob and Lorenz discussed the influencers' desire to be featured in a reality show, which required the influencers to sign video releases.

Moreover, Defendants knew from their communications with Plaintiffs that the "cameras were all in public spaces which each individual was informed about and not in any areas where one would have an expectation of privacy (e.g., a bathroom)." ECF No. 44-3 at 20. The Court should reject Defendants' argument that notice is not consent. Mem. at 9 n.9. The correct inference on a motion to dismiss is that the influencers consented to filming that was disclosed on an iPad sign-in and visually apparent, as well as being industry standard.

*The Times* further knew that Jacob disclosed the existence of video surveillance to entrants of her content creation houses, as a reporter from *The Times* visited the KND house in May 2020 and inquired about signing in on the iPad. SAC ¶ 49. Defendants' argument that these allegations are not "homed to Lorenz" (Mem. at 9) lacks merit because *The Times* published the Article and is a defendant in this matter. *See Sharon*, 599 F. Supp. at 564 ("[A] plaintiff may prove the actual malice of a press defendant by relying on the acts of all of the defendant's employees performed within the scope of their employment.") (citing *Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 253 (1974)). *The Times*, in addition to Lorenz, is therefore liable for knowingly publishing the falsehood that Jacob filmed KND house residents without their consent.

5. **Defendants published Statement 12 with actual malice.**

Statement 12 asserted that Jacob "leaked" nude photographs of Devion Young to her "business partners." SAC ¶ 100(d). The dictionary definition of "leak" is "to allow secret information to become generally known." Leak Definition, *Cambridge Dictionary*, *available at* https://dictionary.cambridge.org/us/dictionary/english/leak. In a pre-publication email, Lorenz conceded that "Mr. Young is not alleging that Ms. Jacob 'publicly' leaked photos," but that *The Times* "ha[s] screen recordings showing that Ms. Jacob distributed these photos to others via text message." ECF 44-3 at 7. Plaintiffs then confirmed to Lorenz that Jacob had not "leaked" the photographs and only learned about their existence after they had been circulating widely online, and that when Jacob learned of the leaked photographs, she treated their disclosure as a matter of "pressing ethical concern." *Id.* ¶¶ 58–60.

Despite *admitting* that Jacob had not "publicly leaked" any photos, Lorenz then published the exact opposite—accusing Jacob of having "leaked" nude photographs—and these publications were made both in the Article and in a post-publication tweet. *Id.* ¶ 62. Thus, Defendants either

knowingly published this false statement or published a "peculiarly harmful or damaging" allegation about Jacob following an abject failure of an investigation. *See Celle*, 209 F.3d at 190.

Defendants argue again that Plaintiffs failed to bring these allegations home to Lorenz. Mem. at 9. Not so. The SAC makes clear that "*as Plaintiffs informed Defendants prior to publication of the Article*," when Jacob became aware of the illicit photographs, she informed an Influencers staff member under a non-disclosure agreement about the photographs' existence, forwarded the screenshots of those text messages to the appropriate collaboration house manager, and confronted Young about the allegations. SAC ¶ 60 (emphasis added). The Court should credit Plaintiffs' specific, factual allegations, not Defendants' conclusory assertion to the contrary.

### 6. Defendants published statement 14 with actual malice.

Statement 14 asserts that Jacob made false statements about representing Ellie Zeiler and that Jacob added Zeiler's name and photograph to Influences' marketing deck without Zeiler's mother's permission. SAC ¶ 100(e). Again, Defendants rely on their canned defense that Plaintiffs failed to bring their allegations home to Lorenz. Mem. at 9. Yet Plaintiffs alleged not only "text messages between Jacob and Zeiler's mother and an email between Jacob and other third parties," *id.*, but also that "*as Plaintiffs informed Defendants prior to publication*," that they never presented either Ellie Zeiler or her mother with a management contract and never represented to anyone in the industry that Plaintiffs had a contract with the Zeilers. SAC ¶ 65 (emphasis added).

