UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARIADNA JACOB *and* INFLUENCES, INC.,

                                    Plaintiffs,

         – *against* –

TAYLOR LORENZ *and* THE NEW YORK TIMES COMPANY,

                                    Defendants.

**OPINION & ORDER**

21-cv-6807 (ER)

R‌AMOS, D.J.:

Ariadna Jacob and her company, Influences, Inc. (collectively, "Plaintiffs"), brought this libel suit on August 12, 2021, against Taylor Lorenz and her then-employer The New York Times (collectively, "Defendants"), for statements made in an allegedly defamatory article written by Lorenz and published by the New York Times on August 14, 2020 (the "Article").[1] Doc. 1.

The Court issued an Opinion granting Defendants' motion to dismiss the first amended complaint ("FAC") on September 7, 2022. *Jacob et al. v. Lorenz et al.*, 626 F. Supp. 3d 672 (S.D.N.Y. 2022); Doc. 26. In the Opinion, the Court granted Plaintiffs limited leave to amend the complaint, and Plaintiffs timely filed a second amended complaint ("SAC") on October 5, 2022. Doc. 28.

Pending before the Court is Defendants' motion to dismiss the SAC for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), Doc. 42, in addition to the parties' letter motions requesting oral argument on the motion, Docs.

---

[1] The article is available at https://www.nytimes.com/2020/08/14/style/influences-tiktok-management-brittany-broski.html and https://perma.cc/PF8K-5DQN.

45, 50.  For the reasons set forth below, Defendants' motion to dismiss is GRANTED in PART and DENIED in PART, and the parties' letter requests for oral argument are DENIED as moot.

## I.      BACKGROUND

### A.  Factual Background

The following facts are based on the allegations in the SAC, Doc. 26, which the Court accepts as true for purposes of the instant motion.[2]  *See, e.g.*, *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

Jacob is the founder and CEO of Influences, Inc.  Doc. 28 ¶¶ 3, 4, 12.  Jacob is in the business of managing, counseling, and guiding "influencers," or people who market themselves as well as products and services on social media platforms.  *Id.* ¶ 13.  Jacob is also known to have managed so-called "collaborative houses" where young influencers live and work.[3]  *Id.* ¶ 14.  Jacob is familiar with computer coding, search engine optimization, and social media, and she has a background in marketing and branding.  *Id.* ¶ 15.  At one point, Influences represented over 85 influencers, also known as content creators.  *Id.* ¶ 13.

The individual defendant Lorenz, at all relevant times, was a technology columnist for The New York Times.  *Id.* ¶ 19.  On August 10, 2020, Lorenz contacted Jacob via text message and requested a call with her.  *Id.* ¶ 21.  Prior to the phone call, which ultimately never occurred, Jacob found out that Lorenz was writing a story on allegations of impropriety against Jacob and

---

[2]As the Court noted in its prior Opinion, courts may also consider documents attached to the complaint as exhibits, as well as documents incorporated by reference in the complaint.  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).  Here, the following documents are incorporated by reference:  the Article, Doc. 18-1, the prepublication communications between Plaintiffs and Lorenz, Docs. 18-3; Doc. 18-4; and a Google document containing information about accommodations for the influencers during a planned trip to Orlando, Doc. 49-1.  *See Jacob*, 626 F. Supp. 3d at 684.

[3] The three influencer houses mentioned in the Article were known as Girls in the Valley ("GIV"), Kids Next Door ("KND"), and Drip Crib.  Doc. 18-1 at 2, 5, 6.

Influences.[4]  *Id.* ¶ 22.  Lorenz then sent an email containing 27 questions and requesting that

Jacob respond by 9 a.m. the next day.  Doc. 44-3 at 8; *id.* ¶ 23.  Jacob and her attorney responded

with documentation and offered to provide additional documentation "on background."[5]  Doc.

28 ¶ 24.  Lorenz responded with an email purporting to summarize the facts and an additional 12

questions.  *Id.* ¶ 24.  Jacob again responded with documentation refuting several of the

allegations.  *Id.* ¶¶ 24, 25; *see also* Doc. 18-3; Doc. 18-4.

On August 14, 2020, the defendants published the Article entitled, "*Trying to Make It Big*

*Online? Getting Signed Isn't Everything*."  *Id.* ¶ 27; Doc. 18-1.  The sub-headline read:  "*Young*

*people come to Los Angeles in droves with dreams of fame and fortune.  Once they're*

*discovered, it's not always sunny.*"  Doc. 18-1 at 2.  Below the headline was a picture of Jacob

and a number of influencers she previously represented.  Doc. 28 ¶ 28.  The caption below the

picture stated that the influencers' dreams were turned "into a living nightmare."  *Id.*

Additionally, the Article included numerous statements that Jacob refuted prior to the Article's

publication, which, according to Jacob, are false.  These statements include:[6]

---

[4] According to Plaintiffs, "Lorenz is deeply familiar with the influencer industry."  Doc. 28 ¶ 31.  The SAC alleges that her experience and expertise gave her a window into the alleged defamatory nature of some of the statements published in the Article.  *See id.*

[5] The SAC defines "on background" as "off the record."  Doc. 28 ¶¶ 25, 26.

[6] The Court's September 7, 2022, Opinion only provided Plaintiffs with limited leave to amend their defamation allegations as to portions Statements 3, 8, 9, 12, and 14.  *Jacob*, 626 F. Supp. 3d at 694 ("Here, amendment of many of the claims would be futile . . . .  However, it is possible that plaintiffs could plead further information to demonstrate actual malice.  Accordingly, the Court will allow plaintiffs to amend the complaint to allege actual malice as to the five statements identified above in Section D(4).").  Pursuant to that directive, the Court will only consider Plaintiffs' defamation allegations as to the portions of those five statements as outlined in its prior Opinion. *See generally Palm Beach Strategic Income, LP v. Salzman*, 457 F. App'x 40, 43 (2d Cir. 2012) ("District courts in this Circuit have routinely dismissed claims in amended complaints where the court granted leave to amend for a limited purpose and the plaintiff filed an amended complaint exceeding the scope of the permission granted.") (collecting cases); *see also Jacob*, 626 F. Supp. 3d at 692, 694 (identifying the portions of Statements 3, 8, 9, 12, and 14 that could be amended to allege actual malice).  The Court will, however, also consider one additional new statement that Plaintiffs included in the SAC because its actionability has not been previously considered.  Doc. 28 ¶¶ 55, 56, 101; Fed. R. Civ. P. 15(a)(2) (noting that courts should freely give leave to amend when justice so requires); *see also Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (concluding that litigants need not be given

- **Statement 3**[7] – Statement regarding the increased share of the rent that the influencers were allegedly asked to pay at the KND house:

  "At the end of July, the influencers were told [by Plaintiffs] that they would have to cover a larger share of rent [at the KND house]." Doc. 18-1 at 3.