Lorenz knew from her text message exchange with Jacob that Plaintiffs were "going to pause on . . . Ellie Zeiler[.]" *Id.* ¶ 67. The importance of this text message is that it shows that Lorenz knew, contrary to the Article's depiction of events, that Jacob was disclaiming any professional relationship between herself and Ellie Zeiler. The Court should reject Defendants' effort to relitigate the substantial truth element regarding whether Jacob was forthright with Lorenz

15

about the reason Jacob removed Zeiler from Influences' marketing deck. Mem. at 10. It is Lorenz's speech that is at issue here, and Lorenz reported that Jacob was falsely holding Zeiler out as her client when it is clear from Jacob's communications with Lorenz that Jacob did no such thing.

### 7. The SAC contains ample circumstantial evidence as to Lorenz's state of mind.

Rather than evaluate each defamatory statement in a vacuum devoid of context, as Defendants urge, the Court must consider the plethora of other defamatory statements contained in the very same article, as well as the circumstantial evidence of actual malice alleged in the SAC. *See Harte-Hanks Commcn's, Inc.*, 491 U.S. at 667–68 (explaining that courts can consider a variety of factors in assessing actual malice, including motive, deviation from professional standards, and other forms of circumstantial evidence). A proper review of this nature requires the Motion to be denied because the actual allegations in the aggregate make it plausible that Defendants published the six false and defamatory statements in the Article with actual malice.

Defendants are wrong that Lorenz's ill will toward Plaintiffs is irrelevant to the Court's actual malice analysis. Defendants rely on *Lindberg v. Dow Jones & Co., Inc.*, No. 20-CV-8231 (LAK), 2021 WL 5450617 (S.D.N.Y. Nov. 22, 2021) for the proposition that Lorenz's actions evinced common law malice rather than actual malice. In actuality, the *Lindberg* court reasoned that "conclusory allegations that the . . . reporters were 'out to get Lindberg, or 'harassed' sources to tell them the 'right information, cannot, standing alone, suffice to allege actual malice." *Lindberg*, 2021 WL 5450617, at *6. Personal biases can support a finding of actual malice where there are facts showing that the speaker acted "pursuant to that bias." *See McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 185 (S.D.N.Y. 2020) (citations omitted).

The SAC is rife with allegations showing Lorenz's deep-seated animosity toward Plaintiffs. Prior to publication, Lorenz spread false rumors about Influences' agreements being

16

invalid and Jacob engaging in "shady" behavior. SAC ¶ 75. Even though the Court held that Lorenz's misleading discussion of the relationship between Plaintiffs and Gary Vaynerchuk (to portray Jacob as dishonest) and hit-and-run discussion of a California Labor Commissioner complaint against Jacob (where Jacob had not violated the law in question) were not defamatory, both allegations must still be considered as demonstrative of Lorenz's ill will toward Plaintiffs. *Id.* ¶¶ 40, 43. Further, Lorenz lured Jacob into providing the address of the KND house under false pretenses, and then proceeded to link to the house's Zillow listing in the article, thereby bait-and-switching and then doxing Jacob.[3] *Id.* ¶¶ 82–83. Lorenz's malicious campaign did not end with the Article; in post-publication tweets, she implied that Plaintiffs "exploit[ed] child internet stars" and manipulated a source's criticism of the industry as a whole into a supposed criticism of Jacob. *Id.* ¶¶ 70, 81. And in addition to the ill will Lorenz harbored against Jacob on a personal level, Lorenz had a financial interest in taking down Plaintiffs as she was represented by UTA, one of Plaintiffs' biggest competitors. *Id.* ¶¶ 88–93.

*Lindberg* is thus distinguishable in two critical respects. First, Plaintiffs' allegations regarding Lorenz's ill will were not conclusory. Rather than make boilerplate recitations of ill will, Plaintiffs alleged numerous instances from which the Court can, at a minimum, infer that Lorenz was *motivated* by ill will. Second, Plaintiffs are not relying on allegations of ill will "standing alone"—Plaintiffs' ill will allegations buttress the numerous allegations that independently display actual malice, both with respect to the Article as a whole and its discrete defamatory statements.