  Plaintiffs allege they merely demanded compliance with the influencers' contractual obligations. Doc. 28 ¶ 38. In a pre-publication communication, Jacob stated that the statement was 100% false; however, she also asserted that she "tried to have a conversation with the individuals" about "side deals" they had taken "without including Influences" or properly paying commissions. Doc. 18-3 at 4.

- **Statement 8** – Quotes from Tianna Singer, a TikTok content creator whom the Article claims was managed[8] by Influences, and her mother, Salam Singer:

  "'She promised brand deals, money and opportunities,' Ms. Singer said. 'Everyone was promised income, but that never happened.'" Doc. 18-1 at 5.

  Plaintiffs allege that influencers who were signed to Plaintiffs as clients "were aware through their signed agreements that Plaintiffs had not promised to procure brand deals." Doc. 28 ¶ 44. They also argue that Defendants "could have easily confirmed" that the influencers *did* receive such opportunities "by reviewing the social media accounts of the influencers Plaintiffs managed." *Id.* ¶ 45. They further allege that Jacob "even directly notified Lorenz of one especially big opportunity called Playlist Live" and "sent Lorenz detailed information" about it. *Id.*

- **Statement 9 –** Statement regarding cameras as installed at The Girls in the Valley influencer house:

  "There was a security camera in the kitchen of the house, which Ms. Singer said was installed 'without our consent' and connected to Ms. Jacob's phone. Ms. Jacob said that the cameras were installed by the property owner for security purposes." Doc. 18-1 at 5.

---

"a chance to reframe" their arguments where a court has previously conducted a substantive review of the claim and determined that repleading would be futile).

[7] While Plaintiffs did not number the statements in their complaint, both parties did so in their motion papers. For the sake of clarity, the Court adopts the numbering of the statements adopted by the parties, as it did in its prior Opinion. *See, e.g.*, Doc. 43 at 10–11; Doc. 48 at 9–10; Doc. 51 at 6–9.

[8] In the SAC, Plaintiffs allege that "Singer was not even managed by Plaintiffs – indeed, Plaintiffs chose not to sign her as a client because of her meager social media following. Instead, Singer was simply allowed to be a *guest* of [The Girls in the Valley] influencer house if she produced content and agreed to the terms of Influences' standard release and non-disclosure agreement." Doc. 28 ¶ 44 (emphasis in original).

4

Plaintiffs further allege that Singer signed an agreement that contained a provision indicating that the property was under video surveillance in all rooms other than restrooms and showers.[9] Doc. 28 ¶ 47. They also contend that Defendants "were made aware of these facts" through prepublication communications and a visit by the New York Times to one of the influencer houses in May 2020, yet they "nonetheless published this baseless accusation[.]" *Id.* ¶ 49.

- **Statement 12 –** Statement regarding the photos of Devion Young, an influencer and former client of Jacob's:

  "'Right before we parted ways she leaked my nudes and sent them to business partners, people in my house and potential investors to slander my name, saying I was unprofessional,' Mr. Young said. 'Ms. Jacob informed an internal consultant of the picture's existence,' Ms. Jacob's lawyer wrote, and clarified that she did not 'publicly' leak the photos." Doc. 18-1 at 6.

  Plaintiffs allege that the implication that Jacob *did* leak the photos is false because the photos at issue "had been circulating for weeks before Young and Plaintiffs had decided to part ways."[10] Doc. 28 ¶ 58; *see also id.* ¶¶ 59–62. Additionally, they underscore that "Jacob only learned about the photographs well after they had gone public," and they include in the SAC text messages "between Jacob and a manager" indicating that Jacob was informed about the pictures in May 2020. *Id.* ¶ 59. Plaintiffs further allege that "Lorenz and *The Times* ignored the inconvenient facts that they knew about the timing and dissemination of the nude photographs . . . ."[11] *Id.* ¶ 62.

- **Statement 14 –** Statement regarding Ellie Zeiler, a TikTok influencer:

  "Sarah Zeiler, 46, met Ms. Jacob in April when Ms. Jacob attempted to sign Ms. Zeiler's 16-year-old daughter, Ellie, to a management contract. Ms. Zeiler declined but soon discovered that Ms. Jacob had already added Ellie to the talent portion of an Influences marketing deck.

  Ms. Zeiler emailed Ms. Jacob and asked her to remove Ellie's name and image from the deck and to stop referring to herself as Ellie's manager. 'Ellie had heard

---

[9] In prepublication communications regarding the installation of the video camera, Jacob asserted that "[t]here was one camera installed in the kitchen in June-July for the safety of the individuals living there. As the person facing liability in the event something happened on the property, Ms. Jacob had instilled several house rules, which were seldom followed . . . . The cameras were all in public spaces . . . . As Ms. Jacob was paying the rent and had all the liability on her, it would be improper if not grossly negligent of her not to have some type of security system on the property." Doc. 18-3 at 7.

[10] The SAC states that Jacob "forwarded" screenshots that were "taken from the very messaging forums where the photographs had already been leaked to over 200,000 people." Doc. 28 ¶¶ 60, 61.

[11] As relevant here, in the parties' prepublication communications, Lorenz indicated that "[r]egarding Mr. Young's illicit photos, Mr. Young is not alleging that Ms. Jacob publicly 'leaked' photos. Rather, we have screen recordings showing that Ms. Jacob distributed these photos to others via text message." Doc. 18-4 at 7.

from a few different notable people to be careful because [Jacob] will tell everyone that she represents you, and that's exactly what happened,' Ms. Zeiler said.

Last week, Ms. Zeiler discovered that Ms. Jacob was still telling people that she had a management relationship with Ellie.  'For any parent to know that someone is out there saying that they're close with your child and they represent them is uncomfortable and unsettling,' she said, adding:  'I didn't hire her for a reason.'" Doc. 18-1 at 7.

Plaintiffs allege that they informed Defendants prior to publication that they never presented Zeiler with a management contract nor used her in any marketing deck, as no such deck existed.  Doc. 28 ¶ 65.  Rather, Zeiler was listed on an *informational* deck for GIV, which Zeiler's mother approved of, and from which Zeiler was removed once Zeiler's mother requested removal.  *Id.*  Additionally, the SAC includes a text message exchange between Jacob and Lorenz wherein Jacob states that "[Plaintiffs] are going to pause on . . . Ellie Zeiler . . . [because] of the coronavirus restrictions and current state in CA extending to July."  *Id.* ¶ 67.