A crucial way Lorenz acted pursuant to her bias against Plaintiffs was by employing shoddy reporting tactics, deliberately blinding herself to all evidence that would undercut the false

---

[3] Even if the Court credits Defendants' argument that Lorenz did not know Jacob lived alone in the KND house, Mem. at 12, Lorenz showed bad faith and ill will by luring Jacob into providing the collaboration houses' addresses based on the false promise that they were not for publication.

narrative about Plaintiffs that Lorenz cobbled together (including the agreements between Plaintiffs and the influencers that Lorenz refused to review). That Lorenz afforded Jacob mere hours to respond to the avalanche of inquiries she sent days before publishing the Article may not in itself show actual malice—but it is consistent with Lorenz's practice of looking only for inculpatory evidence about Plaintiffs and discarding all contrary evidence. SAC ¶¶ 23–24. Lorenz's failure to consider crucial documents, including the management agreements she was deriding in discussions with Plaintiffs' clients, makes it more plausible that Lorenz harbored serious doubts about the veracity of the false statements in the Article. *Id.* ¶¶ 25–26. And again, when Lorenz published information contradicted by the influencers' social media accounts, she either knew the Article contained falsehoods or she impugned Plaintiffs' business and ethics without consulting social media—what should be the starting point in any article about the online content creation, particularly where Lorenz keeps a record of every post she sees with the thirty-odd accounts she uses. *Id.* ¶ 19. This case is therefore like *Harte-Hanks*, where evidence regarding a "newspaper's departure from accepted standards and the evidence of motive" are supportive of other evidence of actual malice, and relevant to proving Defendants' "state of mind through circumstantial evidence[.]" *Harte-Hanks Commcn's, Inc.* 491 U.S. at 667–68 (citations omitted).

In sum, Lorenz began her reporting project with a combination of industry expertise and ill will toward Plaintiffs. Over several months, Lorenz sought compromising information about Plaintiffs, sowing rumors and dissatisfaction among Plaintiffs' clients, and ignoring facts inconvenient to the story she was trying to write. Naturally, this resulted in six discrete defamatory statements about Plaintiffs in a single article, in addition to numerous other half-truths and disparaging statements. In each instance, Lorenz ignored credible, contradictory information.

Considering these facts in the aggregate, as the Court must, it is wholly plausible that discovery will produce further evidence of Lorenz's actual malice.

### C. The Article's Treatment of the Utility Outage Constitutes Defamation and Defamation by Implication.

Defendants further defamed Plaintiffs by publishing that the water and electricity went off in the GIV house in April 2020.[4] SAC ¶ 100(f). Specifically, Lorenz framed the Article as if to give readers the impression that Plaintiffs were so derelict in their duty of managing the GIV house that she let the influencers go without utilities:

> Dayna Marie, 20, said that her months in the Girls in the Valley house were some of the most stressful of her life. Her share of monthly rent, which she paid, was $1,500, but she realized immediately that some bills weren't being.

> "Ari told me all utilities are paid for," Ms. Marie said. "But in April the water, Wi-Fi and electricity went off. We were using water from the pool to flush the toilets." Ms. Jacob said that she had agreed to pay for utilities "up to a certain point, and that she 'was under no obligation to pay the bills."

ECF No. 44-1 at 6.