- **New Statement –** Statement regarding utilities at the GIV house, quoting an influencer that lived there, Dayna Marie:

  "'Ari told me all utilities are paid for,' Ms. Marie said.  'But in April the water, Wi-Fi and electricity went off.  We were using water from the pool to flush the toilets.'  Ms. Jacob said that she had agreed to pay utilities 'up to a certain point,' and that she 'was under no obligation to pay the bills.'"  Doc. 18-1 at 6.

  Plaintiffs allege that "the utilities never went off for any reason in April" and, in March 2020, the California Public Utilities Commission ("CPUC") instituted a moratorium on disconnections for non-payment of utilities.[12]  Doc. 28 ¶ 55.

---

[12] However, in prepublication communications, Plaintiffs asserted that it was "factually true" that the water, Wi-Fi, and electricity were turned off.  Doc. 18-3 at 8.  They further stated the following:

> Ms. Jacob was under no obligation to pay the bills and, after moving out of the content house, informed the individuals living there multiple times that they would need to transfer the bills into their names and continue to make payments.  From a client perspective aside, this is the normal course of action when one roommate moves out of a shared space.  As Ms. Jacob moved out, there was never an intention that she should continue to pay the bills.  Any assumption that she would is baseless.  As the individuals living in the house were busy with their own personal endeavors/agendas, they neglected to take care of the bills and the utilities were turned off.  Ms. Jacob did not vindictively have the utilities turned off, as the above statement potentially infers, and if any individual claims otherwise, such statements are patently false and baseless.

Doc. 18-3 at 8.

After the Article was published, the cosmetics company L'Oréal informed Plaintiffs that it would no longer proceed with its branding agreement with Influences.  Doc. 28 ¶ 71.  Further, numerous other clients pulled out of their agreements with Plaintiffs, citing the Article as the reason.  *Id.*  Plaintiffs allegedly subsequently lost all of their creator and consulting clients, and Jacob had to seek mental health treatment due to suicidal ideations following the Article.  *Id.* ¶ 72.  Ultimately, Jacob had to move from California to Las Vegas to begin a new career "and business ventures."  *Id.* ¶ 73.  Several of the influencers who were previously affiliated with Influences then signed agreements with United Talent Agency ("UTA"), one of Jacob's direct competitors.  *Id.* ¶¶ 89, 90, 97.  When the Article was published, Lorenz had a pending book deal with a Simon and Schuster-affiliated company to write about social media, and UTA represented Lorenz in securing that deal.  *Id.* ¶ 89.

### B. Procedural History

Plaintiffs filed the complaint on August 12, 2021.  Doc. 1.  The Court held a conference on November 12, 2021, *see* Min. Entry dated Nov. 12, 2021, and Plaintiffs filed the FAC a week later, on November 19, 2021, Doc. 13.

Thereafter, Defendants moved to dismiss the FAC on December 23, 2021, and the Court granted the motion on September 7, 2022.  Doc. 16; Doc. 26.  The Court provided Plaintiffs with limited leave to amend the complaint to allege actual malice as to Statements 3, 8, 9, 12, and 14. *Jacob*, 626 F. Supp. 3d at 694.

Plaintiffs filed the SAC on October 5, 2022.  Doc. 28.  Defendants moved to dismiss on January 20, 2023, Doc. 42, and the motion was fully briefed on February 17, 2023, Doc. 51. Several months later, on May 18, 2023, Plaintiffs filed a notice of supplementary authority in opposition of the motion, Doc. 52.

## II.     LEGAL STANDARD

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Christie's Int'l PLC*, 699 F.3d at 145.  However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).  "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits."  *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citations omitted).

### III.    DISCUSSION

Defendants move to dismiss all claims in the complaint with prejudice.  Doc. 43 at 8, 31.
In addition to their Rule 12(b)(6) arguments, Defendants underscore that Plaintiffs' amendments
improperly exceed the scope of leave granted by the Court in its prior Opinion.  Doc. 43 at 7, 11,
26.  Specifically, they assert that the SAC "not only repeats allegations the Court has already
dismissed, but it also improperly broadens this action" by "sneak[ing] in" a new defamation by
implication claim, identifying a new allegedly defamatory statement, and presenting two new tort
claims—even though the Court only permitted them to plausibly allege actual malice as to five
remaining statements.  *Id.* at 7, 11.  In response, Plaintiffs underscore that the Court's prior order
did not *prohibit* them from asserting new claims, and amendments should be liberally permitted
pursuant to Federal Rule of Civil Procedure 15.  Doc. 48 at 24 n.4.

Here, as noted above, the Court will consider those claims that it did not previously
review substantively and deem futile.  *See Cuoco*, 222 F.3d at 112; *Salzman*, 457 F. App'x at 43;
*Jacob*, 626 F. Supp. 3d at 694; *see also* Fed. R. Civ. P. 15(a)(2) (noting that courts should freely
give leave to amend when justice so requires).  While the cases cited by Defendants indeed
demonstrate that courts routinely dismiss claims in amended complaints that go beyond the
scope of court orders delineating the contours of the permitted leave to amend, such dismissal is
discretionary.  Doc. 43 at 26; *Palm Beach Strategic Income, LP v. Salzman*, 457 F. App'x 40, 43
(2d Cir. 2023) (collecting cases).  And as Plaintiffs underscore, courts in this district have
generally denied amendment only when "there are concerns of bad faith, undue delay, or undue
prejudice to the opposing party."  Doc. 48 at 24 n.4 (quoting *Savor Health, LLC v. Day*, No. 10
Civ. 9798 (RA), 2022 WL 1500782, at *1 (S.D.N.Y. May 12, 2022) (internal quotation marks
omitted)).

The Court takes the allegations in turn.

## A.  Defamation Claims

### i.       Applicable Legal Standard and Defenses

"Defamation is the injury to one's reputation . . . by written expression, which is libel[.]"  *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012) (quoting *Idema v. Wager*, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000), *aff'd*, 29 F. App'x 676 (2d Cir. 2002)). Under New York law,[13] a defamation claim must allege "(1) a false statement about the [complainant]; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on [the] part of the publisher; (4) that either constitutes defamation per se or caused 'special damages.'"  *Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 411 (S.D.N.Y. 2009) (alterations in original) (quoting *Gargiulo v. Forster & Garbus Esqs.*, 651 F. Supp. 2d 188, 192 (S.D.N.Y. 2009)).