Defendants' only defense to this claim is substantial truth, arguing that Jacob's agent informed Lorenz in pre-publication correspondence that it is "factually true" that the "water, wifi, and electricity were turned off[.]" ECF No. 44-2 at 8. Yet this "truth" is not the one that matters

---

[4] The Court should reject Defendants' efforts to escape liability for this additional statement and Plaintiffs' remaining claims. The Court's previous order did not prohibit Plaintiffs from alleging new claims. *See* ECF No. 26 at 26–27. Even if the Court concludes that Plaintiffs exceeded the scope of its prior order, it "need not exercise [its] authority to dismiss any claims or allegations on this basis," and can instead "consider whether these amendments should be permitted under Rule 15," where "amendment to a pleading is generally denied only when there are concerns of bad faith, undue delay, or undue prejudice to the opposing party." *Savor Health, LLC v. Day*, No. 19-cv-9798 (RA), 2022 WL 1599782, at *1 (S.D.N.Y. May 12, 2022) (internal citations and quotation marks omitted) (brackets in original).

for a defamation analysis, because the defamatory "sting" of these statements is that Jacob had been derelict in her obligation to pay utilities, which was not the case.

As an initial matter, Jacob's agent never confirmed the utilities went off in April—and in fact, they went off in March, when Jacob was no longer living there and when payment for utilities was the responsibility of the individuals living there. This detail matters because the reference to the April timeframe falsely implies that the utility outage was Jacob's fault when it was not. Defendants intentionally disclose from the reader that in the *same statement* that Jacob's agent told Lorenz about the power outage, he also told Lorenz that this occurred only after Jacob moved out of the GIV house; that she had "informed the individuals living there multiple times that they would need to transfer the bills into their names and continue to make payments;" and that this was a "normal course of action when one roommate moves out of a shared space." *Id.* This information, known to Lorenz before publication, directly contradicts the Article's insinuation that Plaintiffs were derelict in their management duties.

"Defamation by implication 'is premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements.'" *Kesner v. Dow Jones & Co., Inc.*, 515 F. Supp. 3d 149, 170 (S.D.N.Y. 2021) (quoting *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 380–81 (1995)). On a motion to dismiss, "'the plaintiff must make a rigorous showing that the language of the communication as a whole can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference.'" *Id.* (quoting *Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28, 37–38 (2014)). "Where a publication implies something false and defamatory by omitting or strategically juxtaposing key facts, the publication may be actionable even though all of the individual statements are literally

true when considered in isolation." *Martin v. Hearst Corp.*, 777 F.3d 546, 552 (2d Cir. 2015) (citations omitted).

Here, there is a glaring gap between the truth (Jacob moved out of the GIV house and told its occupants to transfer the bills to their own names, which they failed to do, resulting in a utility outage) and what Defendants implied (that Jacob failed to pay the utilities, despite her promises that she would). There is no question that the Article as a whole leads the reader to adopt the latter inference. Defendants omitted key facts (Jacob telling the influencers to transfer the bills to their own names) and juxtapose this misleadingly framed episode with another source describing collaboration houses as "toxic." ECF No. 44-1 at 6. Even when Lorenz pays lip service to Jacob's attorney's account of what happened, Lorenz's use of emphatic quotation marks (scare quotes) and an out-of-context statement that Jacob described herself as "sole lease holder" to undermine Jacob's explanation of what transpired. *See id.* And Lorenz's post-publication tweet implying that Plaintiffs "exploit[ed] child internet stars" (along with all of the other evidence of ill will discussed above) makes it clear that Lorenz intended for her audience to make a defamatory inference from her misleading discussion of the utilities incident. SAC ¶ 70. Defendants' substantial truth defense therefore fails because even otherwise truthful statements can constitute defamation by implication where, as here, they imply a defamatory inference.

### D. Plaintiffs State a Claim for Tortious Interference with Prospective Economic Advantage.

Defendants are liable for tortious interference with prospective economic advantage ("tortious interference") because they deliberately sabotaged Plaintiffs' business relationships with third parties by spreading malicious falsehoods about Plaintiffs. To establish tortious interference under New York law, "[a] plaintiff must prove that '(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the

defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) defendant's interference caused injury to the relationship.'" *PKG Grp., LLC v. Gamma Croma, S.p.A.*, 446 F. Supp. 2d 249, 251 (S.D.N.Y. 2006) (quoting *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003)).