As relevant here, the New York Anti-SLAPP statute[14] protects defendants "facing litigation arising from their public petition and participation."  *Sweigert v. Goodman*, No. 18 Civ. 8653 (VEC) (SDA), 2021 WL 1578097, at *1 (S.D.N.Y. Apr. 22, 2021) (citing *Mable Assets, LLC v. Rachmanov*, No. 2018-04592, 2021 WL 1112893, at *1 (N.Y. App. Div., 2d Dep't, Mar 24, 2021)).  An action involving "public petition and participation" is a claim based upon:

---

[13] While the SAC alleges that "California substantive law applies to Plaintiffs' claims," the Court already considered Plaintiffs arguments in this regard and determined that New York law applies here.  *Jacob*, 626 F. Supp. 3d at 684–86; Doc. 28 ¶ 10.  And as the Second Circuit has made clear in the context of the "law of the case doctrine," where litigants "have once battled for the court's decision, they should [not] be . . . permitted[] to battle for it again" absent a showing of good cause.  *Virgin Atlantic Airways, Ltd. v. National Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (internal quotation marks and citation omitted).  "The major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Id.* (internal quotation marks and citation omitted).  None of those grounds justify a reconsideration of the Court's prior choice of law analysis in this case.

[14] "SLAPP" is an acronym for "Strategic Lawsuits Against Public Participation."  *See* N.Y. Civil Rights Law § 76-a. The Second Circuit has stated that SLAPP suits are suits "brought primarily to chill the valid exercise of a defendant's right to free speech."  *Ernst v. Carrigan*, 814 F.3d 116, 117 (2d Cir. 2016).

> (1) any communication in a place open to the public or a public forum in connection with an issue of public interest; or
>
> (2) any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition.

N.Y. Civ. Rights Law § 76-a(1).  As the Court noted in its September 2022 Opinion, the parties agree that, applying New York law, this lawsuit constitutes an action involving public petition and participation under the anti-SLAPP statute.  *Jacob*, 626 F. Supp. 3d at 686.

Additionally, as the Court also articulated in its prior Opinion, recent amendments to this statute expanded its protections by, in part, broadening the reach of the "actual malice" requirement.  *See id.*  Pursuant to the amendment, damages can only be recovered in such actions where the plaintiff establishes "by clear and convincing evidence that any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false[.]"  N.Y. Civil Rights Law § 76-a(2).  Therefore, to state a claim, Plaintiffs must plead "plausible grounds to infer actual malice by alleging enough facts to raise a reasonable expectation that discovery will reveal evidence of actual malice."  *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015) (internal quotation marks and citation omitted).

As relevant here, in *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989), the Supreme Court stated that circumstantial evidence of departure from accepted journalistic standards *could* constitute some circumstantial evidence of state of mind relevant to an actual malice inquiry.  491 U.S. at 668 ("[I]t cannot be said that evidence concerning motive . . . never bears any relation to the actual malice inquiry").  Denial of the veracity of allegedly defamatory information is not enough, however, as "such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error."  *Edwards v. Nat'l Audubon Soc., Inc.*, 556 F.2d

113, 121 (2d Cir. 1977); *see also Contemp. Mission, Inc. v. New York Times Co.*, 665 F. Supp.

248, 270 (S.D.N.Y. 1987), *aff'd*, 842 F.2d 612 (2d Cir. 1988) ("Publication in the face of a denial

by plaintiffs of a statement's truth does not demonstrate actual malice.").  Nor does failure to

verify statements with the plaintiff before publication constitute actual malice.  *See, e.g.*, *Loeb v.*

*New Times Commc'ns Corp.*, 497 F. Supp. 85, 93 (S.D.N.Y. 1980) ("[F]ailure to verify

statements with the plaintiff and reliance upon some biased sources, in themselves, do not

amount to reckless disregard of the truth").

Finally, under New York law, Plaintiffs may bring a claim for defamation by implication,

which "involves 'false suggestions, impressions and implications arising from otherwise truthful

statements.'"  *Levin v. McPhee*, 119 F.3d 189, 196 n.5 (2d Cir. 1997) (quoting *Armstrong v.*

*Simon & Schuster, Inc.*, 85 N.Y.2d 373, 381 (N.Y. 1995)).  "To survive a motion to dismiss a

claim for defamation by implication [under New York law] . . . the plaintiff must make a

rigorous showing that the language of the communication as a whole can be reasonably read both

to impart a defamatory inference and to affirmatively suggest that the author intended or

endorsed that inference."  *Kavanagh v. Zwilling*, 578 F. App'x 24, 24–25 (2d Cir. 2014)

(summary order) (quoting *Stepanov v. Dow Jones & Co.*, 987 N.Y.S.2d 37, 44 (N.Y. App. Div.

2014) (alteration in original).

###### ii.        Statement 3 – Share of Rent Increase

As noted above, Statement 3 pertains to the share of rent that the influencers were asked

to pay while living in one of the homes managed by Jacob, namely, the KND house.  Doc. 18-1

at 3.

In their motion to dismiss, Defendants argue that the SAC fails to sufficiently plead

"actual malice" to support Plaintiffs' defamation allegation as to this statement, and it also fails

to make the "rigorous showing" necessary to allege defamation by implication.  Doc. 43 at 13,

19–24.  In response, Plaintiffs contend that they did indeed allege actual malice.  Doc. 48 at 15.

They underscore that "the contractual rent owed by the influencers never changed, and Plaintiffs

corrected Defendants on this point *three times* prior to publication."  *Id.* (emphasis in original)

(noting that the Article's "contrary contention is based on an unnamed source").

      The Court dismisses Plaintiffs' allegations as to Statement 3.  Notwithstanding the SAC's

additional allegations that Jacob "thrice denied the false claim about the rent" and Plaintiffs'

corresponding arguments, the complaint simply fails to allege that the statement was published

"with knowledge of its falsity."  Doc. 28 ¶¶ 30–32; N.Y. Civil Rights Law § 76-a.  Taking

together all of the contentions in the SAC, Plaintiffs have not sufficiently claimed that Lorenz or

the New York times "in fact entertained serious doubts as to the truth of [the statement]."

*Brimelow v. New York Times Co.*, No. 21-66-CV, 2021 WL 4901969, at *2 (2d Cir. Oct. 21,

2021), *cert. denied sub nom. Brimelow v. The New York Times Co.*, 142 S. Ct. 1210 (2022)

(quoting *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001) (internal

quotation marks and citations omitted)).  Several facts articulated within or incorporated into the

complaint support this conclusion.  First, at the time that Lorenz wrote the article, at least one

named witness stated that he expected revenue from content creation that would allow him to

"pay [his] half of the rent," but he did not receive "enough deals to cover [his] half."  Doc. 18-1

at 2.  The Article specifically quoted the influencer, Marcus Olin, who stated the following:

> "We went into this thinking we'd have brand deals weekly or monthly," Mr. Olin
> said.  "We were expecting a quota where we could pay our half of rent through
> brand deals.  But we weren't getting enough deals to cover our half of rent."