As an initial matter, Defendants are incorrect that this claim is duplicative of Plaintiffs' defamation claim. Mem. at 21–22. Unlike the defamation claim, which is limited to the statements in the Article, Plaintiffs' defamation claim encompasses additional and separate conduct. Lorenz contacted Plaintiffs' clients to press them for negative information about Plaintiffs; ruined Plaintiffs' reputation with everyone living with Diomi Cordero, one of Plaintiffs' former independent contractors; and spread rumors that Influences' agreements were invalid and that Jacob exhibited "shady" behavior. SAC ¶ 75. These actions on Lorenz's part led influencers to breach their contracts with Lorenz (either directly or as a result of pressure from those Lorenz contacted), leading to millions of dollars in lost revenue on Plaintiffs' part. *Id.* ¶¶ 76. These actions are patently not confined to the four corners of the defamatory Article.

Defendants' remaining argument is that they did not write the Article for the sole purpose of interfering with Plaintiffs' business relationships. Mem. at 24–25. First, this argument ignores the other ways in which Lorenz interfered with Plaintiffs' business relationships, including the malicious falsehoods she spread in her discussions with influencers. SAC ¶ 75. Second, Defendants ignore the disjunctive "or" in the third element of tortious interference—a defendant must act solely out of malice *or* use dishonest, unfair, or improper means. *See PKG Grp.*, 446 F. Supp. 2d at 251. Thus, even accepting that Defendants had the additional purpose of reporting the news, Plaintiffs have alleged facts showing that Lorenz used wrongful means in her discussions with influencers, including spreading the false rumor that Influences' agreements were "invalid."

*See Shapira v. Charles Schwab & Co., Inc.*, 187 F. Supp. 2d 188, 190 (S.D.N.Y. 2002) (explaining that "wrongful means" in the context of tortious interference can include misrepresentations (citations omitted)); *see also Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008) ("While a defendant's commission of a 'crime or an independent tort' clearly constitutes wrongful means, such acts are not essential to find wrongful means." (citations omitted)). Further, the wrongful acts at issue here are wholly separate from Defendants' journalism—even if the Article relates to Defendants' reporting activities, Lorenz's pre-publication whisper campaign against Plaintiffs is distinguished from her reporting activities (i.e., publishing the Article), and therefore Defendants' argument fails.

### E.  Jacob States a Claim for Intentional Infliction of Emotional Distress.

Defendants are liable for intentional infliction of emotional distress ("IIED") for the damage they caused Jacob in fabricating a false narrative about her in order to destroy her business, and in doxing her to disclose her private home address. "In New York, a cause of action for intentional infliction of emotional distress has  four elements:  (i) extreme  and  outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Doe v. Alsaud*, 224 F. Supp. 3d 286, 295 (S.D.N.Y. 2016) (citations and internal quotation marks omitted).

Defendants are wrong that Jacob's IIED claim is duplicative of Plaintiffs' defamation claim. While "parties may not 'repackage' their defamation claims as a different tort," an IIED claim is not duplicative of a defamation claim where it is "premised upon injuries distinct from the defamation claim." *Hanly v. Powell Goldstein, LLP,* No. 05 CV 5089 (KMW), 2007 WL 747806, at *3 n.5 (S.D.N.Y. Mar. 9, 2007), *aff'd sub nom. Hanly v. Powell Goldstein, L.L.P.*, 290 F. App'x

435 (2d Cir. 2008) (citations omitted). Such is the case here. In connection with their defamation claim, Plaintiffs seek damages for "reputational injury, compensatory damages, and special damages for lost contracts," while in connection with her IIED claim, Jacob seeks damages for "extreme emotional distress" caused not only by the Article, but also the doxing. SAC ¶¶ 107, 116.