*Id.*  In other words, Lorenz was told by one of the influencers that the out-of-pocket costs of

living at the content house and contributing to rent were greater than expected over time.

Additionally, Jacob's substantive responses to Lorenz's questions regarding this issue did not directly contradict the statement published in the Article.  Indeed, Jacob stated that "[t]he kids were asked to actually pay their share of rent and expenses per the terms of their agreement" and that she "tried to have a conversation with the individuals" about income from "side deals" that they were involved with and for which they had not compensated Influences.  Doc. 18-3 at 4. Given this context, Plaintiffs have failed to allege that, *at the time that the Article was published*, Lorenz maintained serious doubts about the veracity of the statement regarding the increased share of rent the influencers owed Jacob and Influences.

Moreover, Plaintiffs fail to plead defamation by implication.  Doc. 28 ¶ 105 ("In the alternative, Plaintiffs plead defamation by implication.  Each of the Statements, when read in the context of the Article as a whole, may reasonably be read to impart a false innuendo about Plaintiffs – namely, that Plaintiffs intentionally take advantage of their clients, abuse young talent for their own financial gain, lie about and breach the terms of their contracts, and generally commit unethical and fraudulent business practices.").  The language of Statement 3 cannot "as a whole [] be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference."  *Zwilling*, 578 F. App'x at 24–25.  Indeed, while Plaintiffs suggest that Defendants published the statement to further their "preconceived" and false narrative, Doc. 28 ¶ 38, those allegations are conclusory and unsupported by the facts alleged.  The SAC simply fails to plausibly plead that Statement 3 was published with an actionable lack of regard for the truth.

For these reasons, Plaintiffs' defamation allegations as to Statement 3 are dismissed.

### iii.    Statement 8 – "Promised Brand Deals, Money, and Opportunities"

The Court also grants Defendants' motion as to Statement 8, which pertains to "promised brand deals, money and opportunities" that creators affiliated with the GIV house thought they would receive through their work with Jacob and Influences.  Doc. 18-1 at 5.

In support of their motion as to Statement 8, Defendants argue that actual malice is not properly pleaded by referencing information that Lorenz and the New York Times *could have* reviewed to assess the veracity of the published information, but rather, "what matters is what Lorenz *did* know."  Doc. 43 at 14 (emphasis added) (citing *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)); *Gross v. N.Y. Times Co.*, 281 A.D.2d 299, 299 (1st Dep't 2001); *see also* Doc. 28 ¶¶ 44–45.  They emphasize that Plaintiffs were tasked with alleging that Defendants "had a 'high degree of *awareness* of [the statement's] probable falsity.'"  Doc. 43 at 13 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)) (emphasis added).

Plaintiffs, on the other hand, contend that, in publishing the statement, "Lorenz gave readers the false impression that Plaintiffs failed to deliver results for their clients," despite the fact that "Plaintiffs' signed agreements with the GIV influencers did not contain any promises regarding brand deals."  Doc. 48 at 16.  They underscore their position that "Lorenz had knowledge of contrary facts," therein referencing the influencers' social media pages wherein they "frequently posted about brand deals and other opportunities[.]"  *Id.*

Plaintiffs fail to plead actual malice as to Statement 8.  They have not alleged that Lorenz entertained "serious doubts as to the truth" of the statement.  *St. Amant*, 390 U.S. at 731.  Indeed, as Defendants note, "Plaintiffs have pled the existence of information [that might contradict the statement] but no facts suggesting that Lorenz knew that information."  Doc. 43 at 14.  Plaintiffs' alternate argument—that actual malice is established merely through the allegation "that Lorenz

published the Article without once consulting the influencers' social media pages"—is simply unsupported by the caselaw.  Doc. 48 at 16; *Hodges v. Lutwin*, No. 22-974-cv, 2023 WL 3362836, at *4 (2d Cir. May 11, 2023) (collecting cases that conclude that under New York law, "plaintiffs cannot establish actual malice on the basis that the [] defendants declined to consider plaintiffs' account of the events underlying the allegedly defamatory statements or failed to conduct their own investigation").

Nor does the fact that Jacob made Lorenz aware of one alleged brand deal change the outcome here.  Doc. 48 at 17; Doc. 28 ¶ 45.  Indeed, as Defendants note, "one influencer convention . . . does not demonstrate that Lorenz knew that Influences had secured actual brand deals and business opportunities for its clients."  Doc. 43 at 16–17.  In fact, several named sources stated the contrary.  *See, e.g.*, Doc. 18-1 at 2, 3.  Accordingly, under these circumstances, Plaintiffs failed to plead that Defendants acted with knowledge that Statement 8 was false.

Finally, as to Plaintiffs' defamation by implication allegations, the Court disagrees that "when read in the context of the Article as a whole, [Statement 8] may reasonably be read to impart a false innuendo about Plaintiffs."  Doc. 28 ¶ 105.  As explained above, in the absence of factual assertions that directly shed light on Lorenz's state of mind at the time of publishing, the statement cannot be read to "impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference."  *Zwilling*, 578 F. App'x at 24–25.

Accordingly, Plaintiffs' allegations as to Statement 8 are dismissed.

### iv.    Statement 9 – Video Camera Installation

Plaintiffs' allegations as to Statement 9, which concerns the installation of a video camera in the kitchen of one of the influencer houses, are also dismissed.  Doc. 18-1 at 5.  Defendants argue that "Plaintiffs try to plead actual malice . . . by alleging that their communications with

third parties—not Lorenz—established that the influencers had consented to the security camera
in the GIV house[.]"  Doc. 43 at 14.  Because Plaintiffs failed to "bring home" their allegations
to Lorenz, Defendants contend that the SAC did not sufficiently allege that *Defendants* held
"subjective doubts about the truth of the publication."  *Id.* at 15 (quoting *New York Times Co. v.
Sullivan*, 376 U.S. at 287; *Behar*, 238 F.3d at 174).

Plaintiffs respond by highlighting several facts set out in the SAC:  *first*, everyone who
entered the influencer house signed a release waiver "noting the existence of video surveillance;"
*second*, it was a "common" and "well-known practice" in the industry; *third*, "Defendants knew
from their communications with Plaintiffs that the 'cameras were all in public spaces which each
individual was informed about and not in any areas where one would have an expectation of
privacy (e.g., a bathroom);'" *fourth*, the New York Times "knew that Jacob disclosed the
existence of video surveillance to entrants of her content creation houses, as a reporter from *The
Times* visited the KND house in May 2020 and inquired about signing in on the iPad."  Doc. 48
at 18–19 (citation omitted) (emphasis in original).