Next, Defendants argue the First Amendment bars Jacob's IIED claim because the Article concerned a "matter of public concern." Mem. at 23. In *Snyder v. Phelps*, 562 U.S. 443 (2011), the case upon which Defendants rely, the Court made clear the "[d]eciding whether speech is of public or private concern requires us to examine the content, form, and context of that speech, as revealed by the whole record," and that "[i]n considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." *Snyder*, 562 U.S. at 453–54. Even if the general topic of the Article (the online content creator industry) was newsworthy, the trier of fact should be the one to determine whether the Article's defamatory minutiae, namely the precise ins and outs of the relationship between Plaintiffs and the various influencers, were a matter of public concern. *See Holmes v. Town of East Lyme*, 866 F. Supp. 2d 108, 129 (D. Conn. 2012) (explaining that, in the context of a whistleblower claim, whether a particular statement (as opposed to a subject matter) addresses a matter of public concern is a question of fact) (citation omitted).

Further, the Court should reject Defendants' argument that the publication of the Article is not enough to constitute extreme or outrageous conduct. Mem. at 24. Lorenz's conduct went well beyond the Article's publication as it included a pre-publication smear campaign, doxing, and post-publication tweets in which Lorenz doubled down on her false and malicious narrative. The cases Defendants rely upon relate only to self-contained, disparaging news items. *See* Mem. at 24 (citing *Bement v. N.Y.P. Holdings*, 307 A.D.2d 86 (2003) (publication of a photograph of the

plaintiff wearing a bathing suit next to an article reporting that a movie was being planned about her life as a spy sleeping with foreign officials); *Cassini v. Advance Publ'ns, Inc.*, 125 A.D.3d 467 (2015) (a *Vanity Fair* article about the plaintiff's secret marriage and her conduct in estate litigation). Lorenz's actions are more like the "deliberate and malicious campaign … conceived and executed in a manner designed to inflict maximum professional, economic and social humiliation" upon a professor involving accusations of plagiarism, which "if true, would sustain the cause of action [of IIED]." *Klinge v. Ithaca College*, 634 N.Y.S.2d 1000, 1005 (N.Y. Sup. Ct. 1995). Just as "an allegation of plagiarism" would be "calculated to destroy a career" "among a community of scholars," *id.* at 1006, Lorenz's accusations about Jacob were designed to destroy her career (and largely did destroy Plaintiffs' business). The jury should therefore decide whether Defendants' conduct was extreme and outrageous.

Finally, Defendants' argument that Plaintiffs failed to allege actual malice, Mem. at 23, is patently wrong, as Plaintiffs have alleged actual malice for the reasons discussed above.

## V.     CONCLUSION

Based on the foregoing arguments and authorities, Plaintiffs respectfully request that this Honorable Court deny Defendants' motion to dismiss. In the alternative, Plaintiffs request leave to file a Third Amended Complaint in the event the Court dismisses any part of the SAC.

Dated: February 10, 2023

DHILLON LAW GROUP INC.

/s/ *Harmeet K. Dhillon*
Harmeet K. Dhillon
Krista L. Baughman
Jesse D. Franklin-Murdock*
177 Post Street, Suite 700
San Francisco, California 94108
Tel: (415) 443-1700
Fax: (415) 520-6593

Email: Harmeet@dhillonlaw.com;
KBaughman@dhillonlaw.com;
JFranklin-Murdock@dhillonlaw.com

Matthew S. Sarelson
1601 Forum Place, Suite 403
West Palm Beach, Florida 33401
Tel: (415) 682-6827
Fax: (305) 448-5800
Email: MSarelson@dhillonlaw.com

Ronald D. Coleman
50 Park Place, Suite 1105
Newark, New Jersey 07102
Tel: (973) 298-1723
Fax: (415) 520-6593
Email: RColeman@dhillonlaw.com

*Attorneys for Plaintiffs*

**CAMARA & SIBLEY LLP**


*/s/ Joseph Sibley*
Joseph Sibley*
1108 Lacava Street, Suite 110263
Austin, Texas 78701
Tel: (713) 966-6789
Fax: (713) 583-1131
Email: sibley@camarasibley.com

*Attorneys for Plaintiffs*

*Admitted *pro hac vice*

26

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of February 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which I understand to have caused service on all counsel of record.

/s/ *Harmeet K. Dhillon*
Harmeet K. Dhillon

27