As Defendants underscore, Plaintiffs fail to sufficiently connect their factual assertions to
Defendants' state of mind at the time that they published the Article.  To be clear, the statement
at issue states that "[t]here was a security camera in the kitchen of the house, which Ms. Singer
said was installed 'without our consent' and connected to Ms. Jacob's phone."  Doc. 18-1 at 5.
None of the facts that Plaintiffs raise here support the proposition that *that statement* was
published "with knowledge of its falsity or with reckless disregard of whether it was false[.]"
N.Y. Civil Rights Law § 76-a(2).  While they do shed light upon the context surrounding the
installation cameras in the house broadly, they do not contradict the assertion that a *specific*
camera was installed in the kitchen of the house without the knowledge or approval of the

influencers that were already living or spending time there.  In fact, in prepublication communications, Jacob affirmed that "[t]here was one camera installed in the kitchen in June-July for the safety of the individuals living there," and she did not otherwise assert that the influencers agreed to its installation.  Doc. 18-3 at 7.  Accordingly, Plaintiffs fail to assert that Plaintiffs acted with *actual malice* when they published the statement in the Article.

Plaintiffs' alternative defamation by implication assertions also fail here.  Doc. 28 ¶ 105. As with the other statements, the language of Statement 9 cannot "as a whole [] be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference." *Zwilling*, 578 F. App'x at 24–25.  The substance of the statement came from a named, quoted source, and it was not otherwise directly contradicted by any of the facts that Plaintiffs allege in the complaint.  Under these circumstances, Plaintiffs failed to make the applicable "rigorous showing." *Zwilling*, 578 F. App'x at 24–25.

The defamation allegations as to Statement 9 are thus dismissed.

###### v.      Statement 12 – "Leaked"  Photos of Devion Young

Statement 12 pertains to the dissemination of the "leaked"[15] nude photos of Devion Young.  *See* Doc. 18-1 at 6.

In support of their motion, Defendants assert that Plaintiffs' "allegations about what Lorenz could have or should have known are insufficient to establish malice," given that "actual malice cannot be pled without 'specific facts bearing on' a speaker's knowledge."  Doc. 43 at 14–15 (quoting *Prince v. Intercept*, No. 21 Civ. 10075 (LAP), 2022 WL 5243417, at *17 (S.D.N.Y. Oct. 6, 2022)).  In other words, as with several of the other statements at issue here,

---

[15] As Plaintiffs state in their opposition papers, "[t]he dictionary definition of 'leak' is 'to allow secret information to become generally known.'"  Doc. 48 at 19 (quoting Leak Definition, *Cambridge Dictionary*, *available at* https://dictionary.cambridge.org/us/dictionary/english/leak and https://perma.cc/MRC9-UVFT.)).

they contend that Plaintiffs' actual malice contentions are insufficient because they are merely based on external communications that Lorenz was not privy to, and thus Plaintiffs failed to plead that *she* possessed the requisite state of mind to sufficiently allege actual malice as to Statement 12.  *Id.* at 15.

In response, Plaintiffs underscore that the Article states, through a quote from Devion Young, that Jacob "leaked" his nude photographs, despite the fact that Lorenz had previously communicated to Jacob that *nobody* contended as much.  Doc. 48 at 19; Doc. 18-4 at 7. Accordingly, they argue that the SAC did indeed "bring these allegations home to Lorenz."  *Id.* at 20.

The Court concludes that Plaintiffs have sufficiently pleaded their defamation allegations as to Statement 12 at this stage of the proceedings.  Indeed, the relevant prepublication communications show that Lorenz called into question the truth of the assertion that Jacob "leaked" the photos, and she nevertheless published the statement saying as much.  Specifically, before the Article was published, Lorenz acknowledged that "Mr. Young and others are alleging that Ms. Jacob *privately distributed* Mr. Young's illicit photos to others.  *No one is alleging that she publicly leaked them*."  Doc. 18-4 at 7 (emphasis added).  This distinction is decisive here. Indeed, Lorenz laid out her understanding—prior to the Article's publication—that (1) "leaking" connotes sharing something with a broad audience rather than privately, and that (2) "no one" alleged that Jacob had leaked Young's photos.  *Id.*   Nonetheless, the Article included a quote from Young which stated that "[r]ight before we parted ways [Jacob] *leaked my nudes and sent them* to business partners, people in my house, and potential investors. . . ."  Doc. 18-1 at 6 (emphasis added).  As published, the quotation suggested that Jacob did indeed "leak" the

photos, and it distinguished this action from the private distribution to business partners and others. *See id.*

Given these circumstances, and the fact that the purpose of Rule 12(b)(6) is to test the *formal sufficiency* of Plaintiffs claims, Defendants' motion to dismiss as to this statement is denied.

### vi.   Statement 14 – Management of Ellie Zeiler

Statement 14 pertains to Plaintiffs' relationship with Ellie Zeiler, an influencer that did not have a management contract with Jacob or Influences but nevertheless appeared on a slide deck for one of the influencer houses.  Doc. 18-1 at 7.

Defendants argue that Plaintiffs' claim fails as to this statement because the facts asserted in the SAC—namely, that Ellie Zeiler was listed on an informational slide deck *with* her mother's consent—do not bear on Defendants' knowledge at the time that the Article was published.  Doc. 43 at 14–15; Doc. 28 ¶ 65.  In other words, Defendants underscore that they did not know that Zeiler's mother had apparently consented to her inclusion in the slideshow, and consequently, they did not act with actual malice when they published the statement.  *See generally* Doc. 43 at 17.

In response, Plaintiffs argue the SAC sufficiently alleged that the statement was published with actual malice because Lorenz was aware that "[Plaintiffs] never presented either Ellie Zeiler or her mother with a management contract and never represented to anyone in the industry that [they] had a contract with the Zeilers."  Doc. 48 at 20.  They cite to text messages between Jacob and Lorenz, wherein Jacob "was disclaiming any professional relationship between herself and Ellie Zeiler."  Doc. 48 at 20; *see also* Doc. 28 ¶ 67.  And as discussed

previously, the SAC alleges that Ellie Zeiler "was initially listed on [an] informational deck[] *with the consent of* [her] *mother*[.]"  Doc. 28 ¶ 65 (emphasis in original).

The defamation claim as to Statement 14 is dismissed.  While it is true that Plaintiffs denied the veracity of the contents in the statement, the Court reiterates that "denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error."  *Edwards*, 556 F.2d at 121.  Furthermore, and critically here, although Plaintiffs allege that Defendants knew that Zeiler was listed on an informational slideshow, they do *not* assert that Zeiler's mother's consent was known to Defendants *prior* to the Article's publication.  *See* Doc. 28 ¶ 65.  And Plaintiffs otherwise merely allege that they told Lorenz that they "never presented Ms. Zeiler or her daughter with a management contract, and never represented to anyone in the industry that Plaintiffs had a management contract with the Zeilers."  *Id.*  Those facts do not give rise to a plausible claim that Defendants published the statement with knowledge of its falsity.  *See* N.Y. Civil Rights Law § 76-a(2).  To the contrary, they conform to the substance of Statement 14, which asserts that Plaintiffs added Zeiler to a slide deck despite the fact that the Zeilers had not entered into a management contract with Plaintiffs.  Doc. 18-1 at 7.

All told, Plaintiffs failed to plead "plausible grounds to infer actual malice by alleging enough facts to raise a reasonable expectation that discovery will reveal evidence of actual malice."  *Biro*, 807 F.3d at 546 (citation and internal quotation marks omitted).  Nor do Plaintiffs plausibly allege defamation by implication.  *See* Doc. 28 ¶ 105.  For the reasons stated herein, they did not "make a rigorous showing that the language of the communication as a whole can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference."  *Zwilling*, 578 F. App'x at 24–25.

The claim as to Statement 14 is thus dismissed.

### vii.   New Statement – Utilities at the GIV House

The SAC alleges that an additional statement in the Article, not included in the FAC,[16] was defamatory, namely, its reporting that Jacob failed to pay the utilities at the GIV house. Doc. 28 ¶ 55; Doc. 18-1 at 6.  The Court grants Defendants' motion to dismiss as to this statement, as Plaintiffs have failed to plausibly plead that the statement was not substantially true.

"'Substantial truth' is the standard by which New York law . . . determines an allegedly defamatory statement to be true or false." *Tannerite Sports, LLC v. NBCUniversal News Grp., a division of NBCUniversal Media, LLC*, 864 F.3d 236, 242 (2d Cir. 2017) (citation omitted).  A statement is substantially true if it "would not have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.* (internal quotation marks and citation omitted).  If "fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done." *Id.* at 243 (quoting *Fleckenstein v. Friedman*, 193 N.E. 537 (N.Y. 1934)).

Here, the parties agree that the utilities in the GIV house were indeed shut off.  *Compare* Doc. 43 at 25 *with* Doc. 48 at 24–25.  In fact, in response to the prepublication allegation that "[a]t different points in April, the water, Wi-Fi, and electricity were all temporarily shut off at the Girls in the Valley house," Plaintiffs' stated the following in part:

> While this is factually true (the water, wifi, and electricity were turned off), the facts behind the events are not being communicated.  Ms. Jacob was under no obligation to pay the bills and, after moving out of the content house, informed

---

[16] As noted herein, the Court's prior Opinion provided Plaintiffs with limited leave to amend the FAC, and the SAC exceeded the scope of that permission by asserting several new allegations, including the defamation claim as to this statement.  The Court considers the claim here pursuant to Rule 15 and the Court's discretion to assess new claims in amended pleadings.  *Salzman*, 457 F. App'x at 43.

the individuals living there multiple times that they would need to transfer the
bills into their names and continue to make payments.

Doc. 18-3 at 8. Plaintiffs complain that "Jacob's agent never confirmed the utilities [were shut]

off in April—and in fact, they [were shut] off in March, when Jacob was no longer living there

and when payment for utilities was the responsibility of the individuals living there." Doc. 48 at

25. But that is a distinction without a difference here. As Defendants point out, "[w]hether it

happened in March or April makes no difference, because 'minor inaccuracies do not render an

otherwise substantially true article defamatory.'" Doc. 51 at 11 (quoting *Zappin v. NYP*

*Holdings Inc.*, 769 F. App'x 5, 10 (2d Cir. 2019) (summary order)). Indeed, this difference

"would not have a different effect on the mind of the reader from that which the pleaded truth

would have produced." *Tannerite Sports, LLC*, 864 F.3d at 242. Accordingly, Plaintiffs failed

to plead falsity as to this statement.

Nor did the SAC sufficiently allege a claim of defamation by implication. Plaintiffs

argue that because the Article did not state that Jacob warned the influencers "multiple times that

they would need to transfer the bills into their names and continue to make payments," it

improperly insinuates that Plaintiffs "were derelict in their management duties." Doc. 48 at 25.

However, as Defendants point out, "the Article features Plaintiffs' explanation" in this regard.

Doc. 51 at 15. Indeed, it states that "Ms. Jacob's lawyer described Ms. Jacob as a roommate

herself, not as a landlord, and therefore not responsible for the situation after she "moved out."

Doc. 18-1 at 6. Given this context, including the prepublication communications between Jacob

and Lorenz regarding the utilities at the GIV house, Plaintiffs failed to "make a rigorous showing

that the language of the communication as a whole can be reasonably read both to impart a

defamatory inference and to affirmatively suggest that the author intended or endorsed that

inference." *Zwilling*, 578 F. App'x at 24–25.

The defamation allegations as to this statement are thus dismissed.

## B. New Claims

Plaintiffs also bring several new causes of action that they did not previously set out in their prior complaints. Specifically, the SAC contains claims for tortious interference with prospective economic advantage and intentional infliction of emotional distress. Doc. 28 ¶¶ 108–117.

As stated previously, the parties dispute whether the Court should consider these claims at all. *Compare* Doc. 43 at 25–27 *with* Doc. 48 at 26–30. The Court will assess them here as they were not considered and deemed futile in the Court's prior opinion.

### a. Tortious Interference with Prospective Economic Advantage

In the SAC, Plaintiffs allege that, in publishing the Article, Defendants "deliberately sabotaged" their relationships "with third parties, including multiple influencers." Doc. 28 ¶¶ 109–110. Defendants respond with three main points. They contend that the claim is duplicative of the defamation claim, Doc. 43 at 27, that it fails to allege, "as it must, that Defendants' sole purpose in publishing the Article was to harm Plaintiffs," *id.* at 30 (citing *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 189 (2004)), and that the complaint does not identify "specific third party sources with whom Plaintiffs lost the purported prospect of economic advantage," Doc. 51 at 14.

Under New York law, in order to prevail on a claim for tortious interference with prospective economic advantage, a plaintiff "must show that '(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship.'" *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d

Cir. 2015) (quoting *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008)).  As to the second element, New York courts have rejected claims containing "only a general allegation of interference with customers without any sufficiently particular allegation of interference with a specific contract or business relationship." *Id.* at 262 (quoting *McGill v. Parker*, 179 A.D.2d 98, 105 (1992)).  The third element—that is, the "wrongful purpose" element—sets a "high" bar:  "[A] claim for tortious interference with business relations requires a plaintiff to show, as a general rule, that the defendant's conduct amounted to a crime or an independent tort." *Id.* (internal quotation marks and alterations omitted) (quoting *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 785 N.Y.S.2d 359, 818 N.E.2d 1100, 1103 (N.Y. 2004)).  The only exception is when the defendant "engages in conduct for the sole purpose of inflicting intentional harm on plaintiffs." *Id.* (internal quotation marks omitted).  If a defendant has acted "with a permissible purpose, such as normal economic self-interest, wrongful means have not been shown." *Id.* (internal quotation marks omitted).

As relevant here, New York law considers "claims sounding in tort to be defamation claims . . . where those causes of action seek damages only for injury to reputation, [or] where the entire injury complained of by plaintiff flows from the effect on his reputation." *Hengjun Chao v. Mount Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012).  Where such claims are pleaded, courts routinely dismiss them as duplicative. *See, e.g.*, *id.*; *Anyanwu v. Columbia Broad. Sys., Inc.*, 887 F. Supp. 690, 693 (S.D.N.Y. 1995) ("New York cases have held that a separate cause of action for what are essentially defamation claims should not be entertained.") (collecting cases).

Here, Plaintiffs' tortious interference claim is duplicative of their defamation allegations, and it is otherwise insufficiently pleaded.  The SAC alleges that "Defendants knew about

[Plaintiffs'] relationships [with third parties, including multiple influencers] and deliberately sabotaged them, by defaming Plaintiffs under the guise of interviewing influencers for their story, and by subsequently publishing the false and defamatory Article about Plaintiffs."  Doc. 28 ¶ 110.  A close inspection of the tortious interference claim makes clear that that is merely a rephrasing of Plaintiffs' defamation allegations.

Additionally, the Court agrees with Defendants' assertion that "even if the tortious interference claim were not based on the Article, Plaintiffs still have not satisfied their threshold pleading requirements" due to the imprecise nature of their interference allegations.  Doc. 51 at 14; *Merkin*, 791 F.3d at 261.  The contentions that various entities "now refuse to work with Plaintiffs" and "Influences lost all its creator and consulting clients" simply fail to sufficiently identify "specific contract[s] or business relationship[s]."  Doc. 28 ¶ 72; *Merkin*, 791 F.3d at 261.  Nor have Plaintiffs sufficiently alleged that Defendants acted with the requisite improper purpose.

The tortious interference claim is thus dismissed.

### b.  Intentional Infliction of Emotional Distress

In the SAC, Plaintiffs also allege that Defendants "took the extreme and outrageous course of action of fabricating a false narrative about Jacob—one deliberately calculated to cause her economic ruin—and used their powerful platform as the most prestigious newspaper in the country to propagate this false and defamatory narrative to the world."  Doc. 28 ¶ 115.

To state a claim for intentional infliction of emotional distress ("IIED") in New York, a plaintiff must allege:  (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and injury; and (4) severe emotional distress.  *McGrath v. Dominican College of*

*Blauvelt, New York*, 672 F. Supp. 2d 477, 492 (S.D.N.Y. 2009); *see also Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993).  The standard for asserting a claim is "rigorous, and difficult to satisfy."  *TC v. Valley Cent. Sch. Dist.*, 777 F. Supp. 2d 577, 604 (S.D.N.Y. 2011) (quoting *Howell*, 612 N.E.2d at 702).  "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Howell*, 612 N.E.2d at 702.  Additionally, as noted above, tort claims that duplicate defamation allegations are properly dismissed.  *See Chao*, 476 F. App'x at 895.

The Court concludes that Plaintiffs IIED claim is also duplicative of the defamation claims.  The SAC states that "Defendants are liable for the tort of [IIED] because they took the extreme and outrageous course of action of fabricating a false narrative about Jacob," which "caused extreme emotional distress to Jacob, as evidenced by her need to seek out mental health treatment . . . in the aftermath of watching her business—her life's work—go up in smoke overnight."  Doc. 28 ¶¶ 115, 116.  This, like the tortious interference claim, is a variation of Plaintiffs' defamation allegations and must be dismissed.  *See Anyanwu*, 887 F. Supp. at 694. Additionally, while the SAC makes conclusory allegations about the "outrageous" nature of Defendants' purported actions, the complaint as a whole fails to allege sufficient facts to support those assertions.

The IIED claim is thus dismissed.

### C.  Leave to Amend

Plaintiffs "request leave to file a Third Amended Complaint in the event the Court dismisses any part of the SAC."  Doc. 48 at 30.

Federal Rule of Civil Procedure 15 instructs courts to "freely give leave [to amend a pleading] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  It is "within the sound discretion of the district court to grant or deny leave to amend."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007); *see also Gayle v. Larko*, No. 18 Civ. 3773 (ER), 2019 WL 4450551, at *4 (S.D.N.Y. Sept. 17, 2019).  Importantly, however, leave is unwarranted where "the problem with . . . [the] claims is 'substantive' and, thus, 'better pleading will not cure it.'" *Larko*, 2019 WL 4450551, at * 4 (citing *Cuoco*, 222 F.3d at 112 (2d Cir. 2000)).

Here, further amendment of the complaint would be futile.  Plaintiffs have had two opportunities to reassert their claims, and they have enjoyed "the benefit of a ruling" that highlighted "the precise defects" in their allegations.  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190–91 (2d Cir. 2015).  Additionally, the Court here considered Plaintiffs' *new* allegations that clearly exceeded the scope of its prior order granting leave to amend the First Amended Complaint.  Nevertheless, Plaintiffs failed to plausibly plead most of their claims.  Accordingly, Plaintiffs' request for leave to file a Third Amended Complaint is denied, and those claims that are dismissed are dismissed *with* prejudice.

## IV.   CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss the SAC is GRANTED in PART and DENIED in PART, and the parties' letter motions for oral arguments are DENIED as moot.  Specifically, the Court dismisses with prejudice Plaintiffs' defamation allegations as to Statements 3, 8, 9, 14, and the New Statement, and denies Defendants' motion to dismiss the defamation claim as to Statement 12.  The Court further dismisses with prejudice Plaintiffs' tortious interference and intentional infliction of emotional distress allegations.

The Clerk of Court is respectfully directed to terminate the pending motions, Docs. 42,

45, 50.  The parties are directed to appear for a telephonic status conference at 11 a.m. on July 7,

2023.  The parties are directed to dial (877) 411-9748 and enter access code 3029857# when

prompted.

It is SO ORDERED.


Dated:    June 21, 2023
          New York, New York
                                                    _____

                                                         Edgardo Ramos, U.S.D.J.